UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.  05-60080-CIV-MARRA/JOHNSON
(Proceeding Ancillary to Case No. 03-80612-CIV-MARRA/JOHNSON)

COURT APPOINTED RECEIVER of LANCER
OFFSHORE, INC. and THE OMNIFUND, LTD.,

        Plaintiff,

vs.

THE CITCO GROUP LTD., CITCO FUND
SERVICES (CURACAO) N.V., CITCO FUND
SERVICES (USA) INC., INTER CARIBBEAN
SERVICES, LTD., ANTHONY STOCKS, KIERAN
CONROY, and DECLAN QUILLIGAN,

        Defendants.

_____/

## SECOND AMENDED COMPLAINT

(Jury Trial Demanded)

Plaintiff, Marty Steinberg, Esq., court-appointed Receiver (the "Receiver") of Lancer

Offshore Inc. ("Offshore") and The OmniFund Ltd. ("OmniFund," collectively the "Offshore

Funds"), through undersigned counsel, hereby sues Defendants, The Citco Group, Ltd. ("The

Citco Group"), Citco Fund Services (Curacao), N.V. ("Citco N.V."), Citco Fund Services (USA)

Inc. ("Citco USA"), (collectively referred to hereafter with The Citco Group and Citco N.V. as

"Citco" or the "Citco Defendants"), Inter Caribbean Services, Ltd. ("ICS"), a Citco entity that

served as a corporate director for OmniFund's predecessor funds, The Viator Fund ("Viator")

and The Orbiter Fund ("Orbiter")[1], and for Offshore from its inception until 1998, and three

individuals employed by the Citco Defendants–Anthony Stocks ("Stocks"), Kieran Conroy

---

[1] Unless otherwise specified, all references to OmniFund in this Complaint are meant to include Viator and Orbiter as the predecessor funds to OmniFund.

("Conroy"), and Declan Quilligan ("Quilligan"), each of whom served as Directors for Offshore (collectively with ICS as the "Director Defendants," and the Citco Defendants and the Director Defendants together as "Defendants").  The Receiver hereby demands trial by jury of all issues triable as of right by a jury and alleges upon information and belief the following:

## I.  INTRODUCTION

1.      The Receiver brings this action against the Offshore Funds' former fund administrators–the Citco Defendants  and the Director Defendants–for gross negligence, breach of fiduciary duty under common law and under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), aiding and abetting breach of fiduciary duties, professional malpractice, breach of the duty of good faith and fair dealing, and breach of contract because the Defendants are each directly and/or vicariously liable to the Funds for their misconduct.  The Receiver brings this action against the Director Defendants and the Citco Defendants for their actions and inactions that knowingly, willfully, recklessly, and/or with gross negligence breached their respective duties to the Offshore Funds.

2.      The Receiver was appointed by the Court in connection with a United States Securities and Exchange Commission ("SEC") enforcement action brought against the manager of the hedge funds, Michael Lauer ("Lauer"), and his management companies on July 8, 2003. This action is brought on behalf of the Offshore Funds only and asserts claims for damages caused directly to the Offshore Funds by its former fund administrators and directors, as opposed to any damages the fund administrators and directors may have caused to the Offshore Funds' investors and creditors.

3.      As set forth in detail below, Lauer depleted the Offshore Funds by investing millions of dollars constituting significant percentages of the Offshore Funds' total portfolios in a small number of companies whose shares were not listed on any major exchange and were

instead traded infrequently on the over-the-counter markets.  Lauer would use the Offshore
Funds' assets to acquire large and often controlling stakes in these companies by purchasing
securities with various restrictions on their trading through private transactions, even though
most of the companies had no earnings or even reasonable prospects for significant earnings.
After obtaining these restricted shares and in order to create a "high" net asset value ("NAV") for
the Offshore Funds at the end of the Offshore Funds' respective reporting periods, Lauer would
typically purchase a small number of unrestricted shares in these companies for no apparent
legitimate business purpose at a price much higher than either the original acquisition or historic
price in order to increase the Funds' NAV, upon which Citco's and Lauer's fees were based.
Rather than scrutinizing or questioning these transactions, the Citco Defendants and Director
Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their legal,
professional, common law, and statutory duties of care owed to the Funds by among other
actions and omissions detailed below, valuing *all* of the restricted and unrestricted shares owned
by the Offshore Funds at the higher price manufactured by Lauer's manipulative trading – all
without independently valuing the price of the securities to confirm that Lauer's conflicted
valuation method provided the *fair* value for these securities.

4.     Instead, Defendants knowingly and willfully rubberstamped Lauer's baseless
valuations, which also increased Citco's administrative fees.  As will be detailed below, even the
Citco Defendants and the Director Defendants believed that Lauer's claimed values were absurd,
yet knowingly, willfully, recklessly, and/or with gross negligence breached their legal,
professional, common law, and statutory duties owed to the Offshore Funds by approving these
baseless valuations to increase Citco's administrative fees, which were directly linked to the
Funds' inflated NAVs.  Further, Defendants knowingly, willfully, recklessly, and with gross

negligence breached their duties of care to the Funds by disseminating the false and inflated NAVs to investors and the Funds.

5.      Because of the inflated NAVs, Lauer depleted the Offshore Funds further by extracting huge management and incentive fees–fees that were determined based on the absurdly high purported NAVs for the Offshore Funds that Lauer had created.  The Citco Defendants also benefited from this inflation, as their administrative fees were directly tied to the NAVs of the Offshore Funds.   The Offshore Funds had total investor contributions of approximately $955,000,000.[2]  The Offshore Funds have been placed into Receivership by the Court, and are in the process of being liquidated.

6.      Each of the Defendants is directly and/or vicariously liable for the wrongdoing perpetuated on the Offshore Funds, as set forth more fully below in this Complaint.

7.      Citco actually created the Offshore Funds.  Specifically, a subsidiary of The Citco Group, Citco (B.V.I.) Ltd. ("Citco BVI"), incorporated the Funds in the British Virgin Islands ("BVI").  After incorporating the Funds, The Citco Group and Citco N.V. schemed to control every aspect of the Funds' operations because their lucrative administrative fees were directly tied to the value of the Offshore Funds' NAV.  Thus, Citco had a pecuniary incentive to increase the value of the Funds, despite knowing that Lauer's valuations of the Funds' NAV were baseless and unsupported, because as the Funds' NAV increased, Citco's administrative fees correspondingly increased.

8.      The Citco Group and Citco N.V. accomplished their goal to increase and maximize Citco's administrative fees by placing their own high-level employees and its

---

[2] All amounts referenced in the Complaint are a good faith estimate by the Receiver based on the documentation currently in his possession.  They remain subject to revisions as the Receiver obtains additional documentation and to the extent that the documentation currently in his possession is unreliable.

subsidiary/affiliate--the Director Defendants--on the Offshore Funds' boards of directors. Specifically, The Citco Group placed its employees Stocks and John Verhooren ("Verhooren") and its alter ego and/or agent ICS on the Offshore Funds' boards.  Stocks served as Director of the International Fund Services of The Citco Group, and Verhooren was the Operations Manager of International Fund Services Division of The Citco Group.  Stocks and Verhooren they acted within the scope of their employment and under the express authority of The Citco Group at all times while serving on the Offshore Funds' boards.  The Citco Group's subsidiary ICS was also dominated and controlled by The Citco Group in all of its actions and inactions on the Funds' boards and served as The Citco Group's alter ego and/or agent.  Citco N.V. placed its employees Conroy and Quilligan on the Funds' boards.  Conroy and Quilligan served as Managing Directors of Citco N.V. and acted within the scope of their employment and under the express authority of Citco N.V. at all times while serving on the Offshore Funds' boards.  The Offshore Funds paid Citco, not the Director Defendants, fees for the service of their employees and directors on the Offshore Funds' boards.

9.     The Citco Group, Citco USA, and Citco N.V. controlled and directed the inactions, actions, and votes of the individual Director Defendants.  By controlling the Offshore Funds' boards, The Citco Group, Citco USA, and Citco N.V. insidiously controlled every aspect of the Funds' management, valuations, and activities by controlling and directing the individual Director Defendants' decisions, votes, actions, inactions, and approval and/or acquiescence in Lauer's inflated values of the Funds' NAV while they served on the Funds' boards.

10.     The Citco Group and Citco N.V.'s placement of their own employees on the Funds' boards to control the Funds resulted in a hopeless conflict of interest because any increase in the NAV, by manipulation and inflation of the stock prices, increased Citco's

administrative fees.  Citco served as a vendor of the Offshore Funds with the objective of maximizing its administrative fees.  However, the Funds' objective was to obtain the maximum performance from its vendor, Citco, for the minimum cost.  Yet Citco negotiated to place its own high-level employees and its subsidiary/affiliate on the Offshore Funds' boards.  Citco's purpose was obvious–to protect its interests and maximize its fees and income from the Offshore Funds.

11.    The Defendants and Lauer's interests were adverse to the Funds because they all shared a pecuniary interest in inflating the Funds' NAV to increase and maximize their fees paid by the Offshore Funds.  Indeed, the Citco Defendants and the Director Defendants' interests were actually aligned with Lauer's interests due to their similar fee arrangement since Citco's administrative fees, like Lauer's management fees, were both calculated as a percentage of the Funds' inflated NAV.  The Citco Defendants and the Director Defendants were an integral and active participant in Lauer's scheme to inflate the Funds' NAV because they knowingly, willfully, recklessly and/or with gross negligence breached their legal, professional, common law, and statutory duties of care owed to the Offshore Funds by ratifying Lauer's baseless valuations without any independent verification, by approving and/or acquiescing in his false valuations, disseminating the erroneous inflated NAV to investors and the Funds, failing to complete any due diligence as to Lauer's manipulated valuations, and by failing to replace Lauer, reject his valuation policy, and/or control the Funds' management.   Simply stated, Lauer's scheme to inflate the Funds' NAV could not have been perpetuated without the active and willful participation of the Citco Defendants and the Director Defendants, and the Offshore Funds would not have been damaged but for the acts of the Defendants.

12.    The Director Defendants were never independent of The Citco Group, Citco USA, and Citco N.V., which exercised pervasive control over all of their actions.  Specifically,

The Citco Group controlled its alter ego and/or agent ICS and its employees Verhooren and Stocks' acts on the Funds' board in every manner, including controlling their actions and inactions, votes on board resolutions, and their approval and/or acquiescence in Lauer's inflated values, as well as every aspect of the Offshore Funds' administration via their conflicted insider roles.  Citco N.V. also controlled Quilligan's and Conroy's acts on Offshore's board in every manner, including controlling their actions and inactions, votes on board resolutions, and their approval and/or acquiescence in Lauer's inflated values, as well as every aspect of the Offshore Funds' administration via their conflicted insider roles.  Finally, William Keunen ("Keunen"), who at all times acted in his express authority as the Director of Fund Services of The Citco Group and an officer of Citco USA and/or within the scope of his employment with The Citco Group and Citco USA, controlled the Director Defendants on the Funds' board in every manner, including controlling their actions and inactions, votes on board resolutions, and their approval and/or acquiescence in Lauer's inflated values, as well as every aspect of the Offshore Funds' administration via their conflicted insider roles.

13.    Due to The Citco Group, Citco USA, and Citco N.V.'s pervasive control and domination over their actions, the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their legal, professional, common law, and statutory duties of care to the Funds to ensure that Citco got paid the inflated administrative fees, which were maximized by the Director Defendants' finalization, acquiescence, and/or approval of Lauer's manipulation of the stock prices and inflated NAVs, despite their duties and obligations to the Offshore Funds to independently value the Funds' holdings.

14.    Unlike typical directors, who would be paid individually, Citco N.V., Citco USA, and The Citco Group's strategy to control the Offshore Funds required payment of their

employees' directors fees to Citco, demonstrating the level of excessive control that Citco had over the Offshore Funds via their placement of the Director Defendants on the Funds' boards of directors.  Citco subsequently compensated the Director Defendants for their services on the Offshore Funds' boards, underscoring the Director Defendants' egregious conflict of interest with the Funds.

15.    At all times when serving on the Offshore Funds' boards, Directors Stocks, Conroy, and Quilligan were acting under the express authority of their employers and within the scope of their employment with The Citco Group and Citco N.V, which are liable under a theory of respondeat superior.

16.    Keunen, who acted at all times within his express authority and in the scope of his employment as The Citco Group's Director of Fund Services and as an officer of Citco USA, was directly involved in the misconduct at issue and through his role in administering the Funds on behalf of The Citco Group and Citco USA, which controlled his actions and are directly and/or vicariously liable for his misconduct.  The Offshore Funds did not select the Director Defendants to serve on their boards.  Rather, Keunen participated in the selection of the Director Defendants as directors of the Funds to cement Citco's control over the valuation and administration of the Offshore Funds to ensure that Citco's administrative fees correspondingly increased with the Funds' inflated NAVs.  Significantly, Keunen was not employed by Citco N.V.

17.    The extraordinary depletions of the Offshore Funds' assets, and the various other damages to the Offshore Funds, as discussed in detail below, would not have occurred but for the willful, wanton, reckless, and/or grossly negligent breaches of the Defendants, as described in this Complaint.

18.     Defendants each knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Funds by among other actions and omissions, failing to disclose the absurdity of the stock price manipulation and the valuations to the Funds' independent directors on the Funds' boards (i.e., directors without an adverse interest) (the "Independent Directors") and by failing to alert the investors, the Offshore Funds' auditors, or appropriate authorities to the Offshore Funds' true condition by approving and/or acquiescing in Lauer's grossly inflated valuations that also enhanced their own administration fees, which were based on these grossly inflated valuations.  Tellingly, all of these breaches resulted in Citco's pecuniary gain at the expense of the Offshore Funds.  Competent monthly portfolio valuations by the Citco Defendants and Director Defendants would have preserved hundreds of millions of dollars of value in the Offshore Funds in that: stock price manipulation and the resulting inflated NAVs would not have been permitted or disseminated to investors and the Funds' extraordinarily inflated management, incentive and administration fees would not have been paid; investments in illiquid, restricted stock would have stopped; payment of inflated redemption amounts based on the inflated NAVs would have been prevented; and the Offshore Funds would not have been able to remain in operation.

19.     During the time the Citco Defendants and the Director Defendants colluded to influence and control the Offshore Funds by infiltrating the Funds' boards with Citco employees that owed their only allegiance to Citco, both the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence took advantage of Lauer's stock price manipulation and inflated the Funds' NAV, and each knowingly and recklessly ignored numerous "red flags," breaching their duties of care to the Offshore Funds.  The "red flags" include the following: (a) there was a substantial increase in the Offshore Funds' value at a time

when global equity markets were performing poorly; (b) there was a substantial increase in the concentration of the Offshore Funds' holdings in a small number of thinly traded securities traded on the over-the-counter and bulletin board markets; (c) there was a substantial increase in the values attributed to the Offshore Funds' holdings in such securities; (d) there was a dramatic increase in the values given to large blocks of restricted stock that had been purchased for much lower prices; (e) there were small, end-of-period trades in the thinly traded stock of certain companies that served no business purpose other than to inflate the Offshore Funds' values; (f) the end-of-period trades and the corresponding increases in value of the Offshore Funds coincided with the calculation of Lauer's and the Citco Defendant's fees; (g) there was a substantial increase in the number of shares obtained by the Offshore Funds at little or even no cost through the exercise of warrants, options, or debt conversions, which were then valued at extraordinary amounts; and (h) the Defendants knowingly accepted and approved Lauer's absurd valuations.

20.     As a result of the Citco Defendants' and Director Defendants' violations of ERISA, gross negligence, breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, professional malpractice, breach of the implied duty of good faith and fair dealing, and separate and distinct breaches of contracts, the Offshore Funds themselves have been damaged in a number of ways.  First, the Offshore Funds paid millions of dollars in management and incentive fees to Lauer, administration fees to the Citco Defendants, and finder's fees to sales agents—all based on the inflated NAVs of the Offshore Funds.  If the Citco Defendants and the Director Defendants had performed their duties, these payments would never have been made. Second, the Offshore Funds made continuing "investments" in various suspect companies.  Had the Citco Defendants and the Director Defendants performed even minimal due diligence or

conducted proper valuation procedures, they would have discovered that the companies were grossly inflated as to value.  Third, the Offshore Funds paid out hundreds of millions of dollars in redemptions to investors based on inflated NAVs.  Fourth, the Offshore Funds were kept in operation, solicited additional investor funds, paid additional finder's fees, incurred additional obligations in the conduct of their business and disposed of assets long after they were insolvent, thereby further deepening the insolvency and the liabilities that the Offshore Funds are now unable to fully satisfy.

## II.  THE PARTIES

### A.     The Receiver

21.     The Receiver is a citizen of the State of Florida.  On July 8, 2003, the SEC filed a Complaint for Injunctive and Other Relief against Lauer, his management companies, and other entities before this Court in *SEC v. Michael Lauer, et al.,* Case No. 03-80612-CIV-Marra/Johnson.   On July 10, 2003, the Court entered a Receivership Order, directing the Receiver to "[i]nvestigate the manner in which the affairs of… Offshore [and] OmniFund… were conducted and institute such actions and legal proceedings, for their benefit and on their behalf, and on behalf of the Offshore Funds' investors and other creditors, as the Receiver deems necessary…."   The July 10, 2003, Order appointed the Plaintiff as receiver for Lancer Management Group LLC ("Lancer"), Lancer Management Group II LLC ("Lancer II"), Lancer Offshore Inc. ("Offshore"), OmniFund Ltd. ("OmniFund"), LSPV Inc. ("Offshore LSPV"), and LSPV LLC ("Partners LSPV"), and empowered the Receiver to bring this action on behalf of those entities.

22.     The Financial Services Commission ("FSC") of the British Virgin Islands, an enforcement agency comparable to the SEC, commenced an action in May 2003 against the

Offshore Funds seeking to appoint a liquidator to wind up the funds.  The FSC has agreed to stay its action while these Receivership proceedings continue in the United States.

**B.**     **The Director Defendants**

23.     Defendant Stocks resides in London, England.  The Citco Group selected Stocks, its Director of the International Fund Services division, to serve as a director of Offshore from 1995 until July 2001.  At all times while serving as a director of Offshore, Stocks acted within his express authority and in the scope of his employment as an employee of The Citco Group. Stocks is an English and Welch Chartered Accountant.  The Offshore Funds paid Citco, not Stocks, a fee for Stocks' services on Offshore's board.

24.     Defendant Conroy resides in Dublin, Ireland.  Citco N.V. selected Conroy, its Managing Director, to serve as a director of Offshore from 1998 until early 2002.  At all times while serving as a director of Offshore, Conroy acted within his express authority and in the scope of his employment as an employee of Citco N.V.  Conroy is also an Irish Chartered Accountant.  The Offshore Funds paid Citco, not Conroy, a fee for Conroy's services on Offshore's board.

25.     Defendant Quilligan resides in Curacao, Netherlands Antilles.  Citco N.V. selected Quilligan, its General Manager and Managing Director, to serve as a director of Offshore from 2001 until early 2002.  At all times while serving as a director of Offshore, Quilligan acted within his express authority and in the scope of his employment as an employee of Citco N.V.  Quilligan was involved intimately with the day-to-day operations at Citco N.V. related to Lancer.  Through his role as director and employment with Citco N.V., Quilligan traveled to New York to meet with Lancer personnel regarding various fund issues, including valuation.  Quilligan is not a chartered accountant but holds a Master's Degree in Accounting

from University College in Dublin, Ireland.  The Offshore Funds paid Citco, not Quilligan, a fee

for Quilligan's services on Offshore's board.

26.     Defendant, Inter Caribbean Services, Ltd. ("ICS"), is a corporation organized

under the laws of the British Virgin Islands and is one of The Citco Group's wholly-owned

subsidiaries.  The Citco Group selected ICS to serve as a director of Offshore from 1995 until

1998, as a director of Orbiter from its inception in January 1999 until its merger with Viator into

OmniFund on March 31, 2002, and as a director of Viator from its inception in September 1999,

until its merger with Orbiter into OmniFund on March 31, 2002.  The Offshore Funds paid Citco,

not ICS, a fee for ICS's services on the Funds' board.

27.      ICS is the alter ego and/or agent of The Citco Group.

28.     The Director Defendants and Citco N.V. continuously and systematically

communicated with United States and Florida investors regarding subscriptions, redemptions,

and valuations of the Offshore Funds, as evidenced by correspondence attached hereto as

Composite Exhibit "A."

**C.     The Citco Defendants --The Citco Group, Citco N.V., and Citco USA**

**1.     Citco N.V.**

29.     Citco N.V. is the Curacao-based wholly-owned operating subsidiary of The Citco

Group.  It is a business entity organized and existing under the laws of the Netherlands Antilles,

having its principal place of business at Kaya Flamboyan 9, P.O. Box 812, Curacao, Netherlands

Antilles and Citco Building, Wickams Cay, Road Town, Tortola, British Virgin Islands.[3]

---

[3] Citco Fund Services-BVI/Citco B.V.I. shares this Tortola, British Virgin Islands address with Citco N.V. and is also the registered agent for Omnifund and Offshore.

30.     Citco N.V. performs extensive fund management services for investment funds operated from the United States.

31.     Citco N.V. performed extensive fund management services for Offshore and OmniFund while those funds were operated and managed by Lauer and Lancer Management Group, LLC ("Lancer Management") from executive offices located in New York City and Connecticut.  These services included, but were not limited to:

a.     Collecting thousands of wire transfers from investors–both new investors and investors increasing their investment–through a bank account located in New York at Republic National Bank of New York, now known as HSBC Bank ("HSBC"), in an account held in the name of Citco Banking Corporation N.V.;

b.     Providing a bank account with Citco Banking Corporation, N.V., located in New York, for the Offshore Funds;

c.     Continuously and systematically issuing NAV statements to investors based in the United States, including at least one investor in Florida, attached hereto as Composite Exhibit "B";

d.     Issuing thousands of NAV statements to New York-based Lancer personnel;

e.     Continuously and systematically issuing invoices to New York-based Lancer offices;

f.     Communicating on a systematic and continuous basis with the New York and Connecticut Lancer offices regarding issues of fund governance, subscriptions, and valuation;

g.     Communicating on a systematic and continuous basis with United States and Florida investors and associated third parties as a conduit for information from Lauer and the Offshore Funds, including without limitation letters from Lauer, confirmation of subscriptions and redemptions, reviews of the Offshore Funds; status of the investors' accounts; and responses to investor inquiries as evidenced by true and correct copies of such correspondence, attached hereto as Composite Exhibit "C";

h.     Continuously and systematically communicating and coordinating with Citco USA and Citco Technology Management Inc. in Florida to provide portfolio valuation services and technology infrastructure;

i.     Selecting and placing its employees, Conroy and Quilligan, on the Offshore Funds' boards to serve as directors in exchange for payment from the Offshore Funds to Citco N.V.; and

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

> j.      Controlling and directing the omissions, actions, decisions, and votes of its employees Conroy and Quilligan on the Funds' boards.

32.     Citco N.V. is the largest division of the Citco Fund Services group.  Citco N.V. provides full service administration to 205 funds, totaling $44.9 billion in assets and employing 115 people.  When requesting payment from Lancer for fund administration services, Citco N.V. provided bank wire transfer information for such payments to be made.  These payments could be sent to one of three places: a Citco Banking Corporation account in Curacao, a bank account at a Citibank branch in New York, New York, or a Citibank-owned post office box located in Philadelphia, Pennsylvania.   Citco N.V. and the Director Defendants continuously and systematically issued these invoices via fax to Lancer's New York offices, as evidenced by true and correct copies of the invoices, attached hereto as Composite Exhibit "D."

33.     Citco N.V. and the Director Defendants issued these invoices to the Offshore Funds for administrative services including, without limitation, "preparation of net asset value statements, acting as the Fund's Registrar and Transfer Agent, maintaining the Shareholders Register, communications with Shareholders, Auditors and Third Parties, arranging of the payment of fees and other expenses."  A true and correct copy of this invoice from Citco N.V to the Orbiter Fund is attached hereto as Exhibit "E."

34.     Each investor in the Funds was required to execute a Subscription Agreement and Revocable Proxy (the "Revocable Proxy"), which is attached hereto as Exhibit "F."   The Revocable Proxy designated and appointed Citco N.V. as the "Investor's true and lawful proxy and attorney-in-fact to vote the Shares being subscribed for by the Investor for the Investor at any annual or special meeting of shareholders for all matters proposed by the Board of Directors of the Fund (the "Board"), including, without limitation, for the election of members to the Board and appointment of independent auditors for the Fund."

## 2.   **The Citco Group**

35.     The Citco Group is an integrated financial services holding company that operates through numerous wholly-owned subsidiaries.  According to a recent marketing brochure for The Citco Group, the services offered by The Citco Group include corporate and fiduciary services, fund administration and shareholder services, custody and banking services, fund advisory and brokerage services, and international pension services.  The Citco Group's principal place of business is at Corporate Centre, West Bay Road, Grand Cayman, Cayman Islands-British West Indies.

36.     The Citco Group does not earn any revenue independent of the revenue generated by its subsidiaries, and it serves as the vehicle by which its operating subsidiaries procure business from and conduct extensive fund management services for funds operated from within the United States and around the world.  The Citco Group also maintains offices outside the United States and around the world, including offices in Curacao.

37.     The Citco Group maintains offices throughout the United States, with multiple offices located in Pennsylvania, New York, California, and Florida.  In serving the interests of its operating subsidiaries, The Citco Group and its immediate subsidiaries conduct extensive business, administrative, and marketing operations within the United States and the Southern District of Florida.  In fact, three of The Citco Group's United States subsidiaries are Florida corporations with their respective principal places of business located in the Southern District of Florida.  These subsidiaries include Citco Technology Management, Inc., which has its principal place of business located in Fort Lauderdale, Florida, and maintains all of The Citco Group's technology infrastructure.  In addition, Citco Corporate Services, Inc. shares its principal place of business in Miami, Florida with Defendant Citco USA and serves as Citco USA's registered agent in Florida.

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

38.     The Citco Group holds its network of subsidiaries out as the world's top providers of hedge fund administration services.  The Citco Group claims that its wholly owned operating subsidiaries administer more than 1,000 funds worldwide–almost 30% of the global hedge fund management market, allegedly representing a combined net asset value of more than $110 billion.

39.     Citco N.V. serves as The Citco Group's actual and apparent agent.

40.     Citco USA and Citco N.V. hold themselves out as offices of The Citco Group.  Indeed, on The Citco Group's website (*http://www.citco.com/locations.jsp*), Citco USA and Citco N.V. are listed as offices of The Citco Group network.  All of The Citco Group's subsidiaries, divisions, and offices are referred to throughout the website only as "Citco."  Similarly, all of The Citco Group subsidiaries use the same "Citco" logo on their letterhead, and on each of The Citco Group subsidiaries' stationary, lists all the places where The Citco Group affiliates are located–again emphasizing the integrated, global nature of The Citco Group.

41.     The managing director of each office of The Citco Group that provides fund administration services–including Citco N.V.–takes direction from and reports to Keunen, the Director of Fund Services for The Citco Group.  Keunen, in turn, takes direction from and reports to the four-person executive committee for The Citco Group.

42.     The Citco Group represents that its operating subsidiaries combined constitute a "global fund administrator" and that its operating subsidiaries' ability to administer funds in offices throughout the world renders the combined enterprise able to provide a "consistent service platform."

43.     The Citco Group asserts that its operating subsidiaries allow their personnel "the ability to transfer between offices and divisions" in order to maintain consistent levels of performance worldwide.

44.     Substantially all information regarding hedge funds administered by any of The Citco Group's offices is maintained in a centralized database that can be accessed by the fund manager.   Indeed, the Citco website (*http://www.citco.com/funds/services_online.htm*) touts: "This online reporting service is available to Fund Managers of Funds administered by *any* of the Citco Fund Services offices."  (Emphasis supplied).

45.     The Citco Group's website also contains a brochure that describes a sophisticated, integrated computer system containing all client information that is located in Fort Lauderdale, Florida, and operated by Citco Technology Management, Inc.:

> Citco's dedicated Information Technology Group, based in Fort Lauderdale, Florida is responsible for maintaining and monitoring all software and hardware configurations, and network support. The group also maintains Citco's exclusive database of security information (CDS Citco Data Source), providing prices and corporate actions for US and non-US securities, with integrated cross-reference identification codes, using multiple vendors such as Interactive Data Corporation (IDC), Reuters, Bloomberg and Telekurs.  Each office is set up with a dedicated team of on-site IT staff to monitor daily operations and tailor needs of our clients.

*See http://www.citco.com/funds/CitcoFundServicesBrochure.pdf.*

46.     The Citco Group holds itself out as an integrated network of entities that is an expert in valuing securities.

47.     In addition, Citco USA maintains a sophisticated, trademarked software system called "Ephesus," which has "fully integrated general ledger capabilities…."  This software system includes "an order entry and order acceptance based system to process subscriptions, redemptions (including cash tracking), transfers and switches," and a sophisticated intranet.  This

software is available to and used by the rest of The Citco Group's entities around the world, including Citco N.V.

48.     In fact, in a letter dated July 31, 1999, and on Citco Technology Management, Inc. letterhead (attached hereto as Exhibit "G"), The Citco Group reassured Citco N.V. clients regarding Year 2000 compliance issues with Ephesus and other computer-related issues.  The letter stated, in relevant part:

> Year 2000 readiness statement for *Citco Funds Services* as of July 31st 1999:
>
> The purpose of this letter is to update you on the progress *Citco* is making with Year 2000 compliance.
>
>          \*      \*      \*
>
> *Citco's* core proprietary systems, Ephesus, our Fund Accounting Package, and Global Shareholder System (GSS), our Shareholder Record keeping system already store 4 digit years.
>
>          \*      \*      \*
>
> As a result of these efforts, *Citco Funds Services* is pleased to advise you that we are confident we will have no significant disruptions to our internal systems.
>
>          \*      \*      \*
>
> If you require additional information, please feel free to call me at our Ft. Lauderdale USA office at 954-351-7275 or E-Mail me at SHEIBLUM@CITCO.COM.

(Emphasis added).

49.     The Citco Group selected its employees, Verhooren and Stocks, and its alter ego and/or agent ICS to serve on Offshore Funds' boards to ensure The Citco Group's control over every aspect of the Offshore Funds' management and to increase Citco's administrative fees. Specifically, The Citco Group directed the Funds' policies and procedures via its employees

Verhooren and Stocks and its alter ego and/or agent ICS.  Yet the Offshore Funds paid Citco the fees for Verhooren's, Stocks' and ICS' services on the Funds' boards.

### 3.     Citco USA

50.     Citco USA is a Florida Corporation with its principal place of business located at 701 Brickell Avenue, 12th Floor, Miami, Florida.

51.     In addition to serving as Director of Fund Services for The Citco Group, Keunen is an officer of Citco USA, is a chartered accountant in England, is resident in the Citco USA Miami office, and resides in the Southern District of Florida.

52.     Citco N.V. served as Citco USA's actual and apparent agent.

53.     While acting under his express authority and in the scope of his employment as a Director of The Citco Group and as an officer of Citco USA, and operating from one of The Citco Group's Miami offices, Keunen selected, directed, controlled and instructed other Citco employees who were directors of the Offshore Funds.  Keunen received and responded to both internal and external e-mail inquiries regarding the Offshore Funds, received and responded to correspondence regarding the Offshore Funds, and engaged in meetings and telephone discussions with various Lancer and Citco personnel regarding the Offshore Funds.  Further, Keunen communicated with all of The Citco Group's executive directors regarding the Funds' artificially inflated NAV when The Citco Group, Citco USA, and Citco N.V. were searching for an "exit strategy" in May 2002 in an attempt to extricate themselves from liability to the detriment of the Offshore Funds, despite internally acknowledging Citco's and the Director Defendants' breaches of duties owed to the Offshore Funds.  Finally, Keunen directed the dissemination of the erroneous NAVs associated with the Offshore Funds into the United States and Florida.

54.     Keunen initiated contact in June 2001 with the New York office of PricewaterhouseCoopers ("PwC"), the international auditing firm whose Curacao office was responsible for auditing the Offshore Funds.  Keunen made this contact to engage in a conference call with PwC officials regarding fund valuation issues in an effort to avoid liability for Citco's pernicious wrongdoing regarding the Offshore Funds.

### III.  <u>JURISDICTION AND VENUE</u>

55.     This Court has original, ancillary and/or supplemental subject matter jurisdiction over all claims at issue in this action pursuant to, *inter alia*, 15 U.S.C. § 78aa, 28 U.S.C. § 1367, and the doctrines of pendant and ancillary jurisdiction.  This Court has original, ancillary and/or supplemental subject matter jurisdiction with respect to claims under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), pursuant to 29 U.S.C. § 1132(e)(1) and ERISA § 502(e)(1).

56.     This Court has general personal jurisdiction over each of the Defendants under Florida Statutes § 48.193(2) and the United States Constitution by virtue of the Defendants' substantial, continuous, and regular contacts with Florida.

57.     Further, this Court has personal jurisdiction over all of the Defendants under Florida Statues § 48.193(2) and the United States Constitution by virtue of The Citco Group's substantial, continuous, and regular contacts with Florida, which contacts may be imputed to the Director Defendants and Citco N.V. because of The Citco Group and Citco-USA's role as the Director Defendants' and Citco N.V.'s agents in the United States and Florida.

58.     Alternatively, this Court has specific personal jurisdiction over Defendants under Florida Statutes § 48.193(1)(a) and the United States Constitution by virtue of the Defendants operating, conducting, engaging in, and/or carrying on a business in Florida.  The Defendants' breaches of duties and gross negligence arise out of the Defendants' engaging in business in

Florida.  Specifically, the Defendants continuously place its marketing materials in Florida's stream of commerce, maintain offices in the Southern District of Florida, maintain an integrated computer system containing all of the Defendants' client information in the Southern District of Florida, continuously and systematically communicate and coordinate with its offices located in the Southern District of Florida, and direct the Offshore Funds investors to contact the Defendants' offices located in the Southern District of Florida.

59.     This Court has specific personal jurisdiction over each of the Defendants under Florida Statutes § 48.193(1)(b) and the United States Constitution by virtue of the Defendants' participation in the grossly negligent management and breaches of duties committed by the insiders of Offshore and OmniFund, which occurred in the United States and Florida and caused injury in the United States and Florida.

60.     This Court has specific personal jurisdiction over each of the Defendants under Florida Statutes § 48.193(1)(b) and the United States Constitution because of the Defendants' grossly negligent management of the Funds and breaches of duties, which occurred in Florida and caused injury in Florida by virtue of the Defendants' offices located in the Southern District of Florida and the Defendants' integrated computer system located in the Southern District of Florida, containing all of the Defendants' client information and the Offshore Funds' erroneous NAVs, which were knowingly disseminated by the Defendants to United States and Florida investors.

61.     Finally, this Court has personal jurisdiction over each of the Defendants pursuant to the nationwide service of process allowed under 28 U.S.C. §§ 754[4] and 1692 and the Defendants' continuous and systematic contacts with the United States.

---

[4] The Receiver has complied with the filing requirements of 28 U.S.C. § 754.

62.    By Citco N.V.'s continuous and systematic contacts with the United States and Florida; by Citco N.V.'s engaging in a business in Florida; by committing tortious activity in the United States and Florida and causing injury in the United States and Florida; by issuing thousands of erroneous NAV statements to New York-based Lancer personnel, United States investors, and at least one Florida investor; by continuously and systematically communicating and coordinating with Citco USA and Citco Technology Management, Inc. located in the Southern District of Florida; by continuously and systematically maintaining its computer database containing all of Citco N.V.'s client information, including the value of United States-based securities, and the Offshore Funds' bogus valuations in the Southern District of Florida; by continuously and systematically collecting millions of dollars in wire transfers from United States and Florida investors through a bank account located in New York; by continuously and systematically directing the Funds to wire payment to bank accounts in Philadelphia and/or New York; by holding itself out as an office of The Citco Group; by communicating on a systematic and continuous basis with United States and Florida investors as a conduit for information from Lauer and the Offshore Funds; by continuously and systematically issuing invoices to New York-based Lancer offices; by continuously and systematically using a software platform maintained by Citco USA; by directing Citco-N.V. clients to contact "our Ft. Lauderdale USA office at 954-351-7275;" by continuously and systematically reporting to Citco USA and Keunen, an officer of Citco USA and a resident of the Southern District of Florida; by Keunen's direct participation in the administration of the Offshore Funds and the misconduct at issue while he was in Florida, and by collecting fees from monies obtained or solicited in the United States, which were inflated based on its own misconduct, personal jurisdiction is proper over Citco N.V. under Florida Statutes §§ 48.193(1)(a)-(b),(2) and 28 U.S.C. §§ 754 and 1692.

63.     By The Citco Group's continuous and systematic contacts with the United States and Florida; by The Citco Group's Florida subsidiaries conducting business in Florida as The Citco Group's agents; by The Citco Group's engaging in a business in Florida; by committing tortious activity in the United States and Florida and causing injury in the United States and Florida; by continuously and systematically maintaining numerous offices throughout the United States, including offices located in Pennsylvania, New York, California, and the Southern District of Florida; by continuously and systematically holding itself out with its United States and Florida subsidiaries as an integrated corporation; by continuously and systematically conducting extensive business administrative and marketing operations within the United States and Florida; by continuously and systematically maintaining three subsidiaries with their principal places of business located in the Southern District of Florida; by continuously and systematically maintaining its computer database containing all of The Citco Group's client information and the Offshore Funds' bogus valuations, including the value of United States-based securities in the Southern District of Florida; by directing Citco-N.V. clients to contact "our Ft. Lauderdale USA office at 954-351-7275;" by continuously and systematically using a software platform maintained by Citco USA; and by virtue of Keunen, a resident of the Southern District of Florida and officer of Citco USA, who also serves as Director of Fund Services for The Citco Group and continuously and systematically directed and controlled the Director Defendants who were employed by various Citco entities and served on the Funds' boards while acting in the scope of their employment with Citco as well as the issuance of erroneous NAVs for the Offshore Funds into the United States and Florida; and by Keunen's direct participation in the administration of the Offshore Funds and the misconduct at issue while he was in Florida,

personal jurisdiction is proper over The Citco Group under Florida Statutes §§ 48.193(1)(a)-(b),(2) and 28 U.S.C. §§ 754 and 1692.

64.     By The Citco Group's and Citco N.V's continuous and systematic contacts with the United States and Florida; by The Citco Group and Citco N.V.'s engaging in a business in Florida and the United States by and through Citco-USA and Citco Technology Management, Inc. and by Citco-USA's conducting business in Florida, whose contacts may be imputed to the Director Defendants because of The Citco Group, Citco-N.V., and Citco USA's roles as the Director Defendants' agents in the United States; by committing tortious activity in the United States and Florida and causing injury in the United States and Florida; by continuously and systematically communicating with the Offshore offices in New York and Connecticut; by continuously and systematically communicating with the Defendants' United States and Southern District of Florida offices, including Citco USA; by continuously and systematically traveling to the United States in their role as fund directors and fund administrators; by continuously and systematically communicating with United States and Florida investors regarding subscriptions, redemptions, and valuations of the Offshore Funds; by continuously and systematically engaging in marketing services in the United States and Florida; by serving as directors to the Offshore Funds, which invested in United States securities, were managed out of offices in Connecticut and New York, and which had United States and Florida investors; and by continuously and systematically taking directions from and reporting to Keunen, an officer of Citco USA and a resident of the Southern District of Florida, who directed and controlled  the Director Defendants who were employed by various Citco entities and served on the Funds' boards while acting in the scope of their employment with Citco as well as the issuance of erroneous NAVs for the Offshore Funds into the United States and Florida, personal jurisdiction

is proper over the Director Defendants under Florida Statutes §§ 48.193(1)(a)-(b),(2) and 28 U.S.C. §§ 754 and 1692.

65.     By Citco USA's continuous and systematic contacts with the United States and Florida; by Citco USA's conducting a business in Florida as a Florida Corporation with its principal place of business located in the Southern District of Florida; by committing tortious activity in the United States and Florida and causing injury in the United States and Florida; by holding itself out as an office of The Citco Group; by maintaining a sophisticated trademarked software system that provides a platform for subscriptions and redemptions used by The Citco Group and Citco N.V.; and by virtue of Keunen, an officer of Citco USA and a resident of the Southern District of Florida, who directed and controlled the Director Defendants who were employed by various Citco entities and served on the Funds' boards while acting in the scope of their employment with Citco as well as the issuance of erroneous NAVs for the Offshore Funds into the United States and Florida,  personal jurisdiction is proper over Citco USA under Florida Statutes §§ 48.193(1)(a)-(b),(2) and 28 U.S.C. §§ 754 and 1692.

66.     Venue is proper before this Court pursuant to 28 U.S.C. § 1409.  Venue is also proper in this Court for the ERISA claims pursuant to 29 U.S.C. § 1132(e)(2) and ERISA § 502(e)(2).

67.     Additionally, venue is proper in this Court pursuant to 28 U.S.C. §§ 754 and 1692.

### IV.  FORMATION AND ORGANIZATION OF THE LANCER ENTITIES

68.     Lauer is a resident of Connecticut and is a hedge fund manager.  Lauer is the founder, manager, and sole shareholder of Lancer Management, a Connecticut limited liability company that acted as the investment manager for the Offshore Funds.  Lauer also is the *de facto*

investment manager for the Offshore Funds.  Lauer incorporated Lancer Management in Connecticut in 1997.

69.    Lauer organized Offshore, a British Virgin Islands international business company, in 1995 as an offshore hedge fund for the purpose of investing in securities.  However, a subsidiary of The Citco Group, Citco BVI, actually prepared and filed the Articles of Association to incorporate the Offshore Funds in the BVI.  From its inception in 1995 until the appointment of the Receiver on July 10, 2003, Offshore had approximately $906,000,000 of investor funds under management.  Offshore was listed on the Irish Stock Exchange from December 24, 1998 through April 2003.

70.    The Offshore Funds were open-ended investment funds, a defining feature of which is the ability of investors to purchase and redeem shares at a net asset value per share ("NAV/share").  Unlike ordinary public companies, the share prices of the Offshore Funds did not fluctuate as a function of the supply and demand for their shares.  Rather, the price of a share in an open-end investment fund is solely a function of the calculated NAV/share of the fund. The principal factors in the calculation of the NAV/share of a fund are the value of the portfolio of securities held by the fund on the date of the calculation and the number of shares the fund has issued.

71.    The Offshore Funds were not registered with the SEC, were open only to accredited investors with a certain minimum net worth, had limited redemption windows, and provided limited information concerning both the identity of the securities in the investment portfolio and the funds' investment strategies.  Investors were solicited all over the world, including in Florida, to invest in the Offshore Funds primarily through sales agents using a private placement memoranda ("PPM") and other marketing materials.  For these very reasons,

the Offshore Funds and their investors relied heavily on the NAV prepared by Citco N.V. and by Keunen, who was acting within his express authority as an officer of Citco USA and a director of The Citco Group, and the Director Defendants as well as the business acumen, industry reputation, and other oversight services the Citco Defendants and the Director Defendants represented they would provide.

72.     Lauer was also the founder, sole manager, and sole shareholder of Lancer Management, the management company that served as the investment advisor to the Offshore Funds.  In its capacity as investment advisor, Lancer Management was responsible for identifying and purchasing all investment positions held by the Offshore Funds.  The Offshore Funds paid management and incentive fees to Lancer Management, ostensibly for the use of Lauer's expertise in selecting investment positions for the Offshore Funds.  As the sole shareholder of Lancer Management, Lauer was the sole beneficiary of its income.

73.     Lancer Management's fee for managing Offshore was 1% per year of the total funds under management for each investor and was calculated by multiplying Offshore's NAV at the beginning of each fiscal quarter by 0.25%.  Lancer Management also received an incentive fee equal to 20% of the net profits of Offshore, including any unrealized gain, as calculated on the last day of Offshore's fiscal year.  This incentive fee was also dependent on the Funds' NAV.

74.     Citco BVI incorporated OmniFund, another British Virgin Islands international business company, through the March 2002 merger of two pre-existing funds, namely, Orbiter Fund, Ltd. ("Orbiter") and Viator Fund, Ltd. ("Viator").  Citco BVI incorporated both Orbiter and Viator in 1999 as British Virgin Islands international business corporations for the purpose of investing in securities.  From its inception in 1999 to the appointment of the Receiver on July 10, 2003, investors invested approximately $49,000,000 in OmniFund.

75.   Lancer Management's advisory fee for managing OmniFund was 2% per year of the total funds under management for each investor and was calculated by multiplying OmniFund's NAV at the beginning of each fiscal quarter by 0.5%.  Lancer Management also received an "incentive fee" equal to 25% of the net profits of OmniFund, as calculated on the last day of OmniFund's fiscal year.  This incentive fee was also dependent on the Funds' NAV.

76.   Prior to the formation of OmniFund, Lancer Management's fee for managing Orbiter was 1.5% per year and was calculated by multiplying Orbiter's NAV at the beginning of each fiscal quarter by 0.375%.  Lancer Management also received an incentive fee equal to 50% of the net profits of Orbiter, including any unrealized gain, as calculated on the last day of Orbiter's fiscal year.  This incentive fee was also dependent on the Funds' NAV.

77.   Prior to the formation of OmniFund, Lancer Management's fee for managing Viator was 1% per year and was calculated by multiplying Viator's NAV at the beginning of each fiscal quarter by 0.25% of the total funds under management for each investor.  Lancer Management also received an incentive fee equal to 25% of the net profits of Viator, including any unrealized gain, as calculated on the last day of Viator's fiscal year.  This incentive fee was also dependent on the Funds' NAV.

78.   This fee structure provided Lauer–the eventual beneficiary of the fees paid by the Offshore Funds to Lancer Management–with the incentive to artificially inflate the value of the Offshore Funds' holdings.  Since his fees were calculated as a percentage of the NAV, a higher NAV necessarily results in higher fees.

79.   Lauer's interests were thus adverse to the Offshore Funds' interests.  Each of the Defendants had actual knowledge of Lauer's adverse interests.  In fact, the Citco Defendants' interests were also adverse to the Offshore Funds and aligned with Lauer's interests, since

Citco's administrative fees were also calculated as a percentage of the Funds' NAV.  Lauer's interests were to maximize his management and incentive fees by causing the Offshore Funds to invest in securities and engage in trading practices that could be used to inflate the Offshore Funds' purported NAVs, regardless of whether such investments ultimately benefited the Offshore Funds.  As will be discussed below, that is precisely what Lauer did.

## V.  DUTIES OWED BY THE DEFENDANTS TO THE OFFSHORE FUNDS

### A.      Standards and Responsibilities Of The Defendants

80.     In addition to the legal, professional, common law, and statutory duties of care owed by each Defendant to the Offshore Funds, various sources and documents set forth the responsibilities and standards to which the Citco Defendants and the Director Defendants were held.  These sources include the Offshore Funds' Articles of Association, agreements among the Citco Defendants and the Offshore Funds, the PPM for the Offshore Funds, the "Sound Practices" Manual, and the Citco Defendants' own pronouncements regarding appropriate conduct for hedge fund administrators.

### 1.      Articles of Association/Investment Management Agreement

81.     The Citco Defendants formed and incorporated the Offshore Funds in the BVI. Specifically, Citco BVI, a wholly-owned subsidiary of The Citco Group and an affiliate of Citco N.V. and Citco USA, prepared and filed the Articles of Association for the Offshore Funds, demonstrating Citco's high level of control over the Offshore Funds from their inception.  A true and correct copy of the Articles of Association for Offshore is attached hereto as Exhibit "H" and is incorporated herein by reference.

82.     In relevant part, Offshore's Articles of Association required the Citco Defendants, as fund administrator, to determine Offshore's NAV on a monthly basis "in accordance with generally accepted accounting principles in the United States."  In addition, the Director

Defendants were required by the Articles of Association to consider whether prices generated in a securities' principal market–defined as the securities market that in the opinion of the Funds' directors was the sole securities market upon which such investments were listed, quoted or traded, including any over-the-counter market or recognized exchange–reflected the investment's true value and whether some other valuation method should be used that better reflect the investment's fair value.

83.     Further, the Articles of Association provide that the first Directors of Offshore "shall be elected by the subscriber to the Memorandum [of Association]; and thereafter, Directors shall be elected by the Members for such term as the Members determine….  [A] vacancy in the board of Directors may be filled by resolution of the remaining Directors." Significantly, the "subscriber" that elected the first directors was Citco BVI.  Upon information and belief, Keunen, while acting in his express authority as Director of Fund Services of The Citco Group and as an officer of Citco USA and/or in the scope of his employment with these entities, orchestrated the appointment of the Director Defendants to the Funds' boards to solidify The Citco Group and Citco N.V.'s control over the Offshore Funds and to ensure that Citco's administrative fees would increase.  Keunen, while acting in his express authority and/or in the scope of his employment as Director of Fund Services of The Citco Group and as an officer of Citco USA, also controlled the Director Defendants' actions and inactions on the Funds' boards.

84.     The Director Defendants' authority or control respecting the management or disposition of Offshore's assets included, but was not limited to their responsibility to appoint, monitor, and if necessary, replace Lancer Management in accordance with the Investment Management Agreement between Lancer Management and Offshore dated January 1, 1998 ("Investment Management Agreement"), which provides that Lancer Management is authorized

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

to invest Offshore's assets "subject to the policies and control of the Board of Directors."  The Investment Management Agreement is attached as Exhibit "I."

85.     The Director Defendants had authority to "apply any part of the assets of [Offshore] in the acquisition of any Investments as they shall in their absolute discretion determine" in accordance with the Articles of Association of Offshore.

86.     The Directors Defendants had the authority, control, and responsibility to manage and/or dispose of the Funds' assets including, but not limited to, their authority to "apply any part of the assets of [Offshore] in the acquisition of any Investments as they shall in their absolute discretion determine" in accordance with section 11 of the Articles of Association of Offshore.

87.     The Director Defendants had the authority or control to "suspend redemption rights for all Shareholders when, in the opinion of the Board of Directors, disposal of part or all of the Fund's assets, or determination of Net Asset Value… would not be reasonable or practicable or would be prejudicial to the Shareholders," and "to terminate the Fund at any time for any reason," in accordance with the Offshore Private Placement Memorandum.

88.     The Director Defendants were responsible to meet at least annually to review and assess the investment policy and investment performance of Offshore.

89.     Offshore's Articles of Association  provided that the Director Defendants had the power to "appoint any person or persons as manager of [Offshore] to exercise all or any of the duties, powers, and discretions exercisable by the Directors upon such terms and conditions and for such period and with such restrictions as the Directors think fit."

90.     Offshore's Articles of Association further required the Director Defendants to manage Offshore's entire business and affairs.  Specific items identified therein included not

only determining Offshore's NAV but also issuing shares, maintaining a share registry, keeping proper accounts in accordance with generally accepted accounting principles ("GAAP"), generating balance sheets for Offshore's general meetings, and hiring auditors, attorneys, and other service providers.

91.     The Citco Group, Citco USA, and Citco N.V. absolutely controlled the Director Defendants' votes, decisions, inactions, and actions while they served on the Offshore Funds' boards.

92.     Specifically, the Director Defendants were acting within their express authority and in the scope of their employment with The Citco Group and Citco N.V. while serving on the Funds' boards.  The Citco Group and Citco N.V. also owed legal, professional, common law and statutory duties to the Offshore Funds via respondeat superior, as set forth more fully below.

93.     Keunen, while acting within the express authority and in the scope of his employment as an officer of Citco USA and a director of The Citco Group, controlled, instructed, and directed the Director Defendants' actions and inactions on the Funds' boards. Via Keunen, Citco USA and The Citco Group assumed legal, professional, common law and statutory duties to the Offshore Funds.

94.     The Citco Defendants, therefore, assumed these extra services and obligations toward the Offshore Funds separate and distinct from their contractual responsibilities.

95.     The Citco Defendants and the Director Defendants, as fiduciaries of the Funds, owed the Offshore Funds a duty of loyalty, a duty to manage the Funds in a prudent manner, a duty of good faith in exercising its duties of care, and fiduciary duties, and a duty to remain free from conflicts of interest.

**B.**     **Citco Service Agreements with the Offshore Funds**

96.     Citco N.V. had Administrative Agreements with the Offshore Funds (the "Citco Agreements") from 1996 through its resignation in 2002.  The Citco Agreements with Offshore, Orbiter, and Viator are attached hereto as Exhibits "J," "K," and "L," respectively, and are incorporated herein by reference.

97.     In relevant part, the Citco Agreements required Citco N.V. to prepare and maintain all financial and accounting books and records of the Offshore Funds, compute monthly NAVs, independently price the Offshore Funds, hire all such attorneys, auditors, and other service providers as were necessary, and provide directors to each of the Offshore Funds in exchange for a fee.  In return for these services, the Citco Defendants received administrative and director fees from the Offshore Funds based on the NAV for each Offshore Fund as well as an additional monthly fee for the directors Citco provided to each of the Offshore Funds.  In other words, the Citco Defendants also had an incentive to establish, conspire with Lauer, and/or turn a blind eye toward Lauer's inflation of the NAVs.

98.     Pursuant to the Citco Agreements, the Director Defendants were charged with supervising Citco N.V. in its role as the Funds' contractual administrator.

99.     The Citco Group and Citco USA directly controlled Citco N.V.'s administration of the Offshore Funds directly and via theories of vicarious liability, as set forth more fully below.

**C.**     **The Private Placement Memoranda**

100.     Lauer issued separate PPMs for Offshore (the "Offshore PPM") and for OmniFund (the "Omnifund PPM").  Both PPMs provide that the Offshore Funds' total net asset values should be determined "in accordance with generally accepted accounting principles."

101.    Both PPMs further assured investors and prospective investors that they could rely on the Citco Defendants, as described in the following excerpt:

<u>The Administrator</u>

CITCO Fund Services (Curacao) N.V. (the "Administrator") has been retained by the Fund to perform administrative services for the Fund.  Pursuant to an Administration Agreement entered into between the Fund and the Administrator (the "Administration Agreement"), the Administrator is responsible for, among other things: (i) maintaining the register of Shareholders of the Fund and generally performing all actions related to the issuance and transfer of Shares of the Fund and the safe-keeping of certificates therefor, if any; (ii) reviewing subscriptions for Shares and accepting payment therefor; (iii) publishing and furnishing the Net Asset Value of the Fund's Shares in accordance with its Articles of Association; (iv) performing all acts related to redemption of Shares; (v) keeping the accounts of the Fund and such financial books and records as are required by law or otherwise for the proper conduct of the financial affairs of the Fund and making available annual financial statements for inspection, as well as furnishing quarterly reports regarding the Fund's performance and Net Asset Value per Share, to Shareholders; and (vi) performing all other matters necessary in connection with the administration of the Fund.

102.    The Offshore PPM further stated that if the board of directors determined "that the valuation of any security or instrument pursuant to the foregoing does not fairly represent its market value, the Board of Directors shall value such security or instrument as it reasonably determines and shall set forth the basis of such valuation in writing in the Fund's records."  The Offshore PPM is attached hereto as Exhibit "M," and incorporated herein by reference.

103.    The OmniFund PPM also stated that if the board of directors determined "that the valuation of any security or instrument pursuant to the foregoing does not fairly represent its market value, the Board shall value such security or instrument after consultation with and as advised by the Investment Manager, and shall set forth the basis of such valuation in writing in

the Fund's records."  See Exhibit "N."  The Investment Manager is defined in Exhibit "N" as
Lancer Management.

## D.    The "Sound Practices" Manual

104.    The President's Working Group on Financial Markets, which was composed of
representatives of the Secretary of the U.S. Department of the Treasury and the respective chairs
of the Board of Governors of the Federal Reserve System, the Securities and Exchange
Commission, and the Commodity Futures Trading Commission, established minimum standards
of care for persons involved in managing hedge funds.  The Citco Defendants participated as part
of a working group formed to create similar standards of care for European hedge funds.
Collectively, these standards hereinafter are referred to as the "Sound Practices Manual."
Relevant portions of the Sound Practices Manual are set forth below.

105.    In general, the administrator should have experience in accounting for and valuing
the products traded by the hedge fund.  The hedge fund managers, directors, and administrators
should conduct themselves with prudence and honesty, discharging their duties to the investment
fund with the care, skill, prudence, and diligence under the prevailing circumstances that a
prudent person acting in a like capacity and familiar with such matters would use in the conduct
of an enterprise of a like character and with like aims.

## 1.    Risk Management/Internal Controls

106.    Hedge fund managers, directors, and administrators should seek to limit the
Fund's exposure to potential operational risks, including data entry errors, fraud, system failures
and errors in valuation or risk measurement models.  It may also include the risk of loss due to
the incomplete or incorrect documentation of trades.  Operational risk may be defined by what it
does not include: market risk, credit risk and liquidity risk.

107.    Hedge fund managers, directors, and administrators should consider measures to limit or mitigate operational risk, including establishing a risk monitoring function either internally with an appropriate level of checks and balances to ensure objectivity of risk analysis or through reliance on external service providers.

108.    The risk monitoring function should also consider incorporating "asset liquidity" (i.e., the potential exposure to loss attributable to changes in the liquidity of the market in which the asset is traded) as an additional factor.  While other entities face funding liquidity risk, this risk is more of a central concern to hedge funds because funding liquidity problems can rapidly increase a hedge fund's risk of failure.  A lack of funding liquidity can contribute to a crisis situation for the hedge fund.

109.    Hedge fund managers, directors, and administrators should ensure the independence of the risk monitoring function. The risk monitoring function should be segregated from the investment management function with different people responsible for each.  The hedge fund managers, directors, and administrators should regularly assess whether risk levels are acceptable and consistent with established risk policies and parameters.  Here, of course, no such independence was achieved since both Lauer and the Defendants had an incentive to inflate and conceal the inflation of the Funds' NAV.

110.    Hedge fund managers, directors, and administrators should establish adequate internal controls and review, including appropriate segregation of duties, controls over incoming and outgoing cash flows and balances with counterparties, daily confirmation of trades and positions, etc.

111.    Hedge fund managers, director, and administrators should adopt an organizational structure that ensures effective monitoring of compliance with investment and valuation policies

by allocating defined supervisory responsibilities and maintaining clear reporting lines. Suitably qualified personnel should be retained and adequate systems established to produce periodic reporting that permits hedge fund managers, directors, and administrators to monitor trading activities and operations effectively.

112.    Internal procedures and periodic independent review processes should seek to ensure the enforcement of policies and identify deviations from those policies.   Appropriate controls, reporting and review processes should apply to internal and external managers or traders.

## 2.    Valuation Policies and Procedures

113.    A hedge fund's valuation methods should be fair, consistent, and verifiable.

114.    For NAV purposes, a hedge fund's managers, directors, and administrator should value investments according to GAAP.

115.    The following is a summary of certain pertinent sections of GAAP that govern security valuations that hedge fund managers, directors, and administrators routinely apply in calculating NAVs:

a.    The fair value of an investment is the amount at which the investment could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

b.    Management's best estimate in good faith of fair value should be based on the consistent application of a variety of factors with the objective being to determine the amount at which the investment could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

c.    Situations may arise when quoted market prices are not readily available or when market quotations are available but it is questionable whether they represent fair value. Examples include instances when–market quotations and transactions are infrequent and the most recent quotations and transactions occurred substantially prior to the valuation date, and when the market for the security is "thin" (that is, there are few transactions or market-makers in the security, the spread between the bid and asked prices is large, and price quotations vary substantially either over time or among individual market-makers).

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

    d.    In estimating in good faith the fair value of a particular financial instrument, the board or its designee (the valuation committee) should, to the extent necessary, take into consideration all indications of fair value that are available.  The following is a list of some factors to be considered:

        i.    Financial standing of issuer;

        ii.    Business and financial plan of the issuer and comparison of actual results to plan;

        iii.    Cost at date of purchase;

        iv.    Size of position held and liquidity of the market;

        v.    Contractual restrictions on disposition;

        vi.    Pending public offering with respect to the financial instrument;

        vii.    Pending reorganization activity affecting the financial instrument (such as merger proposals, tender offers, debt restructurings, and conversions);

        viii.    Reported prices and the extent of public trading in similar financial instruments of the issuer or comparable companies;

        ix.    Ability of the issuer to obtain needed financing;

        x.    Changes in the economic condition affecting the issuer;

        xi.    A recent purchase or sale of a security of the company;

        xii.    Pricing by other dealers in similar securities; and

        xiii.    Financial statements of portfolio companies.

    e.    No single method exists for estimating fair value in good faith because fair value depends on the facts and circumstances of each individual case.  Valuation methods may be based on a multiple of earnings, or a discount or premium from market of a similar freely traded security of the same issuer; on a yield to maturity with respect to debt issues; or on a combination of these or other methods.  The board of directors should be satisfied, however, that the method used to estimate fair value in good faith is reasonable and appropriate and that the resulting valuation is representative of fair value.

    f.    The information considered and the basis for the valuation decision should be documented, and the supporting data should be retained.  The board may appoint individuals to assist in the estimation process and to make the necessary calculations.  The rationale for the use of a good-faith estimate of fair value different from market quotations or pricing service valuations should be

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

documented.  If considered material, the circumstances surrounding the substitution of good-faith estimates of fair value for market quotations or pricing service valuations should be disclosed in the notes to the financial statements. That disclosure should include the circumstances surrounding the use of a blockage factor for an unrestricted investment that has a quoted market price in an active market.

g.   For certain investments, such as securities that do not trade regularly, the board of directors and fund administrators should consider obtaining estimates of fair value from broker-dealers or other third-party sources.  In some situations, the board of directors or fund administrator may determine that it is necessary to obtain an estimate of fair value from more than one pricing source.  For example, this may be appropriate if a pricing source has a relationship with an entity that might impair its objectivity.

## 3.   Other General Fiduciary Duties

116.   In addition to the standards above, hedge fund managers, directors, and administrators have certain general fiduciary duties.

117.   Care should be taken to ensure that inducements and fees do not create unacceptable conflicts of interest or influence the hedge fund manager, director, or administrator against acting in the best interest of the fund or its investors.

118.   Hedge funds are controlled by directors either of the hedge fund itself, if organized as a company, or of the hedge fund's corporate general partner, if organized as a limited partnership.  The directors should have relevant standing and experience to allow them to discharge their fiduciary and other duties.  Hedge fund managers, directors, and administrators must act solely in the interest of the Fund and its investors.

## 4.   Duties of Care

### (a)   Citco N.V.

119.   Separate, distinct, and independent from its contractual responsibilities set forth in the Citco Agreements, Citco N.V. owed additional direct duties of care to the Offshore Funds.

First and foremost, Citco N.V. owed the Offshore Funds the duty to disclose the inflated and baseless NAVs to the Independent Directors, the appropriate authorities, and the investors.

120.    Citco N.V. additionally owed the Offshore Funds the duty to speak accurately after knowingly, willfully, recklessly, and with gross negligence disseminating the false and inflated NAVs and/or to correct its misrepresentations about the value of NAVs.  Finally, Citco N.V. owed the Offshore Funds the duty to warn the Funds, particularly the Independent Directors, of the overstated and inflated values of the Funds' NAVs.

**(b)      The Citco Group and Citco USA**

121.    The Citco Group and Citco USA owed direct affirmative duties of care to the Offshore Funds, and each is directly liable for the breaches of these duties because each entity directly participated in the administration of the Offshore Funds.  The Funds reasonably relied on the oversight of The Citco Group and Citco USA because these entities directly communicated with the Funds, as set forth in this Complaint.  The Citco Group and Citco USA, via Keunen, who was acting within his express authority as The Citco Group's Director of Fund Services and as an officer of Citco USA, owed the Offshore Funds the duties to (a) compute the monthly NAV of the Funds with reasonable care and in accordance with The Citco Group, Citco USA, and Citco N.V.'s internal risk management controls, (b) independently price the Funds with reasonable care and in accordance with GAAP, (c) administer the Funds with reasonable care, and (d) avoid conflicts of interest and self-dealing.

122.    Because Keunen directly participated in the administration of the Offshore Funds, and was always acting within his express authority as a Director of Fund Services of The Citco Group and an officer of Citco USA, The Citco Group and Citco USA owed the Offshore Funds the duty to disclose the inflated and baseless NAVs to the Independent Directors, the appropriate authorities, and the investors.

123.     Based on Keunen's direct participation in the administration of the Funds within his express authority as a Director of Fund Services of The Citco Group and an officer of Citco USA, The Citco Group and Citco USA additionally owed the Offshore Funds the duty to speak accurately after Keunen knowingly, willfully, recklessly, and with gross negligence directed the dissemination of the false and inflated NAVs and/or to correct its misrepresentations about the value of the NAV.  Finally, The Citco Group and Citco USA owed the Offshore Funds the duty to warn the Funds, particularly the Independent Directors and the investors, of the overstated and inflated values of the Funds' NAVs.

**(c)     The Director Defendants**

124.     In addition to the duties set forth above under the Funds' Articles of Association, PPM, and Investment Management Agreement, the Director Defendants owed the Offshore Funds the duties to (a) compute the monthly NAV of the Funds with reasonable care and in accordance with The Citco Group, Citco USA, and Citco N.V.'s internal risk management controls, the Articles of Association, and the PPM, (b) independently price the Funds with reasonable care and in accordance with GAAP, (c) oversee Citco's administration of the Funds with reasonable care, and (d) avoid conflicts of interest and self-dealing.

**5.     Fiduciary Duties**

125.     In addition to the general fiduciary duties set forth above, the Citco Defendants and the Director Defendants undertook additional fiduciary duties to the Funds beyond the typical contractual administrative relationship.

126.     Specifically, Citco N.V., The Citco Group, Citco USA, and the Director Defendants owed the Offshore Funds express and implied fiduciary duties.  The Offshore Funds reposed trust and confidence in Citco N.V., The Citco Group and Citco USA and the Director Defendants to provide more than ministerial services to the Offshore Funds because these

entities were charged with independently pricing and computing the value of the Funds' NAV, and to alert, to warn, and to disclose to the Independent Directors, the Funds and their investors any problematic and inflated valuations.  Moreover, Citco N.V., The Citco Group, and Citco USA and the Director Defendants assumed extra services for the Funds as detailed in this Complaint, received greater economic benefit than from a typical hedge fund administration, and exercised extensive control over the Offshore Funds.

127.    Citco N.V., and The Citco Group, and Citco USA, via Keunen, while acting within his express authority and/or in the scope of his employment as the Director of Fund Services of The Citco Group and an officer of Citco U.S.A., and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence disseminated false and misleading statements that omitted material facts about the true value of the Offshore Funds.

128.    Instead of conducting an independent valuation or calculating the fair market value of the Funds' investments, Citco N.V., and The Citco Group and Citco USA, via Keunen, while acting within his express authority and/or in the scope of his employment as the Director of Fund Services of The Citco Group and an officer of Citco U.S.A., and the Director Defendants directly communicated false and inflated NAV figures to the Funds and the investors via monthly NAV Statements, in knowing, willful, wanton, and reckless disregard of the fact that these figures had no basis in reality from 1996 forward.

129.    In so doing, Citco N.V., and The Citco Group and Citco USA, via Keunen, while acting within his express authority and/or in the scope of his employment as the Director of Fund Services of The Citco Group and an officer of Citco U.S.A., and the Director Defendants endorsed these NAV Statements to the Funds and the investors as independently verified and

omitted to inform the Funds and the investors that no such independent verification had been completed.

130.    Citco N.V., and The Citco Group and Citco USA, via Keunen, while acting within his express authority and/or in the scope of his employment as the Director of Fund Services of The Citco Group and an officer of Citco U.S.A., and the Director Defendants knew or should have known they were disseminating false portfolio valuations of the Funds because their own employees, managers, and directors served as board members on the Offshore Funds.

131.    The Citco Group selected and supplied its own employees Stocks and Verhooren, and its alter ego and/or agent ICS to serve on the Funds' boards so that The Citco Group could control the Funds' management and ensure that Citco's administrative fees would be maximized.

132.    Citco N.V. selected and supplied its own employees, Quilligan and Conroy, to serve on the Funds' boards so that Citco N.V. could control the Funds' management and ensure that Citco's administrative fees would be maximized.

133.    Further, as set forth below, a number of "red flags" regarding these false and inflated NAVs were known and/or recklessly disregarded by Citco N.V., and The Citco Group and Citco USA, via Keunen, while acting within his express authority as the Director of Fund Services of The Citco Group and an officer of Citco U.S.A.,  and the Director Defendants.

134.    As such, Citco N.V., and The Citco Group and Citco USA, via Keunen, while acting within his express authority and/or in the scope of his employment as the Director of Fund Services of The Citco Group and an officer of Citco U.S.A., and the Director Defendants expressly undertook fiduciary obligations, in addition to those set forth in the PPM, Articles of Association, and Investment Management Agreement, to provide critical services to the Funds, including without limitation a) preparing and maintaining all customary financial and accounting

books and records, b) computing, independently verifying and disseminating the Funds' NAV

information, c) preparing, or causing to be prepared, and disseminating to investors the annual

reports of the Funds, as well as other quarterly reports regarding the NAV of the Funds, and d)

performing all other accounting and management services necessary in connection with the

administration of the Funds.  These undertakings demonstrate that the Citco Defendants and the

Director Defendants had access to the Funds' financial reports, but nonetheless knowingly,

willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore

Funds by failing to perform any due diligence, independently verify Lauer's manipulated inflated

valuations, and/or by disseminating the false inflated NAVs to investors and the Funds.

135.    Citco N.V. and The Citco Group and Citco USA, via Keunen, while acting within

his express authority and/or in the scope of his employment as the Director of Fund Services of

The Citco Group and an officer of Citco U.S.A., and the Director Defendants even internally

acknowledged and admitted that they owed the Offshore Funds a fiduciary duty.  Edward

Hedeima, a manager of Citco N.V., reflected Defendants' knowledge that they owed fiduciary

duties to the Funds to Quilligan, Keunen, Conroy, Verhooren, and Greg Fenlon (attached as

Exhibit "O") after the Defendants became concerned about their liability for breaching their

duties of care, fiduciary duties, and obligations to the Offshore Funds:

> From:        Heidema, Edward CUR
> Sent:        Thursday, June 06, 2002 11:19 PM
> To:          Quilligan, Declan CUR; Keunen, William MIA; Conroy, Kieran
>              DUB, Verhooren, John GEN
> Cc:          Fenlon, Greg CUR
> Subject:     RE:  Lancer conf call, first reply from Bruce Cowen
>
> Was listening in on the conference call and made notes of what has been said.
> Will make a summary of it for the files.  I guess if we receive the memo's and
> documentation on the valuation process of the questioned positions, our position
> will be stronger.  **Nevertheless, I would suggest to approach them in a way
> that we would be happy to continue as Administrator, but that we do not feel
> comfortable from a <u>fiduciary perspective</u> as we are not in a position to**

> **properly value the Private Placement Investments and to maintain our fiduciary responsibility in the way the Fund is structured at the moment, with an open-ended character.**  As Private Placement Investments are usually structured in closed end Funds or Private Equity Partnerships, where distributions and incentive fee payments are only made at the close or at the realization of gains upon a sell off, we therefore should suggest to spin off the questioned positions in a separate class, which will have a closed end character.  Upon sell off or market liquidity of a position, the received cash or position and related pro rata shareholding can be re-allocated and be moved from the segregated class into the liquid class again.
>
> Just my thoughts.
>
> Will distribute the draft summary for your review early next week.
>
> Tks. Rgds,
>
> Edward
>
> (Emphasis supplied).

136.   Indeed, the Citco Defendants and the Director Defendants internally acknowledged and admitted that they owed fiduciary duties to the Funds, and even suggested to restructure the Funds' portfolio so that the manipulated values would be in a separate "class" in an attempt to justify Lauer's inflation of the NAV, so that their administrative fees would continue to increase.  This demonstrates that the Citco Defendants undertook more than a ministerial role in administering the Offshore Funds above and beyond the contractual obligations and had a special relationship to advise and counsel the Funds separate and distinct than the contractual duties, as further evidenced by the duties set forth by the PPM, Articles of Association, and Investment Management Agreement.  The Citco Agreements did not limit the Citco Defendants' and the Director Defendants' fiduciary duties to the Funds.

**(b)    The Citco Defendants**

137.   Citco N.V. owed the Offshore Funds an express fiduciary duty because the Offshore Funds reposed trust and confidence in Citco N.V. separate and distinct from the

contractual and ministerial administrative relationship.  Because Citco N.V. held itself out to the Offshore Funds as having policies and procedures to ensure that its independent pricing and valuation of the Funds' NAV would be accurate and fair, the Offshore Funds reasonably relied on these representations and expected Citco N.V. to independently and fairly counsel and inform the Funds.  Through this reliance, the Funds imposed trust and confidence in Citco N.V. to independently and fairly value and compute the price of the NAV and to report and disclose Lauer's misconduct in inflating the NAV to the Funds, the Independent Directors, the investors, and the appropriate authorities.  Citco N.V.'s fiduciary duty arises from its unique role as the party charged with counseling, advising, and informing the Funds regarding its purported independent valuation of the Funds' NAV.  Citco N.V.'s express fiduciary duties also arise from the fiduciary duties of the Director Defendants via respondeat superior, as set forth below.

138.   Because Keunen directly participated in the administration of the Offshore Funds and the misconduct at issue while acting within his express authority as Director of Fund Services for The Citco Group and as officer of Citco USA, The Citco Group and Citco USA directly owed the Offshore Funds an express fiduciary duty because the Offshore Funds reposed trust and confidence in The Citco Group and Citco USA, via Keunen.  Because The Citco Group and Citco USA held themselves out to the Offshore Funds as having policies and procedures to ensure that their independent pricing and valuation of the Funds' NAV would be accurate and fair, the Offshore Funds reasonably relied on these representations and expected The Citco Group and Citco USA to independently and fairly counsel and inform the Funds.  Through this reliance, the Funds imposed trust and confidence in The Citco Group and Citco USA to independently and fairly value and compute the price of the NAV and to report and disclose Lauer's misconduct to the Funds, the Independent Directors, the investors, and the appropriate

authorities.  The Citco Group and Citco USA's fiduciary duties arises from their unique role as the parties that purported to independently value the Funds' NAV and that disseminated the NAV to investors.  The Citco Group and Citco USA's express fiduciary duties also arise from the fiduciary duties of the Director Defendants via respondeat superior, as set forth below.

139.   Citco N.V., The Citco Group, and Citco USA also owed the Offshore Funds implied fiduciary duties because Citco N.V., The Citco Group, and Citco USA assumed extra services for the Offshore Funds as set forth in this Complaint, received greater economic benefit from administering the Funds than from typical hedge fund administrations, and exercised extensive control.

140.   The Citco Defendants undertook management and oversight responsibilities by controlling the actions, inactions, decisions, and votes of the Director Defendants at all times when they served on the Funds' boards.

141.   Moreover, in the Revocable Proxy, the Funds' investors appointed and designated Citco N.V. as their proxy and attorney-in-fact for shareholder meetings.  Citco N.V., and by virtue of their vicarious liability, The Citco Group and Citco USA, used these proxy rights to approve the decisions, actions, and inactions of the Citco employees (Conroy, Stocks, Quilligan, and Verhooren) and ICS, The Citco Group's alter ego and/or agent, while they served on the Funds' boards.  This further demonstrates the level of pervasive and excessive control Citco exercised over the Funds.  The Citco Defendants therefore knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary and legal duties to the Funds by actively ratifying and/or acquiescing in Lauer, Lancer Management, the other Citco Defendants, and the Director Defendants misconduct via their proxy votes.  Further, by knowingly accepting and approving their actions, Citco N.V. aided and abetted the other Director Defendants', the Citco

Defendants', Lauer's, and Lancer Management's breaches of fiduciary duty by providing substantial assistance via its proxy votes.

142.    As such, Citco assumed extra services for the Funds, separate and distinct from their contractual obligations by controlling the Funds' boards, placing their own employees and on the Funds' boards, and suggesting valuation techniques to Lauer and Lancer as a means to validate the inflated NAV despite their actual knowledge that the NAV was baseless and unsupported by reality.  Further, the Citco Defendants worked in concert with Lauer and Lancer in an attempt to cover-up and avoid liability for their knowing, willful, reckless, and/or grossly negligent inflation of the Funds' NAV for their own pecuniary gain.  Finally, the Citco Group and Citco N.V. are vicariously liable under the doctrine of respondent superior for the Director Defendants' obligations and extra service set forth in the Articles of Association, PPM, and Investment Management Agreement, which gave the Director Defendants' discretion over the management and disposition of the Funds' assets.

143.    The Citco Defendants received a greater economic benefit from administering the Offshore Funds than from other similar and typical hedge fund administrations.   The administrative fees the Citco Defendants generated from the Funds were both a higher percentage and a higher total payment based on Citco's knowing and willful ratification of the inflated NAV, which directly increased the amount of Citco's administrative fees.

144.    Furthermore, the Citco Defendants' exercise of extensive control is demonstrated by The Citco Group and Citco N.V.'s placement of their own managerial employees and The Citco Group's alter ego and/or agent on the boards of the Offshore Funds to insidiously control all aspects of the Offshore Funds' valuation and management to ensure that their own administrative fees would increase correspondingly with the inflated NAV.  Pursuant to the Citco

Agreements, Citco N.V. was charged with providing directors to the Offshore Funds' boards in exchange for a fee.  However, instead of providing independent directors free from conflicts of interest, Citco N.V. instead selected its own General Manager and Managing Director, Quilligan, to serve on the board of Offshore, and its Managing Director, Conroy, to serve on the board of Offshore.  The Citco Group selected and provided its Director of International Funds Services, Stocks, and its executive, Verhooren, to serve on the boards of Offshore, and its own alter ego and/or agent, ICS, to serve as a director of the Funds.

145.    Unlike typical directors, who would be paid individually, Citco N.V, Citco USA, and The Citco Group's strategy required payment of their employees' directors fees to Citco, not to the individual Director Defendants.

146.    Accordingly, Citco N.V., The Citco Group, and Citco USA owed the Offshore Funds a duty of loyalty, a duty to manage the Funds in a prudent manner, a duty of good faith in exercising its duties of care, and fiduciary duties, and a duty to remain free from conflicts of interest.

**(c)    The Director Defendants**

147.    The Director Defendants owed the Offshore Funds express fiduciary duties because they served on the boards of the Offshore Funds.  However, their interests were irreconcilably adverse to those of the Offshore Funds because the Director Defendants were controlled by The Citco Group, Citco N.V., and Citco USA via Keunen,  while they served on the Funds' boards.  Specifically, the applicable fee structure between the Funds and Citco created an incentive for the Director Defendants to participate in self-dealing in a scheme to artificially inflate the NAVs for their own personal gain, and for their employers' personal gain, to the detriment of the Offshore Funds.

**E.      The Citco Group, Citco N.V., and Citco USA Are Vicariously Liable To The Offshore Funds**

148.    In addition to owing the direct duties of care and fiduciary duties as set forth above, The Citco Group, Citco N.V., and Citco USA are vicariously liable to the Offshore Funds.  First, Citco N.V. served as The Citco Group and Citco USA's actual and apparent agent.  Second, Citco N.V. served as the alter ego and mere instrumentality of The Citco Group, so that The Citco Group's corporate veil may be pierced.  Third, ICS served as the alter ego and mere instrumentality of The Citco Group, so that The Citco Group's corporate veil may be pierced.  Fourth, ICS served as The Citco Group's actual and/or apparent agent.  Finally, The Citco Group, Citco N.V., and Citco USA are also vicariously liable via respondeat superior.

**1.      Actual Agency**

149.    Citco N.V. served as The Citco Group and Citco USA's actual agent.  The Citco Group and Citco USA acknowledged to the Offshore Funds that Citco N.V. would act on their behalf by (1) an express understanding between Citco N.V., on the one hand, and The Citco Group and Citco USA, on the other hand, that Citco N.V. would act on their behalf in administering the Offshore Funds, (2) Keunen's decision-making and pervasive control and domination over Citco N.V.'s administration of the Offshore Funds (Citco N.V. was the only entity that endorsed the Citco Agreements to administer the Funds), while he acted in his express authority as Director of Fund Services of The Citco Group and an officer of Citco USA, and (3) The Citco Group's placement of its own employees and subsidiary, Verhooren, Stocks and ICA, on the boards of the Offshore Funds.  Any and all of these acts by The Citco Group and Citco USA acknowledged to the Offshore Funds that Citco N.V. had authority to act on The Citco Group's and Citco USA's behalf in administering the Offshore Funds.

150.    Citco N.V. expressly accepted the undertaking to serve as The Citco Group's and Citco USA's actual agent.

151.    As more fully detailed below, The Citco Group and Citco USA exercised pervasive control and dominated Citco N.V., their actual agent.  Specifically, Keunen, who was acting within his express authority as Director of Fund Services of The Citco Group and an officer of Citco USA, exercised pervasive control over Citco N.V. because Keunen knowingly ordered Citco N.V. to send out the erroneous NAV, and drafted a memorandum to Christopher Smeets, CEO of The Citco Group, relating to Citco N.V.'s resignation and the strategy to cover-up Citco's misconduct and to avoid liability for all Citco entities that actively participated in the willful, wanton, and/or grossly negligent misconduct and breaches of duty toward the Funds. Further,  Keunen controlled Citco N.V.'s appointment of the Funds' board members by selecting the Director Defendants to serve as directors of the Offshore Funds.

152.    ICS served as The Citco Group's actual agent.  The Citco Group acknowledged that ICS would act on The Citco Group's behalf because The Citco Group selected and appointed ICS, its alter ego and wholly-owned subsidiary, to serve as a director on the boards of the Funds.  Because ICS at all times acted under the control of Stocks and Verhooren, who acted in their express authority and within the scope of their employment with The Citco Group, The Citco Group acknowledged to the Offshore Funds that ICS served as its agent.

153.    ICS expressly accepted the undertaking to serve as The Citco Group's agent.

154.    The Citco Group exercised pervasive control and dominated ICS, its actual agent. Specifically, The Citco Group, via its employees Stocks and Verhooren, controlled and directed all of ICS's actions, inactions, votes, and decisions on the Funds' boards.  Significantly, Stocks and Verhooren had the dual roles of serving as The Citco Group's employees and serving as

ICS's attorneys-in-fact and/or directors authorized to sign on behalf of ICS, demonstrating The Citco Group's pervasive control over ICS.  Moreover, The Citco Group selected and appointed ICS to serve on the Funds' boards to ensure that Citco's fees would be maximized.

**2.**     **Apparent Agency**

155.    Citco N.V. served as The Citco Group and Citco USA's apparent agent because The Citco Group and Citco USA created the appearance of an agency relationship to the Offshore Funds.

156.    Keunen, while acting within his express authority as Director of Fund Services of The Citco Group and an officer of Citco USA, represented to the Offshore Funds that Citco N.V. served as The Citco Group and Citco USA's agent.  These representations were in the form of Keunen repeatedly communicating with the Offshore Funds and their board members, thereby directly representing that Citco N.V. was acting as an agent on behalf of The Citco Group and Citco USA.  Significantly, Keunen was not at any relevant time employed by Citco N.V. Moreover, Keunen controlled Citco N.V.'s administration of the Offshore Funds, which constituted a direct acknowledgment to the Funds that Citco N.V. was acting on behalf of The Citco Group and Citco USA at all times because Citco N.V. was the only entity that had endorsed the Citco Agreements.  Further, Keunen represented to the Funds that Citco N.V. served as The Citco Group and Citco USA's agent by selecting and appointing employees and a subsidiary from The Citco Group to serve as directors of the Funds.

157.    Specifically, The Citco Group and Citco USA, via their director and officer Keunen, and via The Citco Group's director Stocks, employee Verhooren, and fully-owned subsidiary ICS, represented to the Offshore Funds that Citco N.V. had the authority to act on their behalf because they regularly participated and intervened in the administration of the Offshore Funds.  These representations include, without limitation, (1) controlling Citco N.V.'s

administration of the Offshore Funds, (2) communicating on behalf of Citco N.V. with Lauer and Lancer, (3) directing the dissemination of the inflated NAV, (4) formulating and implementing the inflated valuations of the Offshore Funds, (5) responding to investor inquiries, (6) communicating with the Offshore Funds' auditor regarding valuation issues, and (7) selecting and appointing Citco employees from various Citco entities as directors of the Funds.

158.    The Offshore Funds reasonably relied on The Citco Group's and Citco USA's representations regarding Citco N.V.'s authority to act on their behalf.  The Citco Group and Citco USA did nothing to dispel the Offshore Funds' perception that Citco N.V. acted on behalf of The Citco Group and Citco USA during their course of dealing, as set forth above.

159.    As a result, the Offshore Funds detrimentally changed position in reliance on The Citco Group and Citco USA's representations that Citco N.V. would act on their behalf by continuing the employment of Citco N.V. based on Citco's reputation as a valuation expert (despite Citco's active participation and scheme to inflate the Funds' NAV) and by relying on the erroneous inflated NAVs provided by Citco, which resulted in the Funds' deepening insolvency and damaged the Funds.  Furthermore, the Offshore Funds relied heavily on the acknowledgment that Citco N.V. was acting on behalf of The Citco Group and Citco USA due to their business acumen and industry reputation.

160.    ICS served as The Citco Group's apparent agent because The Citco Group created an appearance of an agency relationship to the Offshore Funds.

161.    The Citco Group, via its employees, Stocks and Verhooren, who were at all times acting in their express authority and within the scope of their employment with The Citco Group, represented to the Offshore Funds that ICS served as The Citco Group's agent.  These representations included Stocks' and Verhooren's designations as ICS's attorneys-in-fact and/or

directors who were authorized to sign on ICS's behalf, and The Citco Group's extensive and pervasive control and domination over ICS's actions, inactions, votes, and decisions as a director of the Funds.

162.    The Offshore Funds reasonably relied on The Citco Group's representations regarding ICS's authority to act on The Citco Group's behalf.  ICS did nothing to dispel the Offshore Funds' perception that ICS acted on behalf of The Citco Group via its employees Stocks and Verhooren's control over ICS's acts as ICS's attorneys-in-fact and/or directors during their course of dealing.

163.    As a result, the Offshore Funds detrimentally changed position in reliance of The Citco Group's representations that ICS acted on its behalf by failing to take action to replace ICS as a director of the Offshore Funds and by relying on ICS's actions and inactions as a board member that was purportedly acting in the best interests of the Funds.

### 3.    Piercing the Corporate Veil

164.    Citco N.V. is the alter ego and mere instrumentality of The Citco Group.

165.    Moreover, as demonstrated in paragraphs 254-283, The Citco Group wholly disregarded Citco N.V.'s corporate personality and dominated and controlled Citco N.V.'s actions in administering the Funds.

166.    The Citco Group used Citco N.V. for an improper purpose, including, without limitation, ordering Citco N.V. to send out erroneous NAVs, and via Keunen, directly participating in the Offshore Funds' administration to wrongfully inflate their administration fees that were directly linked to the bogus NAVs, and selecting and directing the appointment of Citco N.V. employees, Conroy and Quilligan, and The Citco Group's employees, Verhooren and Stocks, and wholly-owned subsidiary ICS to serve as directors of the Funds to approve and/or

acquiesce in Lauer's inflated valuations that inured to Citco's financial benefit, as detailed in this Complaint.

167.     ICS is the alter ego and mere instrumentality of The Citco Group.

168.     The Citco Group wholly disregarded ICS's corporate personality and dominated and controlled ICS's actions, inactions, decisions, and votes at all times while ICS served on the boards of the Offshore Funds.  The Citco Group's own employees, Stocks and Verhooren, were authorized to sign on ICS's behalf as attorneys-in-fact and/or directors, demonstrating The Citco Group's total domination of ICS and The Citco Group's disregard of ICS's corporate personality.

169.     The Citco Group used ICS for an improper purpose, including, without limitation, by (i) selecting and directing the appointment of  ICS to the Funds' boards in bad faith to insidiously control the Funds and to ensure that Citco's administrative fees would be maximized, (ii) controlling and directing ICS's approval and/or acquiescence in Lauer's inflated valuations of the Funds so that Citco's fees would correspondingly increase, (iii) by controlling and directing ICS's issuance and dissemination of the false and inflated NAVs to the investors and the Funds, and (iv) by directing ICS to disregard its common law, statutory, professional, and fiduciary duties to the Funds and act in the sole interest of The Citco Group by actively participating in Lauer's scheme to maximize Citco's fees.

**4.     Respondeat Superior**

170.     The Citco Group and Citco N.V. are vicariously liable for the Director Defendants' acts and misconduct wrought upon the Offshore Funds via the doctrine of respondeat superior.

171.     The Citco Group is liable under the doctrine of respondeat superior for Stocks' and Verhooren's breaches of fiduciary, statutory, professional, and legal duties owed to the Funds that were committed while Stocks and Verhooren acted within the scope of The Citco

Group's business and employment and under Verhooren's and Stocks' express authority as an executive of The Citco Group and The Citco Group's Director of International Funds Services, respectively.  Specifically, the breaches and misconduct at issue were committed by Stocks and Verhooren while they acted within the scope of The Citco Group's business and employment because The Citco Group hired Stocks and Verhooren to serve as directors of investment funds based on their abilities and skills, the breaches of duties owed by Stocks and Verhooren to the Funds as directors occurred within the time and space limits of their jobs as The Citco Group employees, and the breaches were activated to serve their employer, The Citco Group, because Stocks and Verhooren were able to maximize Citco's administrative fees via their insider and conflicted roles on the Funds' boards.

172.    Citco N.V. is liable under the doctrine of respondeat superior for Conroy's and Quilligan's breaches of fiduciary, statutory, professional, and legal duties owed to the Funds that were committed while Conroy and Quilligan acted within the scope of Citco N.V.'s business and employment and under Conroy's and Quilligan's express authority as General Manager and Managing Director, respectively.   Specifically, the breaches and misconduct at issue were committed by Stocks and Verhooren while they acted within the scope of The Citco Group's business and employment because Citco N.V. hired Conroy and Quilligan to serve as directors of investment funds based on their abilities and skills, the breaches of duties owed by Conroy and Quilligan to the Funds as directors occurred within the time and space limits of their jobs as Citco N.V. employees, and the breaches were activated to serve their employer, Citco N.V., because Conroy and Quilligan were able to maximize Citco's administrative fees via their insider and conflicted roles on the Funds' boards.

173.    At all times when serving on the Offshore Funds' boards, Directors Verhooren, Stocks, Conroy, and Quilligan were acting as employees and within the scope of their employment and under the express authority of their employers, The Citco Group and Citco N.V., while Verhooren, Stocks, Conroy, and Quilligan committed the misconduct at issue.  The Citco Group controlled Verhooren's and Stocks's acts on Offshore's board in every manner, including controlling their votes on board resolutions, their approval and/or acquiescence in Lauer's inflated valuations, and every aspect of the Offshore Funds' administration via their conflicted insider roles.  Citco N.V. also controlled Quilligan's and Conroy's acts on the Funds' boards in every manner, including controlling their votes on board resolutions, their approval and/or acquiescence in Lauer's inflated valuations, and every aspect of the Offshore Funds' administration via their conflicted insider roles.

174.    Citco collected the fees paid by the Funds for the services of Citco's employees (Stocks, Verhooren, Conroy, and Quilligan) on the Funds' boards.

175.    In short, Verhooren, Stocks, Conroy, and Quilligan were each acting as an employee and/or agent of The Citco Group and Citco N.V., respectively, when they served on the boards of the Offshore Funds.  Fees for their services as directors were paid directly to Citco.  The Citco entities then paid the Director Defendants for their services on the Funds' boards.  The director fees under the Citco Agreements were paid to Citco–not to the individual Citco employee/Offshore director, Verhooren, Stocks, Quilligan, or Conroy.  Finally, Verhooren, Stocks, Quilligan, and Conroy were controlled by and took all directions from their employers, The Citco Group and Citco N.V.–not from the Offshore Funds.

176.    Additionally, The Citco Group and Citco USA are vicariously liable for the acts and misconduct wrought upon the Offshore Funds by Keunen under the doctrine of respondeat

superior.  Keunen was employed as the Director of Fund Services for The Citco Group and an officer of Citco USA.

177.    As detailed in this Complaint, while Keunen undertook the administration of the Offshore Funds, knowingly directed Citco N.V. to issue the bogus inflated NAVs, and selected and directed the appointment of various employees of Citco entities to the boards of the Funds, Keunen acted at all times within the express authority of his role as director of The Citco Group and officer of Citco USA, and committed these acts within the scope of The Citco Group's and Citco USA's business and within the scope of his employment with these two entities.

178.    More specifically, the breaches and misconduct at issue were committed by Keunen while he acted within the scope of The Citco Group's and Citco USA's business and employment because The Citco Group and Citco USA hired Keunen to participate in and control Citco's administration of hedge funds and select and/or appoint the boards of these funds administered by Citco based on his abilities and skills, the breaches of duties owed by Keunen to the Funds occurred within the time and space limits of his job as a Citco USA and The Citco Group employee, and the breaches were activated to serve his employers, The Citco Group and Citco USA, because Keunen was charged with maximizing Citco's administrative fees via his direct participation in the misconduct at issue.

F.      **The Citco Defendants' Marketing Materials and Publications**

179.    In various publications, brochures, and on their website, the Citco Defendants embrace the standards set forth in the Articles of Association, the PPM, and "Sound Practices" manual.  The Citco Defendants further represent that their worldwide organization will carry out hedge fund administration in a prudent and independent manner.

180.    A brochure for The Citco Group and its subsidiaries located on The Citco Group's website provides further laudatory statements regarding The Citco Group's worldwide

capabilities and oversight functions.  A copy of this brochure is attached hereto as Exhibit "P".

The brochure provides:

> The Citco Group is an integrated company.  Citco has substantial hedge fund experience.  Citco is prepared to take advantage of the growth of the hedge fund industry.  Its offices in Curacao and in other venues "typically work with our North American clients."
>
> Citco trains its staff in providing specialized accounting and valuation support, investor relations, corporate services and day-to-day management.
>
> Citco provides the following services:
>
> (A)     Accounting.
>
> (B)     Valuation:     "We price the portfolio using independent recognized pricing sources.  We calculate the net asset value and prepare financial statements."
>
> (C)     Investor relations and communications.
>
> (D)     Corporate services, including all record keeping.
>
> (E)     Back Office Services including, but not limited to "daily profit and loss and net asset value calculations."
>
> Shareholder Services
>
> (A)     Providing Share Registration.
>
> (B)     Order entry, acceptance, subscriptions, redemptions, transfers and switches.  Shares are issued in certified or non-certified form.
>
> (C)     Overnight processing of trade activities, cash journals, cash movements and corporate actions, required for daily reconciliation and net asset value production are performed.
>
> (D)     Preparing SAS 70, US Statement of Auditing Standard Number 70, Reports on the Processing of Transactions by Service Organizations.   The SAS 70 Report will provide information as to:  "The control objectives and relevant policies and procedures in place to ensure that Net Asset Value calculations meet the criteria of accuracy, responsiveness and confidentiality."

181.    In a November 28, 2003, interview with <u>Hedgeweek,</u> which appears on The Citco Group's website, Keunen, The Citco Group Director of Fund Services, outlined The Citco Group's worldwide presence and capabilities, noting that The Citco Group has serviced Hedge Funds for thirty years and has fifteen offices worldwide. The Citco Group has aggressively sought to represent hedge funds in the United States, marketing its sophisticated technology through a software platform called AExeo.

182.    Keunen's November 28, 2003, <u>Hedgeweek</u> interview also recognized the fund administrator's vital role.  First, because the U.S. does not regulate hedge funds, the "valuation process becomes a crucial part of the NAV calculation."  Second, the administrator is "the ideal independent counter party that is the sole counter party able to aggregate information in a way that represents added value to both investors and managers."

183.    In the Alternate Investment Quarterly, Second Quarter 2002: <u>The Role of Fund Administration and Technology in a Maturing Alternative Investment Market</u>, Keunen recognized problems in the hedge fund industry that fund administrators must address:

> "To begin with, it is paramount that events such as the Manhattan Investment Fund fraud of 1999 are not repeated.  Hedge Funds are burdened with the task of convincing the entire investment community that they can run their operations properly and responsibly."

184.    Verhooren, an executive with The Citco Group and a director for Offshore from 1995 to 1998, told the trade journal <u>Hedge Funds Review</u> in May 2003, that two of the most important duties of The Citco Group's subsidiaries in administering a hedge fund is determining and verifying the fund's NAV and fulfilling the administrator's "risk monitoring" responsibilities:

> "For example, pricing is an area at the heart of the administrator's business in which much technical discussion is taking place and new standards are developing.  However, a good

administrator will always have insisted on independent pricing, and will terminate a contract with a hedge fund if they cannot agree with its pricing methodology."

"A study of 100 hedge fund failures concluded that operational risks are the main single cause of hedge fund failure."

"It found that in those cases where the finger can be pointed at fraud and misrepresentation, water-tight operational standards can either reduce the size of losses or enable them to be uncovered at a much earlier stage."

"The operational arena is the one most affected by the quality of a fund's counter parties, in particular its prime brokers and administrators.  Institutional investors want an institutional quality administrator with experienced and appropriately qualified staff, independent pricing and valuation procedures, and the technology to support its enhanced role."

"Even though the Funds themselves still tend to have monthly trading, the administrator can now publish either weekly or daily net asset values (NAV) for the fund, rather than the traditional monthly valuation."

"Institutions have to disseminate a fund's numbers to their broad distribution of investors.  They cannot afford to wait two or three weeks for a NAV; they need to have it within the first week at the latest."

185.    An article recreated for The Curacao Financial Services Review, 2001, quoted Citco N.V. officer and Offshore director Quilligan at length regarding a hedge fund administrator's duties and responsibilities.  In this article, Defendant Quilligan emphasized the fund administrator's need for independence and the administrator's fiduciary duties:

"Independence combined with an accurate, timely and professional service is how we can add value."

"The shareholders are our ultimate client and they rely on our experience and time in the industry–which is since the very beginning–and take confidence from our subsequent position as a market leader.  Our involvement means they don't have to rely on the investment manager."

"Citco Funds Curacao provides full administration services to alternate investment funds, including the provision of core

accounting, Net Asset Value (NAV), fund set-up, investor relation and back office services….”

"Shareholder services”… is a "centralized department” and can provide "services to Citco Funds whether they are administered in Curacao or New York.  Citco provides daily profit and loss for U.S. clients.”

"…over the last couple of years, the perceived importance of the administrative side of the fund has grown significantly.  First, there was the debacle of the Manhattan Fund at the end of 1999.”

"…the Fund Administrator must be independent to be taken seriously.  The definition of independence in the context of traditional fund administration includes some of the following parameters:

    (A)    Accounting and Net Asset Value calculation.

    (B)    All bank, broker and custody balances are agreed, and the portfolio is priced independently.  Administrators use independent pricing services and analyze variances.

    (C)    The Net Asset Value per share is calculated based on the recognition of the fund's capital activity.  Financial statements are produced and disseminated.

    (D)    At each reporting interval, reports are sent to all investors confirming the price of the funds, its performance and the investor's holdings.  Thus, investors are kept informed of the welfare of their positions from an independent source.

    (E)    Corporate services such as maintaining the principal corporate records, convening meetings and dealing with local regulatory requirements are typically seen as standard fare by the administrators.

*    *    *

    (H)    Administrators will be required to demonstrate a commitment to technological capabilities that point to integrated systems featuring real time automated processing and reconciliations, the use of independent pricing services, and reporting capabilities….”

    (I)    "The role of the fund administrator is gradually evolving from a service provider that produces results on a

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

monthly basis after the fact, into a back-office outfit that calculates daily P&L numbers and Net Asset Values."

"But the administrator's primary responsibility is as a fiduciary agent to a fund's investors.  In addition, the administrator should be relied upon for an independent verification role that is efficient and accurate."

186.    In a chapter of <u>The Capital Guide to Hedge Funds</u> titled "A Year of Turmoil:

Impact on Hedge Fund Operations," written in Fall 2002, Keunen recognized the importance and

the risks of both portfolio pricing and thinly traded securities:

"The growing interest in hedge fund investing, together with a profile that generates daily media exposure, has made measuring and managing risk a hot topic within the sector."

"Investors indicate that their main concerns are liquidity and market risk.  The majority have experienced a negative surprise regarding a hedge fund manager; the result being that the demand for transparency takes on added urgency."

"Risk generally relates to performance, and poor performance can result from two major areas – market risk and operational risk.  While market risk can be caused either by the performance of the market as a whole or by a specific position in a portfolio, operational risk is typically considered to be non-market related.  This is the area that is affected most by the quality of a fund's counterparties, the prime brokers and the administrator."

"For example, pricing the portfolio can be problematic, especially in the case of illiquid securities or for portfolios with complex derivatives.  Pricing models may be invalid and even listed securities are often thinly traded.  In reality, the only time a price can truly be verified is when it is traded."

"So, how can the administrator help?  The independence of the administrator is of critical importance.  The fund's prospectus discloses its pricing policy, and scrutiny of the administration agreement provides insight into the administrator's role in the pricing process."

"Probing the administrator to verify their approach reinforces the overall perception as to whether the administrator is genuinely adding value to risk measurement.  After all, the

administrator could just be taking the prices from the fund manager."

"Finally, if the administrator is able to satisfy the investor's need for transparency, then they should be in a position to supply information about the fund's activities, if not about individual positions.  This could include sector exposure, attribution and the proportion that big bets represent to the overall portfolio."

187.    Accordingly, the Director Defendants and the Citco Defendants owed the Offshore Funds a duty of loyalty, a duty to manage the Funds in a prudent manner, a duty of good faith in exercising their duties of care and fiduciary duties, and a duty to remain free from conflicts of interest.

## VI.  THE CITCO DEFENDANTS AND DIRECTOR DEFENDANTS KNOWINGLY, WILLFULLY, RECKLESSLY, AND/OR WITH GROSS NEGLIGENCE BREACHED THEIR DUTIES TO THE OFFSHORE FUNDS

188.    Despite the Citco Defendants' and the Director Defendants' contractual, professional, common law, legal, and statutory obligations and their representations and promises in publications and brochures, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached these duties by disregarding and/or failing to satisfy the minimum standards to be free from conflicts of interest, to remain independent, to undertake risk monitoring, and to value the Funds' holdings independently and in accordance with GAAP.  By doing so, the Citco Defendants and the Director Defendants actively participated in a scheme to provide and disseminate inflated NAVs for the Offshore Funds that served to increase their own administrative fees thereby creating an irreconcilable conflict of interest between themselves and the Offshore Funds.

## A.    The Citco Defendants and Director Defendants Knowingly Disregarded and Ignored Numerous "Red Flags"

189.    The facts known to the Citco Defendants and the Director Defendants regarding all the Offshore Funds, beginning at least back to 1999, and possibly even earlier, and extending

until the Citco Defendants resigned in 2002, should have alarmed the Citco Defendants and the

Director Defendants into action. Numerous "red flags" that were known to the Citco Defendants

and the Director Defendants would have put a reasonably prudent fund administrator or director

on notice that Lauer was engaged in conduct to the extreme detriment of the Offshore Funds.

These glaring "red flags" would have prompted a reasonably prudent fund administrator or

director to investigate and disclose the inflated values of the securities held by the Offshore

Funds to the investors, the Independent Directors, the Offshore Funds' auditors, and/or the

appropriate authorities. By simply complying with their professional responsibilities, duties of

care, and fiduciary duties, the Citco Defendants and the Director Defendants could have ceased

the diminution of the Offshore Funds' value. Instead of conducting themselves as required by

the legal, professional, and contractual obligations to the Funds, the Defendants knowingly,

willfully, recklessly, and/or with gross negligence took advantage of the following misconduct.

**1.** **Red Flag #1 – There Was a Substantial Increase in the Offshore Funds' Value at a Time When Global Equity Markets Were Performing Poorly.**

190. Lauer's claims of rapidly increasing NAVs in a declining equity market should

have received professional skepticism on the part of the Citco Defendants and the Director

Defendants, but did not. At the conclusion of 1999, the global equity markets declined

significantly and investors generally suffered negative returns for 2000 and 2001. In 2000, major

equity indices either lost significant value or grew little–S&P 500 (-10.14%), DJIA (+5.11%)**,**

NASDAQ 100 (-39.3%). In 2001, major equity indices lost value–S&P 500 (-13.04%), DJIA

(-11.07%)**,** NASDAQ 100 (-21.05%). Yet, the Offshore Funds purportedly grew exponentially

during both 2000 and 2001. From December 31, 1999 to December 31, 2001, Offshore

purportedly gained 37.9%. From December 31, 1999 to December 31, 2001, Orbiter purportedly

gained 10.3%. From December 31, 1999 to December 31, 2001, Viator gained an astounding

105.8%.  These dramatic gains, in the face of at best a stagnant or declining market, should have caused the Citco Defendants and the Director Defendants to scrutinize the sources of the gains and reevaluate how the NAVs were calculated for the Offshore Funds.  Because the Citco Defendants and the Director Defendants owed the Offshore Funds the above-noted duties of care and fiduciary duties, they had a duty to act and to conduct minimal due diligence in light of this red flag.  The Citco Defendants and the Director Defendants violated and knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore Funds by failing to do so and by taking financial advantage of these acts.

2.    **Red Flag #2 – There Was a Substantial Increase in the Concentration of the Offshore Funds' Holdings in the Target Companies.**

191.    Over the same time period that the Offshore Funds' purported performance was strikingly better than the performance of the global equity markets, there was a growing concentration of the Offshore Funds' total portfolio attributed to increasingly fewer, thinly traded stocks, including Biometrics Security Technology, Inc. ("Biometrics") (formerly known as AUG Corp.), Fidelity First Financial Corp. ("Fidelity First"), SMX Corp. ("SMX"), XtraCard Corp. ("SMX") (formerly known as Nu-D-Zine, Inc., hereinafter as "Nu-D-Zine"), Method Products Corp. ("MPC"), Total Film Group, Inc. ("Total Film"), World Wireless Communications ("World Wireless"), Equitel, Inc. ("Equitel"), and Continental Southern Resources, Inc. ("CSR") (collectively, the "Target Companies").

192.    Specifically, there was a dramatic increase in the Target Companies as a percentage of the Offshore Funds' holdings.  For the year ended December 31, 1998, the Target Companies accounted for only 5.9% of the Offshore Funds' portfolio value of $325,600,000.[5]

_____

[5] The pre-receivership values stated for portfolio companies in this Amended Complaint do not reflect actual values but the values stated by Lauer and approved by the Defendants, unless otherwise noted.  These values

(continued…)

By December 31, 2000, the Target Companies accounted for 53.4% of the Offshore Funds'

portfolio value of $768,200,000.  This concentration continued to grow, so that by December 31,

2002, the Target Companies accounted for 83.2% of the Offshore Funds' portfolio value of

$878,400,000.  Moreover, the majority of the Target Companies were companies that did not

make filings with the SEC and for which there was no publicly available financial information

and had questionable or deteriorating financial conditions.  A minimum of due diligence would

have disclosed Lauer's huge investments in failing companies and the unsupported increases in

these failing companies' stock valuations.  This dramatic increase in the concentration of the

Offshore Funds in the Target Companies should have presented a red flag sufficient enough to

increase the Citco Defendants' and the Director Defendants' scrutiny of them.  Even assuming

the Citco Defendants and the Director Defendants recognized these tell tale aberrations that

signified a valuation problem had permeated the Offshore Funds, rather than notifying investors,

Independent Directors, the Offshore Funds' auditors, and/or appropriate authorities of this

increasing "proportion that big bets represent to the overall portfolio," as Keunen stated fund

administrators should do, the Citco Defendants and Director Defendants said and did nothing.

Because the Citco Defendants and the Director Defendants owed the Offshore Funds the above-

noted duties of care and fiduciary duties, they had a duty to act in light of this red flag.  The

Citco Defendants and the Director Defendants violated and knowingly, willfully, recklessly,

and/or with gross negligence breached their duties of care to the Offshore Funds by failing to do

so and by taking financial advantage of these acts.

---

reflect Lauer's manipulative trading and valuation strategies.  The Receiver does not endorse these numbers as true
valuations for these holdings; rather, these manipulated valuations are so detached from reality as to give the
Defendants obvious proof of Lauer's manipulations.

**3.      Red Flag #3 – There Was a Substantial Increase in the Values Attributed to the Offshore Funds' Holdings in the Target Companies.**

193.     At the same time there was a substantial increase of the Target Companies as a percentage of the Offshore Funds' holdings, there was also a dramatic increase in the values attributed to them.  For the year ended December 31, 1998, the Target Companies accounted for only $19,300,000 of the Offshore Funds' portfolio value.  By December 31, 2000, the Target Companies accounted for $342,400,000 of the Offshore Funds' portfolio value–a fourteen-fold increase.  By December 31, 2002, the Target Companies accounted for $730,700,000 of the Offshore Funds' portfolio value.  This dramatic increase in the value of a small number of holdings should have caused the Citco Defendants and the Director Defendants to scrutinize the valuations placed on the Offshore Funds' holdings in the Target Companies and take appropriate steps to ensure that the "big bet" positions were carried at fair value in accordance with GAAP.  Moreover, a minimum of due diligence would have exposed these baseless valuations.  Because the Citco Defendants and the Director Defendants owed the Offshore Funds the above-noted duties of care and fiduciary duties, they had a duty to act in light of this red flag.  The Citco Defendants and the Director Defendants violated and knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore Funds by failing to do so and by taking financial advantage of these acts.

**4.      Red Flag #4 – There Was a Dramatic Increase in the Values Given to Large Blocks of Restricted Stocks That Had Been Purchased for Much Lower Prices.**

194.     Between 1998 and 2002, the bulk of the Offshore Fund's investments in the Target Companies were purchased for pennies per share in private, off-market transactions for restricted stock.  These restricted securities were then written up by tens of millions (or even hundreds of millions) of dollars just days or months later based primarily on the price for comparatively tiny purchases of unrestricted shares of the same stock by the Offshore Funds that

they acquired through the public markets.  The holdings were then reflected in the financial statements as having millions of dollars of "unrealized gains."   These dramatic jumps in purported value of restricted shares should have caused the Citco Defendants and the Director Defendants to scrutinize the valuations of the securities.  Only when the Citco Defendants and Director Defendants were looking for a way to disassociate themselves from the Offshore Funds did they ask for an explanation of this issue from Lauer and Lancer.   Because the Citco Defendants and the Director Defendants owed the Offshore Funds the above-noted duties of care and fiduciary duties, they had a duty to act in light of this red flag.  The Citco Defendants and the Director Defendants violated and knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore Funds by failing to do so and by taking financial advantage of these acts.

5. **Red Flag #5 – There Were Small, End of Period Trades in the Stock of the Target Companies Serving No Business Purpose Other than to Inflate the Offshore Funds' NAVs.**

195.    The Funds' tiny purchases of unrestricted shares in the Target Companies at high prices that were used to value the enormous holdings of restricted securities served no apparent business purpose other than to inflate the Offshore Funds' NAVs.  When the Offshore Funds already held hundreds of thousands or even millions of shares in the Target Companies–and often had controlling interests–there was no business purpose served in purchasing a comparatively miniscule number of publicly traded shares at the end of a month, quarter, or fiscal year at relatively high prices.  These tiny, end-of-period trades should have caused the Citco Defendants and the Director Defendants to scrutinize the valuations of the securities in which these trades were taking place.  Only when the Citco Defendants and Director Defendants were looking for a way to disassociate themselves from the Offshore Funds did they request an explanation of this issue from Lauer and Lancer.  Because the Citco Defendants and the Director

Defendants owed the Offshore Funds the above-noted duties of care and fiduciary duties, they had a duty to act in light of this red flag.  The Citco Defendants and the Director Defendants violated and knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore Funds by failing to do so and by taking financial advantage of these acts.

6.  **Red Flag #6 – The End of Period Trades, and the Corresponding Increases in Valuation of the Target Companies, Coincided with the Calculation of Lauer's Fees.**

196.   Not only was there no valid business purpose for the small, end-of-period trades, but the timing of the trades suspiciously coincided with the timing of the calculation of management and incentive fees paid to Lancer and thereafter to Lauer.  The management and incentive fees paid to Lancer and to Lauer were calculated based on the NAV of the Offshore Funds at the end of certain quarters or the fiscal year.  It was thus in Lauer's interest to cause the NAV of the Offshore Funds to appear to be high at the points in time when these fees were calculated; the small, end-of-period trades in the Target Companies served this interest–a fact that should have been obvious to the Citco Defendants and the Director Defendants, especially since their *own* fees were calculated at the same time and on a similar basis.  Because the Citco Defendants and the Director Defendants owed the Offshore Funds the above-noted duties of care and fiduciary duties, they had a duty to act in light of this red flag.  The Citco Defendants and the Director Defendants violated and knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore Funds by failing to do so and by taking financial advantage of these acts.

7.  **Red Flag #7 – There Was a Substantial Increase in the Number of Shares Obtained by the Offshore Funds at Little or Even No Cost.**

197.   A substantial percentage of the shares in the Target Companies obtained by the Offshore Funds were acquired for little or no cost through the exercise of warrants, options or debt conversions.  These very same securities were then valued at extraordinary amounts, despite

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

their nominal cost basis.  For example, in 2001, Lauer converted approximately $500,000 in defaulted loans to Fidelity First into common stock in Fidelity First.  This conversion was done at a ratio of one share of stock for each penny of debt (plus accrued interest), resulting in the issuance of 56,656,629 shares.  Lauer then simultaneously valued these shares at $2 per share, resulting in the conversion of approximately $500,000 in worthless debt into equity with a purported value of approximately $113,000,000.  This and other dramatic increases in value for securities obtained at little or no cost should have caused the Citco Defendants and the Director Defendants to scrutinize the valuations for those holdings.  Only when the Citco Defendants and Director Defendants attempted to disassociate themselves from the Offshore Funds did they ask for an explanation of this issue from Lauer and Lancer.  Because the Citco Defendants and the Director Defendants owed the Offshore Funds the above-noted duties of care and fiduciary duties, they had a duty to act in light of this red flag.  The Citco Defendants and the Director Defendants violated and knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore Funds by failing to do so and by taking financial advantage of these acts.

**8.**      **Red Flag #8 – The Defendants Knowingly Accepted and Approved Lauer's Absurd Valuations.**

198.      During all relevant time periods, there was no readily ascertainable market price to determine the value of the majority of the Target Companies.  For these securities, the Citco Defendants and the Director Defendants knew that the valuations claimed by Lauer were absurd. *See*, *infra,* Exhibit "R."  Lauer used trades at the ends of months, quarters, and years in determining their purported values.  The values claimed for these securities thus jumped from only a few million dollars to a figure approaching one billion dollars in only two years.  The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross

negligence accepted the investment manager's baseless opinion for valuing thinly traded and restricted securities.  This dramatic increase should have caused the Citco Defendants and the Director Defendants to scrutinize the valuations of the Offshore Funds' holdings.  Instead, the Citco Defendants and Director Defendants relied on Lauer's absurd valuations and recklessly failed to verify them, when the Defendants knew that Lauer's fees, like theirs, increased with the value of the absurd valuations.  Because the Citco Defendants and the Director Defendants owed the Offshore Funds the above-noted duties of care and fiduciary duties, they had a duty to act in light of this red flag.  The Citco Defendants and the Director Defendants violated and knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore Funds by failing to do so and by taking financial advantage of these acts.

**B.**     **Citco Knowingly, Willfully, Recklessly, And With Gross Negligence Breached Their Duties to The Funds By Failing to Monitor Risk and to Value the Portfolio Properly and Independently**

199.     Beginning at least as early as 2000, Lauer caused the Offshore Funds to pursue a risky investment strategy.  In a 1997 Business Week article, Lauer was quoted as stating that the funds' "secret" was to seek out "fallen angels"–companies in which Wall Street firms have little or no interest.  However, the PPM represented that "[t]he majority of the common stocks in which the Fund has and intends to invest are traded on the New York Stock Exchange, the American Stock Exchange or in the over-the-counter market in the United States of America."  Since 2000, however, Lauer caused the Offshore Funds to focus almost exclusively on roughly a dozen stocks traded on the over-the-counter ("OTC") market.  OTC securities are securities that are not traded on an exchange such as the NYSE, NASDAQ, or AMEX, usually due to an inability to meet listing requirements.

200.     For each of the years between 2000 and 2003 inclusive, the great majority of the Offshore Funds' trading activity was for securities traded on the OTC markets, as opposed to the

NYSE, NASDAQ, or AMEX.  Similarly, a significant portion of the Offshore Funds' total purported market value became concentrated in investments in a handful of companies with shares traded in the OTC markets.

201.   As of December 31, 2001, approximately 74% of Offshore's purported market value was composed of securities in only eight such companies.  Similarly, as of December 31, 2002, approximately 84% of Offshore's purported market value was composed of securities in only nine such companies, including the Target Companies.

202.   Lauer's interest in the Target Companies, and his depletion of the Offshore Funds' assets into these companies, was not the result of his interest in any fundamental value in their businesses.  The Target Companies had little or no earnings in 2000 or thereafter.  In fact, several of them had no material business operations.  Only one of the Target Companies realized a profit in 2001, and that was a direct result of cancellation of debt, not from business operations. The Director Defendants and the Citco Defendants breached their duties to the Offshore Funds by failing to conduct a minimum amount of due diligence, which would have disclosed the dire financial condition of these Target Companies.

203.   Lauer depleted the Offshore Funds and invested in the Target Companies to further his own interests.  The Target Companies were used by Lauer to inflate the purported NAV of the Offshore Funds and, as a result, the fees paid to Lauer and the Citco Defendants.

204.   Lauer artificially inflated the purported value of the Offshore Funds' holdings in the Target Companies by causing the Offshore Funds to acquire large blocks of restricted stock or other securities in the Target Companies in private transactions, often paying only pennies per share.  Lauer would then, directly or indirectly, make manipulative trades in a comparatively insignificant amount of the unrestricted, publicly traded stock of these Target Companies at

artificially high prices.  At the end of certain months, Lauer would place orders for small numbers of shares in the thinly traded Target Companies at prices much higher prices than he paid in the private transactions.  Often these orders would be the only retail transactions in shares of the Target Companies during that day.  OTC pricing services then would report the price paid for these publicly traded shares.  Simply put, Lauer would take the last price traded, even though he had created that artificially high price, as the value of the stock and multiply it by the thousands of shares he had previously bought for pennies to inflate the Funds' NAVs.

205.    Indeed, Defendants and Lauer's interests were aligned against the interests of the Funds because both Citco's and Lauer's fees increased as the Funds' NAVs were inflated and increased.  The Defendants' alignment with Lauer perpetuated Defendants' scheme to maximize their fees despite their actual knowledge that their fees were unsupported by reality.  Defendants actively participated in this scheme with Lauer by breaching their duties of care to the Funds and by disseminating the inflated and false NAVs to the investors and the Funds.

206.    The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care and fiduciary duties to the Offshore Funds by improperly using this "last trade price" as the per-share value of the Target Companies' shares without inquiring into the nature of the end of the month trades.  The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care and their fiduciary duties and obligations by projecting the "last trade price" value onto *all* of the shares in the Target Companies held by the Offshore Funds, including the large blocks of restricted shares acquired for only pennies per share, without determining whether this valuation method was in accordance with GAAP as the Citco Defendants were required to do or without regard to their obligation to determine if the

transactions were performed by a person (such as Lauer) with a personal interest in the value of the stock.  The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care and fiduciary duties to the Offshore Funds by failing to recognize Lauer's glaring conflict of interest (and the Defendants' own conflicts of interest) in providing these valuations.  The Citco Defendants and the Director Defendants had actual knowledge that Lauer's fees, like their own, were also tied to the inflated NAVs he provided.  Rather than independently valuing Lauer's inflated and baseless NAV, or even performing the slightest due diligence, the Citco Defendants and Director Defendants rubberstamped and approved these bogus valuations to maximize their administrative fees, which corresponded to the inflated NAV, again breaching their duties of care and fiduciary duties owed to the Offshore Funds.

207.    Accordingly, the Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duty to disclose the inflated and baseless NAVs to the Offshore Funds themselves and to report and disclose the inflated and baseless NAVs to the investors appropriate authorities and the Independent Directors.  Further, the Defendants knowingly, willfully, recklessly and with gross negligence knowingly, breached their duty to independently determine and verify the values as well as warn of the overstated and inflated values of the Funds' NAVs.

208.    The Defendants each knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties to the Funds by failing to replace Lauer as the investment manager, failing to control Lancer's investments in the thinly traded securities, approving and/or acquiescing in Lauer's baseless inflated valuations of the Funds that Defendants disseminated to the investors and the Funds, and/or to forbid and reject the valuation

methodology that had no other apparent rationale other than to increase Lauer's and the Citco Defendants' own fees, as set forth more fully below.

209.    Lauer's conduct, along with the egregious breaches of the Citco Defendants and the Director Defendants, had the effect of grossly over-inflating the values assigned to the Offshore Funds' portfolio.  For example, while the book (cost) value of Offshore's portfolio as of December 31, 2000 was $274,967,678, the reported market value was $711,487,556.  Similarly, while the book (cost) value of Offshore's portfolio as of December 31, 2001 was $261,908,110, the reported market value was $830,293,002.  The vast majority of the unrealized increase in value was not based on any actual increase in value of the Offshore Funds' portfolio, but was the result of Lauer's manipulation of the NAV and the Citco Defendants' and the Director Defendants' knowing and reckless failure to recognize the manipulation, knowing and reckless failure to apply the valuation principles under GAAP that they were required to apply, and knowing and reckless failure to independently price the Offshore Funds.

210.    The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately about the value of the Offshore Funds' NAV.

211.    Significantly, these inflated NAVs for the Offshore Funds in turn inflated the fees payable to Lancer, Lauer, and the Citco Defendants.  Lauer's conduct resulted in the overpayment in the tens of millions of dollars of management, incentive, and administrative fees to Lancer and to the Citco Defendants.  These "false profit" fee payments harmed the Offshore

Funds by draining the Offshore Funds of value.  The inflated values also leant credibility to
Lauer and prolonged the life of the Offshore Funds, despite hopeless and deepening insolvency,
solely for the purpose of generating fees payable to Lancer, Lauer, and the Citco Defendants.

212.   The Citco Defendants and the Director Defendants knowingly, willfully,
recklessly, and/or with gross negligence breached their duties of care, fiduciary duties, and
obligations to the Funds by knowingly approving Lauer's overstated valuations for their own
pecuniary gain and by failing to disclose the grossly over-inflated valuations of the Target
Companies as well as the increased accumulation of the Funds' equity positions in the Target
Companies, since both the Citco Defendants and the Director Defendants had contractual,
statutory, and common-law obligations to the Offshore Funds to discover and take appropriate
steps to prevent the continuing depletion of the Offshore Funds.  Instead, the Citco Defendants
accepted the benefits of this scheme in the form of increased administrative fees to Citco.  The
Citco Defendants' and the Director Defendants' breaches of duties of care, fiduciary duties, and
obligations to the Funds was an essential element of the scheme to harm the Funds.  Lauer would
not have been able to prolong the life of the Offshore Funds and continue depleting them of
value but for the gross negligence and willful misconduct of the Citco Defendants and the
Director Defendants.

213.   The Citco Defendants and the Director Defendants also knowingly, willfully,
recklessly, and/or with gross negligence breached the duties of care set forth in the PPM, the
Articles of Association, the Investment Management Agreement, the Sound Practices Manual,
Citco's own risk management controls and valuation policies and procedures, as well as their
fiduciary duties by failing to replace Lauer and Lancer Management after they discovered the
inflated valuations, by approving and/or acquiescing in Lauer's inflated valuations of the Funds,

by failing to reject or forbid Lauer's valuation policy, by failing to terminate the Fund after they discovered the inflated valuations, by failing to supervise the administration of the Funds, by failing to independently value the Funds, by failing to determine the NAV in accordance with GAAP principles and standards, by actively mismanaging the Funds' business and affairs, by failing to perform due diligence, by failing to set forth the bases of the Funds valuations, and by possessing conflicts of interest with the Funds they were charged with independently valuing.

**1.      Fiscal Year 2000 Holdings**

214.    As of December 31, 2000, the Offshore Funds' stated NAV consisted largely of holdings whose stated values were grossly overstated by Lauer and by the Citco Defendants and the Director Defendants.  The Defendants' failure to determine fair value for these holdings in accordance with GAAP or even exercise a minimum of due diligence knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care and fiduciary duties owed to the Funds in addition to the Citco Defendants' breaching their contractual duties.

**(b)      The Skynet Bridge Loans**

215.    As of December 31, 2000, Offshore had three outstanding bridge loans to Skynet Holdings, Inc. ("Skynet"), totaling $8,500,000, and Orbiter had an outstanding loan to Skynet of $1,600,000.  The loans, however, were in default, and Skynet had filed for bankruptcy in June 2000.

216.    Skynet's filings with the SEC–which were publicly available through various sources to the Citco Defendants and the Director Defendants–reflected that Skynet had filed for bankruptcy and that Offshore's $8,500,000 in loans was secured by nothing more than a third-position security interest in a Skynet subsidiary.

217.    Moreover, a June 30, 1999 Skynet filing with the SEC stated, "[w]e believe that during the past several years [the subsidiary] has incurred substantial operating losses and presently has a negative net worth of approximately $8 million."

218.    The Citco Defendants and the Director Defendants failed to value these loans at their fair value and in accordance with GAAP, despite this publicly available information. Instead, the Citco Defendants and Director Defendants willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by carrying the Skynet bridge loans at their claimed full-face value of $10,100,000 on Offshore's ledgers for purposes of NAV calculation.  Moreover, the Defendants either knew of the publicly available information and ignored it or failed to even perform minimal due diligence to review publicly available information relating to the Skynet bridge loan.

219.    Because of the bankruptcy, the Skynet Bridge Loans were later sold to a third party for approximately 3% of their total face value.

    **(c)**    **<u>SMX</u>**

220.    As of December 31, 2000, Offshore owned common stock and warrants in SMX valued by Lauer at a total of $188,734,700.  This represented approximately 27% of Offshore's total NAV as stated by Lauer.  This valuation also represented a purported gain to Offshore of $186,379,890, according to Lauer.

221.    The Citco Defendants and the Director Defendants knew or should have known the following about SMX's true condition as of December 31, 2000:

    a.    SMX had *no* revenues for the year.

    b.    SMX was a shell company with *no* operations of any kind.

    c.    SMX had total assets of only $2,154,244, made up of cash and one note receivable.

    d.    SMX was a non-reporting entity that did not file any publicly available financial information.

222.    Even if the NAV stated by Lauer had not been manipulated through month-end trading, the valuation stated by Lauer was obviously inaccurate because it failed to account for the fact that 99.6% of Offshore's holdings in SMX consisted of restricted shares, which had been acquired privately for $2,032,400, at an average cost per share of 36¢.  These shares should not have been valued at the last closing price (which was based on transactions related only to unrestricted shares), even if legitimate, because they could not have been freely sold at such price.  But, by using Lauer's manipulated market valuation of $27 per share, which the Citco Defendants and the Director Defendants willfully, knowingly, consciously, recklessly, and/or with gross negligence used for NAV calculations, these restricted shares inaccurately reflected a gain of $150,274,600. Accordingly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately and/or correct their misrepresentations about the value of the Offshore Funds' holding in SMX.

    **(d)**    **Fidelity First**

223.    As of December 31, 2000, Offshore owned stock and warrants in Fidelity First valued by Lauer at a total of $39,510,715.  This represented approximately 5.7% of Offshore's total NAV and represented a purported gain to Offshore of $31,310,359.

224.    Yet the Citco Defendants and the Director Defendants knew or should have known the following about Fidelity First's true condition as of December 31, 2000:

   a.    Fidelity First had revenues from discontinued operations of only $810,696 for the year.

   b.    Fidelity First had *no* operations of any kind.

   c.    Fidelity First had a *negative* net worth of $753,520.

   d.    Fidelity First was a non-reporting entity that did not file any publicly available financial information.

225.    Even if the NAV stated by Lauer had not been manipulated through month-end trading, the valuation stated by Lauer was obviously inaccurate because it failed to account for the fact that 90% of Offshore's holdings in Fidelity First consisted of restricted shares, which had been acquired privately for $5,238,856, at an average cost per share of $5.69.  These shares should not have been valued at the last closing price (as a result of transactions related only to unrestricted shares), even if legitimate, because they could not have been freely sold at such price.  But, by using Lauer's manipulated market valuation of $22 per share, which the Citco Defendants and the Director Defendants willfully, knowingly, consciously, recklessly, and/or with gross negligence used for NAV calculations, these restricted shares inaccurately reflected a gain of $15,005,723. Accordingly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately and/or correct their misrepresentations about the value of the Offshore Funds' holding in Fidelity First.

   (e)    **Nu-D-Zine**

226.    As of December 31, 2000, Offshore owned stock and warrants in Nu-D-Zine valued by Lauer at a total of $51,329,445.  This represented approximately 7.4% of Offshore's NAV and represented a purported gain to Offshore of $50,897,333.

227.    Yet the Citco Defendants and the Director Defendants knew or should have known the following about Nu-D-Zine's true condition as of December 31, 2000:

a.    Nu-D-Zine had *no* revenues for the year.

b.    Nu-D-Zine was a shell company with *no* operations of any kind.

c.    Nu-D-Zine had total assets of only $354,128, made up of $300,000 in cash and a $4,128 deferred tax asset

d.    Nu-D-Zine was a non-reporting entity that did not file any publicly available financial information.

228.    Even if the NAV stated by Lauer had not been manipulated through month-end trading, the valuation stated by Lauer was obviously inaccurate because it failed to account for the fact that 99.6% of Offshore's holdings in Nu-D-Zine consisted of restricted shares, which had been acquired privately for $425,000 at an average cost per share of 2¢.  These shares should not have been valued at the last closing price (which resulted from transactions related to only unrestricted shares), even if legitimate, because they could not have been freely sold at such price.  But, by using Lauer's manipulated market valuation of $1.06 per share, which the Citco Defendants and the Director Defendants willfully, knowingly, consciously, recklessly, and/or with gross negligence used for NAV calculations, these restricted shares inaccurately reflected a gain of $21,728.320.    Accordingly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by

failing to speak accurately and/or correct their misrepresentations about the value of the Offshore

Funds' holding in Nu-D-Zine.

## 2.      The Fiscal Year 2000 Holdings of Orbiter and Viator

229.    Like Offshore, Orbiter and Viator held securities in many of the same Target

Companies, including Fidelity First, SMX, Total Film and World Wireless.

230.    Using Lauer's and the Defendants' valuations, these securities represented

$20,329,276 of Orbiter's total holdings, or 45%, in the fiscal year 2000 financial statements.

They represented $12,595,904 of Viator's total holdings, or 47.8%, in the fiscal year 2000

financial statements.

231.    Given the nearly worthless nature of the Skynet loans, the illiquidity of the

Offshore Funds' restricted shares in SMX, Fidelity First, and Nu-D-Zine, and the lack of a

"quoted market price for these securities in an active market," under GAAP, the Citco

Defendants and the Director Defendants should have measured the Offshore Funds' investments

in the Target Companies' securities at their fair value, as determined in good faith, rather than

valuing all these securities at their "last trade" price (a price that was obviously manipulated by

Lauer).   But, to fairly value these portfolio holdings would have meant that the Citco

Defendant's fees would have been reduced accordingly.  By willfully, knowingly, consciously,

recklessly, and/or with gross negligence failing properly to value these investments, the NAVs

for Offshore, Orbiter and Viator, as determined by the Citco Defendants and the Director

Defendants, were grossly overstated.  For example, in Offshore alone, despite these entities' lack

of business operations, SMX was valued at $186,000,000 over its cost, Fidelity First was valued

at $31,000,000 over its cost and Nu-D-Zine was valued at $51,000,000 over its cost.

Accordingly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly,

and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and

obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately and/or correct their misrepresentations about the value of the Offshore Funds' holding in these investments.

### 3.     Fiscal Year 2001 Holdings

232.    As of December 31, 2001, the Offshore Funds' stated NAV consisted largely of holdings whose stated values were grossly overstated by Lauer and by the Citco Defendants and Director Defendants.  The Citco Defendants' failure to determine fair value for these holdings in accordance with GAAP fell well below the applicable standard of professional care and their contractual requirements.  Accordingly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately and/or correct their misrepresentations about the value of the Offshore Funds' Fiscal Year 2001 holdings.

#### (b)     Target Company Valuations

233.    On June 18, 2002, Lauer provided the Citco Defendants and the Director Defendants with copies of valuation memoranda for ten companies (individually as "FY 2001 Valuation Memo"), including SMX, Fidelity First, Nu-D-Zine, Total Film, Lighthouse Fast Ferries, Inc., The Credit Store, Inc., Wolfpack Corp., EPL Technologies, Inc., Biometrics, and MPC.

(i)    **SMX**

234.    As of December 31, 2001, Offshore owned common stock and warrants in SMX valued by Lauer at a total of $133,416,942.  This represented approximately 16% of Offshore's NAV and represented a purported gain to Offshore of $129,173,554.

235.    Yet the Citco Defendants and the Director Defendants knew or should have known the following about SMX's true condition as of December 31, 2001:

   a.    SMX had revenues of only $99,441 for the year.

   b.    SMX was still a shell company with *no* operations of any kind.

   c.    SMX had total assets of only $1,282,034, comprised of cash and an amount owed to it from settling a lawsuit.

   d.    SMX was a non-reporting entity that did not file any publicly available financial information.

236.    In the SMX FY 2001 Valuation Memo, Lauer justified the valuation of Offshore's holdings in SMX on the grounds that the company "has identified numerous potential acquisition candidates, one of which is Space Logic Ltd. (SLL)."   Yet, the purported acquisition had not occurred as of the date of Lauer's memo and never actually occurred.

237.    Even if the NAV stated by Lauer had not been manipulated, the valuation stated by Lauer was obviously inaccurate because it failed to account for the fact that 98.7% of Offshore's holdings in SMX consisted of restricted shares, which had been acquired privately for $2,032,400, at an average cost per share of 19¢.   Offshore actually received approximately 5,000,000 shares of SMX during 2001 at zero cost.  These shares should not have been valued at the stated price because they could not have been freely sold at such price.  But, by using Lauer's manipulated valuation of $12.25 per share, which the Citco Defendants and the Director Defendants willfully, knowingly, consciously, recklessly, and/or with gross negligence used for NAV calculations, these restricted shares inaccurately reflected a gain of $126,994,600.

Accordingly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately and/or correct their misrepresentations about the value of the Offshore Funds' holding in SMX.

**(ii)      Fidelity First**

238.    As of December 31, 2001, Offshore owned stock in Fidelity First valued by Lauer at a total of $120,192,474.   This represented approximately 14.3% of Offshore's NAV and represented a purported gain to Offshore of $110,618,648.

239.    Yet the Citco Defendants and the Director Defendants knew or should have known the following about Fidelity First's true condition as of December 31, 2001:

   a.    Fidelity First had non-operating revenues of only $106,768 for the year.

   b.    Fidelity First had *no* operations of any kind.

   c.    Fidelity First had total assets of only $81,646 and a *negative* net worth of $424,669.

   d.    Fidelity First was a non-reporting entity that did not file any publicly available financial information.

240.    In the Fidelity First FY 2001 Valuation Memo, Lauer justified the valuation of the Fidelity First warrants in Offshore's portfolio on the grounds that Fidelity First "has developed an acquisition strategy to build a new type of financial services company.  The concept is based upon the acquisition of Columbia National and or Vcross…"  Yet, the purported acquisitions had not occurred as of the date of Lauer's memo and never actually occurred.

241.   Even if the NAV stated by Lauer had not been manipulated through month-end trading, the valuation stated by Lauer was obviously inaccurate because it failed to account for the fact that 99.7% of Offshore's holdings in Fidelity First consisted of restricted shares, which had been acquired privately for $5,599,176, at an average cost per share of 10¢.  These shares should not have been valued at the stated price because they could not have been freely sold at such price.  But, by using Lauer's manipulated valuation, which the Citco Defendants and the Director Defendants willfully, knowingly, consciously, recklessly, and/or with gross negligence used for NAV calculations, these restricted shares inaccurately reflected a gain of $113,984,719. Accordingly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately and/or correct their misrepresentations about the value of the Offshore Funds' holding in Fidelity First.

**(iii)     Nu-D-Zine**

242.   As of December 31, 2001, Offshore owned stock and warrants in Nu-D-Zine valued by Lauer at a total of $138,570,918.  This represented approximately 17% of Offshore's NAV and represented a purported gain to Offshore of $137,289,208.

243.   Yet, the Citco Defendants and the Director Defendants knew or should have known the following about Nu-D-Zine's true condition as of December 31, 2001:

a.     Nu-D-Zine had *no* revenues for the year.

b.     Nu-D-Zine was a shell company with *no* operations of any kind.

c.     Nu-D-Zine had total assets of only $1,779,385.

     d.     Nu-D-Zine was a non-reporting entity that did not file any publicly available financial information.

244.    In the Nu-D-Zine FY 2001 Valuation Memo, Lauer justified the valuation of the Nu-D-Zine warrants in Offshore's portfolio on the grounds that Nu-D-Zine "has identified numerous potential acquisition candidates, one of which is Active InterMedia, Inc. (AIM)."  Yet the purported acquisition had not occurred as of the date of Lauer's memo and never actually occurred.

245.    Even if the NAV stated by Lauer had not been manipulated, the valuation stated by Lauer was obviously inaccurate because it failed to account for the fact that 98.8% of Offshore's holdings in Nu-D-Zine consisted of restricted shares, which had been acquired privately for $925,000, at an average cost per share of 3¢.  These shares should not have been valued at the stated price because they could not have been freely sold at such price.  But, by using Lauer's manipulated market valuation of $3.10 per share, which the Citco Defendants and the Director Defendants willfully, knowingly, consciously, recklessly, and/or with gross negligence used for NAV calculations, these restricted shares indicated a gain of $82,193,750. Accordingly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately and/or correct their misrepresentations about the value of the Offshore Funds' holding in Nu-D-Zine.

### 4.    Continuing Failure as Fund Administrator and as Directors

246.    Lancer and Lauer retained Stenton Leigh Capital Corp., ("Stenton Leigh") a purported security valuation expert, to prepare and provide valuation reports for four Target Companies–Nu-D-Zine, MPC, Biometrics and SMX.  No valuation reports were provided for the remaining six companies.

247.    Stenton Leigh's valuation reports, however, used inappropriate and unrealistic projections, hypotheticals, and assumptions, and as such, could not be considered sufficient, reliable or adequate evidence upon which to value these securities "in good faith."  More importantly, Stenton Leigh's principal, who executed the reports, stated therein that Stenton Leigh's **"engagement is not of an independent nature and that I, my companies or affiliates may own shares in this Company or other LANCER-owned or LANCER-controlled companies."** (Emphasis supplied).

248.    In fact, Stenton Leigh shared the same address in Boca Raton, Florida, as Biometrics, one of the companies that it was called upon to value, and the same address and phone number as Nu-D-Zine, another of the companies it valued.  Principals of Stenton Leigh served as directors and officers of Biometrics, Nu-D-Zine, and SMX–three of the four Target Companies that Stenton Leigh valued at Lancer's request.  Stenton Leigh was also a shareholder of MPC–the only other company Stenton Leigh was asked to evaluate.  The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by relying on these blatantly conflicted valuation reports for their own pecuniary gain, by failing to disclose the conflicts of interest to the Independent Directors, and by failing to request a valuation report from a non-conflicted entity.

249.    A comparison of Lauer's patently deficient justifications for his valuations with the true conditions of the Target Companies again makes the Citco Defendants' and the Director Defendants' gross negligence readily apparent.  The true conditions of the Target Companies were either known or should have been discovered by the Citco Defendants and the Director Defendants through the exercise of their professional responsibilities simply by requesting copies of the Target Companies' financial statements and similar information.  Instead, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties and obligations to the Offshore Funds by recklessly relying upon the "last trade" price as frequently supplied by Lancer itself in performing their NAV calculations.

250.    The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by abdicating their responsibilities as the independent fund administrator and as fund directors in valuing the Offshore's Funds holdings in the Target Companies.

251.    Even with respect to the four securities for which Lauer provided valuation reports prepared by a conflicted expert, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by failing to follow GAAP. GAAP requires the Board of Directors to take into consideration all available indications of fair value.  Also, the Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Funds by relying on Stenton Leigh's valuations, despite the fact that the evaluation itself disclaimed its

reliability by alerting the Citco Defendants and the Director Defendants that the "engagement [was] not of an independent nature and that I, my companies or affiliates may own shares in this Company or other LANCER-owned or LANCER-controlled companies."

252.     Similarly, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties and obligations to the Offshore Funds because they relied on Stenton Leigh's conflicted analysis and failed to independently confirm Lauer's and Stenton Leigh's methods to estimate the fair value of the Funds' NAV.  Given Stenton Leigh's lack of independence and its use of inappropriate and unrealistic projections, hypotheticals, and assumptions, the Citco Defendants and the Director Defendants nonetheless used these valuations as a basis to determine fair value. Similarly, the FY 2001 Valuation Memoranda also failed to provide a reasonable basis to determine the fair value of the ten companies Lauer discussed.

253.     Given the illiquidity of Offshore's restricted shares in the Target Companies, and the lack of a "quoted market price [for the securities] in an active market," under GAAP, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties and obligations to the Funds by knowingly approving Lauer's and Stenton Leigh's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately about the value of the Offshore Funds' holdings in accordance with GAAP.  Because the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached these duties, Offshore's NAV as of December 31, 2001 was grossly overstated.  For example, SMX's valuation was approximately $129,000,000 over cost, while

Fidelity First's valuation was approximately $110,000,000 over cost, and Nu-D-Zine's valuation

was approximately $51,000,000 over cost.

## VII.  THE CITCO DEFENDANTS GRASP FOR WAYS TO AVOID LIABILITY AND ADMIT THAT THEY BREACHED THEIR DUTIES TO THE FUNDS

254.   As early as October 1996, the Citco Defendants and the Director Defendants

understood the valuation risks that the Offshore Funds and the investors were subjected to, as

reflected on the October 31, 1996 memo from one of Citco's internal auditors, Ger Jan Meijer, to

Defendant Quilligan, among others, and copied to, Defendant Stocks, among others (the

"October 1996 Memo").  The October 1996 Memo, a copy of which is attached hereto as Exhibit

"Q," specifically states:

| | |
|---|---|
| To: | Sjaco Kroon <br> Declan Quilligan |
| From: | Ger Jan Meijer |
| C.c.: | Ben Jansen <br> Tony Stocks <br> John Verhooren <br> Edward Heidema |
| Date: | October 31, 1996 |
| Subject: | Review NAV statements of Lancer Offshore, Inc. as of September 30, 1996 |

Herewith you receive some comments re the of Lancer Offshore
Inc., as per September 30, 1996.

**1. General**

Lancer Offshore, Inc. (the "Fund") is a British Virgin Islands
corporation.   The Fund started operations in November 1995.
Since November 1995 the net asset value per share increased from
USD 100 to USD 189.72.

| Directors of the Fund: | Anthony Stocks |
| | John Verhooren |
| | Inter Caribbean Services Ltd. |
| Investment manager: | Lancer Management Group LLC |
| Auditors: | Ernst & Young |
| Administration fee: | 8 b.p. (minimum USD 750 per month for NAV up to USD 5 million, USD 1,250 for 5 till USD 10 million and USD 1,750 for 10 till USD 20 million.) |

**DRAFT FOR DISCUSSION PURPOSES ONLY**

Net assets on September 30, 1996          USD 10,803,551

## 1. Reg S deals

One of the investments activities of the Fund is Regulation S ("Reg S") deals.  Under Reg S companies can sell unregistered securities to foreign investors without first registering the deal with the SEC. The foreign investors must hold the securities for at least 40 days, at which point (62%) of the increase of net assets resulting from operations (total USD 4,478,415) for 1996 can be allocated to Reg S dealing in EPL Technologies Inc. Shares of this company (with 40 days restriction) were purchased for USD 2.50 on the moment the market value was USD 6.25.

CITCO values the restricted securities immediately as common shares, which results in most of the cases directly in a high unrealized gain on the deal.

I do not agree with to value restricted shares as common shares, because of:

-       its against the prudence concept;
-       the value of the restricted shares are lower, because of the restriction;
-       the market price can get a drop as soon as restricted securities are offered to the market.  The offering of large quantities of shares resulting from Reg S will have a negative influence on the market value (watering).

In my opinion the accounting principles re restricted securities have to be amended.  I propose a method with a daily appreciation from purchase price to expected market value.  In this case the expected market value is the market value minus a discount percentage for watering.  The discount percentage should depend

> from the quantity of restricted shares to be offered and the normal sales volumes on the market.
>
> I propose to ask the external auditors for a confirmation for the method to use.
>
> Furthermore I recommend to discuss with Kevin Meehan the disclosure requirements for the Fund for situations that a material (5 or more) percentage of interests in a company is held by the Fund.

*       *       *

255.    As reflected by the October 1996 Memo, the Citco Defendants and the Director Defendants recognized very early in their affiliation with the Offshore Funds the importance of not valuing the restricted shares of the Funds' holdings as if they were unrestricted shares and basing valuations on actual market value, not the last share price.

256.    Yet, as reflected above, the Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care, fiduciary duties and obligations to the Offshore Funds by knowingly approving Lauer's conflicted and baseless valuations for their own pecuniary gain, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately about the value of the Offshore Funds' NAV.

257.    Even in September 2001, Defendant Quilligan recognized that Lancer's valuations were absurd.  In an e-mail that Quilligan sent to Defendant Conroy (attached hereto as Exhibit "R"), Quilligan admitted to his fellow director that the Lancer portfolio valuation had no basis in reality:

> From:        Quilligan, Declan  CUR
> Sent:        Friday, September 21, 2001 5:20 AM
> To:          Conroy, Kieran  DUB
> Subject:     FW: Lancer NAV

I took a detailed look at the pf following notification by Serge of what valuation Lancer wanted to put on a prfd stock just recently bought.  **As far as I am concerned 75% of the portfolio is very illiquid with absurd valuations relative to the cost which is on average a fraction of the market value.  Warrants are grossly overvalued and have been since start of year as the broker statement prices for wts have merely been accepted.**  Lancer accept [sic] this and agreed to write down such wts before end of year.  PWC signed off on the latest financial statements to be released tomorrow but I am quite concerned.  It appears to me that they have put absurd valuations on illiquid stocks since the start of the year in particular in order to compensate for serious losses from some of their P/E or reg D deals.

(Emphasis supplied).

258.   In later conversations amongst themselves, the Citco Defendants and the Director Defendants knew that these investments could not sustain the valuations placed on the various stock holdings, yet all failed to report these problems to anyone outside the Citco organization. For example, discussions in February 2002 recognized that the valuation placed on Total Film by the Offshore Funds was unrealistic at best.   Ger-Jan Meyer wrote an e-mail to Defendant Quilligan on February 4, 2002, (attached hereto as Exhibit "S"), identifying this issue:

> From:         Meyer, Ger-Jan  CUR
> Sent:         Monday, February 4, 2002, 5:30 PM
> To:           Quilligan, Declan  CUR
> Subject:      Lancer
> Importance:   High
>
> Bram Gedopt came to me and told me that he does not feel comfortable with the valuation with the Total Film Group.  He has background information that the company has serious trouble, but Lancer is still showing a very high unrealized gain (cost USD8 mio market 35 mio)  He has to issue the January 31, 2002 financials in this week.  I think there is a serious risk that PWC want to adjust the valuation per December 31, 2001.

I understood that you are away until February 12.  Do you want
that I contact Gino Nivilac to get a solution here?

Rgrds,

Ger Jan

259.    Shortly thereafter and on February 6, 2002, Defendant Quilligan and Edward

Heidema of Citco N.V. traveled to New York to meet with Lancer personnel, including Michael

Lauer, Bruce Cowen, Martin Garvey, and David Newman.  Quilligan sent the following recap

via e-mail of this meeting reporting to Keunen, a director of The Citco Group and an officer of

Citco USA, in Miami and Conroy in Dublin (attached hereto as Exhibit "T"):

| | |
|---|---|
| From: | Quilligan, Declan  CUR |
| Sent: | Wednesday, February 06, 2002 11:52 PM |
| To: | Keunen, William  MIA; Heidema, Edward  CUR |
| Cc: | Fenlon, Greg  CUR; Conroy, Kieran  DUB |
| Subject: | RE: Lancer problems |

William,
The meeting with Lancer this afternoon was unpleasant.  Michael
Lauer, Bruce Cowen, Marty Garvey and Dave Newman all
attended and Edward was with me.  They think their valuations of
the portfolio is reasonable and are very much of the view that the
market priced all the dot.coms [sic] and the Yahoo's etc of this
world because of perception and nobody raised valuation issues for
Funds that held these.  We got off to a bad start when it turned out
that an investigation into Fidelity First Financial Corp actually had
no relevance to Lancer as the company they are invested in is First
Fidelity Financial Corp which they say is a totally unrelated
company.  We stressed the risk awareness approach we are taking
and that the Fund had been identified as one requiring extra
scrutiny.  They want time to put what we have asked for together
and do not feel that the NAV should be delayed pending them
acculating [sic] this information.   They invited us to meet
representatives from all these companies and if we wished to
attend some of their meetings etc.  Did any of this make me feel
more comfortable, not really.  Although they take haircuts on two
positions they are hugely aggressive in valuing thinly traded stocks
and Note they did say that all their investors know exactly what
they are doing, that they speak to them regularly etc.  They said
they had replacement directors in line, one of which is an investor
in the Fund and the other who is well known in the financial world

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

(Eddie can you remember the name).  Also Michael mentioned that if we were concerned that hey we could just walk away if we wished and Marty made a point of bringing up any mistake that we ever made.  At this stage although there is subscription activity of $14m should we give them that time frame to collate everything we need and then on the basis of that make an informed decision of what we want to do.  Note the below is a brief description of some of the large positions in the portfolio which I got sent to me from Curacao.  Eddie can you add anything to the above? Is the next email that I will send in a minute a suitable one to send to Michael Lauer or should we add more or make it sound better.  I am travelling [sic] for four hours between 8 and 12 tomorrow morn but will be in touch soon thereafter.  Kieran do you have anything to add.  PWC are also concerned.

Rgds
Declan

**AUG Corp.**
AUGC suspended ongoing operations in 1/1/1999 and is currently seeking buyers or strategic partners for further development of its existing technology, as well as merger opportunities.  For the 9 months ended 09/30/01, the company reports no revenue.  Net loss before extraordinary item fell 69% to $48,000.  Results reflect the suspension of revenue generating activities.  Lower loss reflects the absence of $90,000 in interest expenses and $108,000 in other income.

**NU-D-ZINE**
No ready information available on this one, which is a concern in itself I would say.

**SMX Corp–valued at over $130m**
Issue: April 23, 2001
LAKE MARY, Fla., April 23 /PRNewswire Interactive News Release/ -- FARO Technologies Inc. (Nasdaq: FARO), a leading provider of computer-aided manufacturing measurement (CAM2) solutions, today announced that it has entered into an agreement with SMX Corp. of Kennett Square, PA to provide SMX up to $3.0 million in new financing.   As part of this financing arrangement, FARO and SMX have executed a letter of intent for an option to acquire SMX.

SMX Corp. is a leading manufacturer and worldwide supplier of laser tracers and targets as well as metrology software and contract inspection services.  Laser trackers are highly accurate, portable, coordinate measurement machines used to make three-dimensional

measurements of tooling, fixtures, large parts and other large objects in a wide variety of industrial, scientific and commercial applications.

"Our financing and intended option to acquire SMX provides FARO an excellent opportunity to expand our product line with a complementary measurement technology to better serve our worldwide customer base," said Simon Raab, FARO's President and CEO.

**Total Film Group**

As part of the ongoing effort to restructure Total Film Group (the "Company") to profitability in the future, the Company reduced its workforce by approximately 75% at its Beverly Hills headquarters. The announced layoffs were due to the underperformance of the Company's two most recent motion pictures released through Paramount Classics: My First Mr. and Bride of the Wind.

The Company, which has incurred ongoing losses from operations recently divested itself of all non-core business segments.

Current market conditions have and are significantly affecting the Company's operating results and liquidity.  In the near future, the Company will be forced to make difficult decisions regarding its plan of operation and capital structure.  Currently, there is no assurance that the Company will be able to continue to fund its operations through the sale of equity or by issuance of debt instruments.

260.    This demonstrates that the Director Defendants, Citco N.V., and The Citco Group and Citco USA, via Keunen, knew how to obtain information about the companies held in the Funds' portfolio, and that the information was readily available to them at all times to independently value the Funds' NAV and to confirm Lauer's valuations.  The Defendants knowingly, willfully, recklessly and/or with gross negligence breached their duties of care to the Offshore Funds by ignoring this information and/or failing to obtain it.  Further, the Defendants actively participating in Lauer's scheme by knowingly, willfully, recklessly, and/or with gross negligence disseminating false NAVs to the Funds and to the investors.

261.    Moreover, the Citco Defendants and the Director Defendants never verified Lauer's claim that "the investors know exactly what they are doing" in relation to the Funds' holdings in the Target Companies.  Even more troubling, the Defendants did not even know the name of one of the companies in the Funds' portfolio–demonstrating their failure to perform even a minimal level of due diligence or independent valuation.

262.    Despite having actual knowledge of the Funds' inflated NAVs, on February 7, 2002, Keunen, while acting within his express authority and within the scope of his employment as the Director of Fund Services of The Citco Group and as an officer of Citco USA, responded to Quilligan's e-mail by directing Citco N.V. to, "**send out the NAV for Jan**."  (attached hereto as Exhibit "T") (Emphasis supplied).

263.    As demonstrated by the above email excerpts, The Citco Group disregarded corporate formalities, and Citco N.V. served as its alter ego.  In the alternative, Citco N.V. served as The Citco Group and Citco USA's agent via Keunen's control over Citco N.V. and acknowledgements and representations to the Offshore Funds.  The Defendants could have easily obtained independent information to verify the true value of the portfolio companies throughout their administration of the Offshore Funds as demonstrated by the information that they cite in their own internal emails.

264.    It was not until March, 2002, however, that the Citco Defendants and Director Defendants apparently decided that the valuation problems would result in their liability.  At that point, they finally decided to consult Lauer, as reflected by an e-mail exchange between Defendant Quilligan, Lauer, and Bruce Cowen, a Lancer insider, in March and April 2002.  This exchange, which is attached hereto as Composite Exhibit "U," demonstrates that (a) Citco's internal audit and compliance department required detailed backup valuations, (b) Citco and the

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

Director Defendants always knew what information to request to "properly evaluate" the Funds'

valuations, (c) independent and fair valuation methods are "part of Citco's policies and

procedures," (d) Defendants recognized and admitted their obligation to compute and

independently value the NAV, (e) Defendants finally attempt to gain "comfort" about Lauer's

valuation methodology, which they had internally discredited all along, (f) Defendants finally

"woke up" because of pending disaster and their potential liability–prior to this point, they gladly

accepted their inflated administration fees based on Lauer's manipulated and inflated valuations.

Further, the emails reflect that The Citco Group disregarded Citco N.V.'s corporate formalities

and controlled Citco N.V.'s administration of the Funds, and that the Citco Defendants and the

Director Defendants understood but breached their duties toward the Fund by actively concealing

the risks that the Funds and their investors were exposed to:

> From:  Quilligan, Declan  CUR [Dquilligan@citco.com]
> Sent:   Wednesday, March 27, 2002 9:55 PM
> To:      Bcowen@thelancergroup.com; Michael Lauer
> Subject: RE: Memo Valuation Dec 31, 2001 and 2002
>
> Bruce, Michael,
> If you cannot get us the full detail re backup to the portfolio
> valuations that you already committed to give to us by March 31
> please let me know what you can provide.  We committed to our
> internal audit and compliance dept on the basis of your
> commitment to me to have detailed back up to valuation issues by
> this month end.  Senior management of Citco are aware of the
> valuation issues and are keenly awaiting the data you promised.
> What can we get prior to March 31?
>
> Pls let me know so we can move forward
>
> Thanks
> Declan

*        *        *

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

From:  Quilligan, Declan CUR [mailto: DQuilligan@citco.com]
Sent:   Monday, April 08, 2002  10:53 PM
To:      bcowen@thelancergroup.com
Cc:      mlauer@thelancergroup.com
Subject:  Our discussion today

Bruce,

Just to confirm our discussion today.  Citco needs to receive the full documentation, financial analyses, future plans etc that will justify the valuations that Lancer Management consistently say are fair and reasonable for the major positions in the portfolio.  We were to receive such by March 31 but you have stated that due to a number of circumstances you were unable to collate the material in that timeframe.  In order to properly evaluate such material prior to the next month end Citco requires such documentation by Tuesday April 23.  If Citco has not received the requested documentation at that juncture Citco will have to consider its position carefully in the context of our internal risk management policies and other considerations.

Best regards,

Declan

                        *       *       *

From:  Bruce Cowen [mailto:bcowen@thelancergroup.com]
Sent:   Tuesday, April 09, 2002  8:30 AM
To:      Quilligan, Declan CUR
Subject:         RE:  Our discussion today

                        *       *       *

Our first requirement is to continue to manage the Fund to ensure that we are performing our fiduciary responsibility to our investors, which we will continue to do.  Secondly, we are preparing the necessary information for the audit and have engaged a firm to perform valuation services on certain positions as we feel this will be most beneficial to PriceWaterhouseCoopers in rendering an opinion on our financial statements.

                        *       *       *

In the meantime, I will prepare a memorandum, in some detail, on our major positions and present it to you by your deadline of April 23rd.

\*     \*     \*

From:  Quilligan, Declan  CUR [DQuilligan@citco.com]
Sent:  Thursday, April 11, 2002 4:55 PM
To:  Bruce Cowen; mlauer@thelancergroup.com
Subject:  RE:  Our discussion today

Bruce, Michael,
Let me again reiterate that we are looking for comfort as regards valuation issues in the context of a risk management approach that is part of Citco's policies and procedures.  We had an understanding that we would get information from Lancer Management by March 31 and not receiving that did cause us some difficulty.  You are correct as regards what you say as regards small staff etc and I fully understand that point and the fact that you have a fiduciary responsibility to shareholders.  You are also correct in saying that Citco and Lancer have always had a very good relationship and I very much hope that any tension that may have arisen over our requests for backup documentation will dissipate once we receive and are comfortable with the documentation provided.

I regard the fact that you have engaged a valuation firm to perform valuation services as extremely positive and I much look forward to receiving the detailed memorandum on or before April 23 which will give us the time we need to go through it before month end.

Please see attached the administration agreement.  As part of computing the NAV we need to gain comfort about the valuation of the portfolio.  With 6 thinly traded securities making up a very significant portion of the portfolio and net assets we feel it is appropriate to gain as much comfort as we can about these positions and on a regular basis and not just at audit time.  You and Lancer Management do have an integral role in providing that comfort required to ourselves and of course PWC.

Thank you and best regards.
Declan

265.  By the time Quilligan demanded this information, however, the Defendants'

internal discussions focused on finding a way to extricate themselves from association with the

Offshore Funds.  By this point, the Citco Defendants' and Director Defendants' last hope was that the Offshore Funds' auditor would approve the Offshore Funds' financial statements. The Citco Defendants and the Director Defendants believed that the best method for avoiding liability was the auditors' approval of the financial statements.  In  other words, if the auditors signed off on Lauer's financial statements, the Defendants apparently believed that this would relieve them from liability.

266.    Nevertheless, Citco personnel internally admitted that the Citco Defendants' and the Director Defendants' own management of the Offshore Funds was an utter failure and that they had breached their duties of care, fiduciary duties, and obligations to the Offshore Funds. Internal auditor Ger-Jan Meyer prepared a valuation memorandum for wide dissemination inside The Citco Group, Citco USA, and Citco N.V. regarding problems in Offshore's portfolio (attached hereto as Exhibit "V").  In relevant part, this memorandum states:

> To:     Declan Quilligan
>         Greg Fenlon
>         Claudio Cecchini
>         Bram Gedopt
>
> From:  Ger Jan Meijer
>
> C.c.:   William Keunen
>         Dennis Dambruck
>         Edward Heidema
>         Jos Leppers
>         Albert van Nijen
>
> Date:  May 13, 2002
>
> Subject:        Valuation of the portfolio of Lancer Offshore Inc.
>
> **1.      Introduction**
>
> CFS has concern about the possible aggressive valuation of the portfolio of Lancer Offshore Inc. and has requested the investment manager for additional background information about the

valuation.  We received this background information on May 8 and performed a review on it.  Our findings are summarized in this memo.

*        *        *

## 3.        Conclusions

*        *        *

## 3.2        Bloomberg

Most of the investments have a quotation in Bloomberg.  These are obtained from the Bloomberg OTC Bulletin Board.  It is doubtful if we can rely on these prices, because they look easy to manipulate by interested parties.

There are serious indications that Lancer is/was manipulating the prices for:

AUG Corp;
Method Prod;
Fidelity First Financial
World Wireless

Manipulation of market prices might be seen as a criminal action. We have jurisprudence about the Rockies funds (much smaller fund) where the directors had to pay a fine for manipulating the market price.

*        *        *

## 4.        Aug Corp.

*        *        *

## 4.2        Comments on the Lancer valuation

In my opinion the valuation by Lancer is too aggressive and not based on the prudent concept:

- According to Bloomberg the trade volume is 0 to 5,000 share per week.  Several weeks have no even [sic] any trading activity at all. It is doubtful that this market is a sound basis [for] determining valuation of a position of 18,000,000 shares;

- There is a risk that Lancer has influence/control over the market prices by Bloomberg.  **There are even serious indications that Lancer is manipulating the market price.;**

- The market price of AUG is subject to high volatility and that could be an indication that the market price is not a sound source for valuation: (Nov 28, 2001: **6.00** / Dec 31, 2001: **3.50** / Jan 31, 2002: **5.00** / Feb 28, 2002: **5.00**).

\*       \*       \*

- It is my experience that most other investment managers would value this position for not more than cost.

## 5.      Manhattan Scientifics Inc.

\*       \*       \*

### 5.2      Comments on Lancer Valuation

- According to Bloomberg the total number of shares is 120,900,000 per May 12, 2002;

- Total equity per March 31, 2002 is USD 1,240,000 (unaudited financials).  Intrensic [sic] value per share is thus more or less USD 0.01.  Market price is 20 to 30 times the intrinsic value;

\*       \*       \*

### 5.3      Conclusion

It is my experience that a haircut of such huge positions (compared to the market volumes) should be taken.  Also there will be dilution of the value per share when the warrants would be issued. I propose a haircut of 20% on the total market value of shares and warrants–**20% x (8,001,455 + 3,200,000) = 2,240,291**

## 6.      Method Prods Corp New common shares and warrants

\*       \*       \*

### 6.2      Comments on Lancer valuation

*Shares*
- According to Bloomberg low quantities are traded.  Several weeks have no even [sic] any trading activity at all.  It is doubtful

that this market is a sound basis [for] determining valuation of a position of 2,451,059 shares;

- There is a risk that Lancer has influence/control over the market prices by Bloomberg.  **There are even serious indications that Lancer is manipulating the market price.**  By the end of March the only trades were 500 shares for 5.00 on March 27 and 500 for 5.85 shares [sic] on March 28.  Lancer was purchasing these quantities.  Also for other months Lancer is always purchasing just before month end;

- The market price of Method Prod is subject to high volatility and that could be an indication that the market price is not a sound source for valuation: (April 25, 2002: **3.25** / April 30, 2002: **6.05**)

\*       \*       \*

- It is my experience that most other investment managers would value this position for not more than cost.

### 7.       Nu-D-Zine Bedding and Bath Inc

Pending: waiting for background information.   No information found in Bloomberg.

### 8.       SMX

\*       \*       \*

### 8.2      Comments on Lancer valuation

- The trade volume according to Bloomberg is very thin if compared with the holdings by the fund;

- It is normal practice to take a haircut on the market price when having such huge positions;

- There is a risk that Lancer has influence/control over the market prices by Bloomberg;

- The market price is subject to high volatility and that could be an indication that the market price is not a sound source for valuation.

\*       \*       \*

### 9.       World Wireless Communication

\*       \*       \*

**9.2     Comments on Lancer valuation**

- The trade volume according to Bloomberg is thin if compared with the holdings by the fund;

- It is normal practice to take a haircut (15-20%) on the market price when having such huge positions;

- There is a risk that Lancer has influence/control over the market prices by Bloomberg.  Why is Lancer purchasing little quantities while they obtain large quantities of shares with the private placements…?

- Please note that Lancer Partners LP and Orbiter Fund LP have also positions.

*       *       *

**10.     Fidelity First Financial**

*       *       *

**10.2     Comments on valuation by Lancer**

There are almost not [sic] quantities traded on the market and probably the only trades are made by the Lancer group.  Such trades are always made just before month end.  It is my opinion the Bloomberg prices is [sic] not good basis for valuation and **there are even serious indications that Lancer is manipulating the market prices.**

(Emphasis in original).

267.    Only after it had become clear that they had to extricate themselves from liability

to the Offshore Funds did the Defendants undertake a close analysis of the Funds' portfolio

holdings.  However, the Citco Defendants and the Director Defendants knowingly, willfully,

recklessly, and/or with gross negligence breached their duties of care to the Funds by failing to

fulfill these duties from the date Citco and the Director Defendants first began administering the

Offshore Funds.  Defendants further breached their duties to the Funds by failing to disclose this

information to the appropriate authorities, investors, and the Independent Directors and by

actively participating in Lauer's scheme by disseminating false inflated NAVs to the investors and the Funds.

268.   Ger-Jan Meyer's memo was sent to Keunen for his review and comment.   In response, Keunen, acting within his express authority and in the scope of his employment for The Citco Group and Citco USA, responded by forwarding the memo to all Citco Executive Directors on May 22, 2002,  addressing his comments to Christopher Smeets, the CEO of The Citco Group:

| | |
|---|---|
| From: | Keunen, William  MIA |
| Sent: | Wednesday, May 22, 2002, 7:48 PM |
| To: | zz*Citco All Executive Directors |
| Cc: | Quilligan, Declan  CUR; Verhooren, John  GEN; Conroy, Kieran  DUB; Peller, Jay  NYC |
| Subject: | Lancer |

Chris, as I mentioned to you yesterday, here is the story about Lancer, a fund that has been administered out of Curacao since its inception in 1995.

Recently the management team in Curacao have become concerned about the pricing policy of the Fund, in particular with respect to its less liquid positions which at their current reported value make up two thirds of the value of the portfolio.  We began by discussing our concerns with the Investment Manager and then asked for back-up in the form of reports about the relevant companies.  To date two of seven reports have been received and they do not make for pleasant reading.  Then we had our internal audit group perform a detailed analysis of the positions.  Their report is enclosed.  The upshot is that there are a handful of positions which we feel the IM has at the least grossly over-valued and at worst manipulated the month end valuations by executing large buys close to month end that force the price up.  The whole situation was discussed during my visit to Curacao.

Other issues to be taken into consideration:

- The pricing policy of the Fund as stated in the Prospectus is clear–value positions at latest closing price – the Fund follows this policy and a strict interpretation of such indicates that it is not breaking its rules.

- **Our personal directors** (Kieran and Declan) resigned earlier this year.

- The Fund's auditors, PwC Curacao have signed each year's audit report up to 2000, but have still not signed off 2001. Their deadline is Irish Stock Exchange imposed – June 30. They recently collected the company reports we requested from the IM.  If PwC decide not to sign, our mission is clear – resign immediately.  Declan is in touch with them, but they don't seem to be in any hurry and the May 31 NAV cycle looms.

- If PwC do sign, we should still consider our exit strategy, but by doing is likely to create shock-waves that could cause significant distress, and our association will not be pretty.

We will keep you posted – comments welcome.

Rgds, William

(Emphasis supplied).

269.    Keunen, acting within his express authority and in the scope of his employment as a director of The Citco Group and as an officer of Citco USA, even admits that Citco's "personal directors" performed for and at the direction of The Citco Group, Citco USA, and Citco N.V. when they served on the Funds' boards.  Keunen's observation that Citco and the Director Defendants' association with Lancer and Lauer "will not be pretty" is prophetic, and further demonstrates Defendants' scheme to accept inflated fees based on the Funds' inflated valuations.

270.    In response, and attached as Exhibit W, Christopher Smeets, CEO of The Citco Group wrote to Keunen, Quilligan, Conroy, and all of The Citco Group Executive Directors:

| | |
|---|---|
| From: | Smeets, Christopher, G. |
| Sent: | Thursday, May 23, 2002 8:51 AM |
| To: | Keunen, William MIA; zz*Citco All Executive Directors |
| Cc: | Quilligan, Declan CUR; Verhorren, John LON; Conroy, Kieran DUB, Peller, Jay NYC |
| | |
| Subject: | RE:  Lancer |

**Let's develop a quit [sic] exit scenario.**

**CGS**

(Emphasis supplied).

271.    In response to CEO of The Citco Group's directive for Citco to extricate themselves from the administration of the Offshore Funds after their knowing, willful, reckless, and grossly negligent breaches of the above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds, Verhooren, a director of The Citco Group, wrote to Keunen, the Director of Fund Services of The Citco Group and officer of Citco USA (attached as Exhibit "X"):

> From:       John Verhooren  GEN
> Sent:       Thursday, May 23, 2002 8:56 AM
> To:         Keunen, William MIA
> Subject:    RE: Lancer

> William,

> **they manipulated the price by executing small portions, not large ones.  That makes the smell of fraud even worse.**  While they have position of 2.5 mln shares in Method Prods, they buy 500 shares to bring the price from $3 to $5.  **I think you have to convince the board that a quick exit is indeed the way to go, but that won't save us from a big falout** [sic].They should know the shareholders are all big players in the market. (the same guy that tell everybody that they have such wonderful due dilligence [sic] systems and procedures in place!)

> John

(Emphasis supplied).

272.    Plainly, this litany of emails demonstrates that The Citco Group and Citco USA dominated and controlled Citco N.V.'s administration of the Offshore Funds to the point of disregarding its corporate existence by scheming about their purported "exit strategy" in hopes to escape liability for the Citco Defendants and the Director Defendants' knowing, willful, reckless,

and/or grossly negligent breaches of the above-stated duties, fiduciary duties and obligations to the Offshore Funds.

273.    Furthermore, the emails show that Lauer's manipulation and inflation of the Funds' NAV was easily discoverable had the Defendants fulfilled their duties of care owed to the Offshore Funds.  This series of communications also plainly demonstrates that the Defendants either possessed the information that established the invalidity of Lauer's valuations or such information was readily available and they ignored it until they were faced with potential liability for their knowing, willful, reckless, and/or grossly negligent breaches of duty owed to the Funds.

274.    Keunen, acting within his express authority and in the scope of his employment as a Director of Fund Services for The Citco Group and as an officer of Citco USA, followed this up with discussions with Jay Peller of the New York City Citco operations.  Peller agreed to check with Tudor Investments, an investment management group, to see if their people had heard of any of the companies in question.

275.    Rather than passing their conclusions along to the Independent Directors, investors, or appropriate authorities as to the Offshore Funds' true condition, the Defendants instead continued plotting for their own exit as fund administrator.  The issues with the Offshore Funds were discussed and decided at The Citco Group's highest level–its executive committee, meeting in New York City in May 2002.  These e-mails contain clear evidence of the complete knowing, willful, reckless and/or grossly negligent breaches of the Defendants of their above-stated duties of care, their fiduciary duties and obligations to the Offshore Funds.  The e-mails attached hereto as Composite Exhibit "Y" state:

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

| | |
|---|---|
| From: | Keunen, William  MIA |
| Sent: | Tuesday, May 28, 2002 |
| To: | Peller, Jay   NYC; Barten, Dre   NYC; Conroy, Kieran  DUB; Verhooren, John  GEN |
| Cc: | Quilligan, Declan  CUR |
| Subject: | RE: Pause for thought… |

The other topic for the EC in NY this week will be Lancer – we need to have our strategy in place.  I know that Jay was speaking to people at Tudor on that – plus did we receive any more reports Declan?

They have also requested a copy of the watch-list – Declan, could you work on that based on what we discussed last week – plus any updated information?

Thks, William


            *        *        *


| | |
|---|---|
| From: | Verhooren, John  GEN |
| Sent: | Wednesday, May 29, 2002 5:15 AM |
| To: | Quilligan, Declan  CUR; Keunen, William  MIA; Peller, Jay   NYC; Barten, Dre   NYC; Conroy, Kieran  DUB |
| Subject: | RE: Pause for thought… |

Declan,
any news from PWC?

I think their signing off is crucial.  If they don't, all will come out and we will get the blame since it will be perceived that we never saw or reported it.  This would be very bad news for us.

If they sign off, we still have time for an exit scenario.  I think we should consider reporting this to whichever (US) authority could be responsible for this.   At least that way it looks like we uncovered the problems.  We have been following the accounting guide lines by taking the prices from official sources, but because of our internal controls and because of the good work of our internal audit and compliance department we uncovered this 'fraud.' (If we do this, obviously we should be 100% sure that it is fraud).

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

We probably should ask legal advice in any case as soon as possible.  I don't think we need more valuation books to get more confirmation about the situation.

regards,

John

          *     *     *

From:  Quilligan, Declan  CUR
Sent:   Wednesday, May 29, 2002 12:11 PM
To:     Verhooren, John   GEN; Keunen, William   MIA; Peller,
        Jay NYC; Barten, Dre  NYC; Conroy, Kieran  DUB
Subject:        lancer

I received this email this morn.  I have also scanned the introductory page to Stenton Leigh, the valuation firm which Lancer has used (has anybody heard from them) which I took from the internet.

After we receive what is mentioned below I believe we/PWC will have valuation books for the 6 largest positions.

Now that we have the name of the valuation firm I suggest I ask Lancer can we contact them direct, if they refuse we should resign because we cannot work properly under such restrictions.  If they accede then we can ascertain if the valuation books we received are fully the work of Stenton Leigh and whether they fully stand over the valuations, their name is not mentioned in the valuation books or if it is I have not seen it.  If they do stand over them it's a plus, its an independent party with industry expertise certifying the valuations, if they don't the whole thing has been a non-exercise and again on that basis we should resign.  I think it is clear at this stage that our view is that the positions should be haircutted.  If the IM is not prepared to revalue them then because our comfort level has been reduced we should resign.  We should get legal advice before we confront the IM for a face to face high level discussion on the matter of haircutting because at this meeting it would have to be a "if you don't do this we will walk" situation.  I think if we go this route and have this meeting we should look for an explanation of some of the small trades at end of month that appear to make little sense to us.  We should get legal advice on that too.  If the explanation don't [*sic*] make any sense then we might have obligations.  Once we resign we will need legal advice as regards our notice to shareholders.

Case No.  05-60080-CIV-MARRA/JOHNSON Proceeding Ancillary to
Case No. 03-80612-CIV-MARRA/JOHNSON

As regard PWC we gave them the valuation books which Gino himself is examining.  I spoke to Gino and he will be looking for more back up as regards what was contained in the booklets.  They have some issues wrt price decreases subsequent to year end which they want answers on.  This process will drag on for another few weeks I believe and I think if they don't get the responses they need they will qualify the report.

276.    Only in connection with manufacturing its own "exit scenario" did the Citco Defendants and Director Defendants investigate the Target Companies, the valuations, and end-of-period trades.  By this point, however, the damage to the Offshore Funds had already been done.  The e-mail attached hereto as Exhibit "Z" states:

> From:  Quilligan, Declan      CUR [Dquilligan@citco.com]
> Sent:   Thursday, June 06, 2002 3:11 PM
> To:      Bruce Cowen (E-mail); Michael Lauer
> Subject:        Conference call this morning
>
> Michael, Bruce,
> As per our conversation the positions that we are most concerned about are the positions that have little cost attached and very significant market values relative to the overall value of the portfolio.
>
> These positions are
> AUG Corp
> Fidelity First Financial Corp
> Method Products, both common stock and warrants
> Nu-D-Zine Bedding & Bath Inc, both common stock and warrants
> SMX Corp
> Total Film Group
> Expression Graphics
>
> We have Stenton Leigh valuation booklets that you have sent to us.  However what we would like to obtain in order to gain comfort as to the valuations is a memorandum from yourself as Investment Manager detailing to ourselves, PriceWaterhouse Coopers and the directors of the Fund, specific relevant information as to events that will propel liquidity in order that the current valuation of these investments will be realised.  I would further like to have you detail your current thinking on your exit strategy from these positions.

As regards the trades that we mentioned this morning, can you please detail in written form the reasons for the small trades involving purchase of Method Products stock on March 27, 2002 and March 28, 2002 for blocks of 500 shares at a price of $5.00 and $5.85 respectively.

Furthermore, as regards warrant valuations, we had seen a valuation placed on Nu-D-Zine warrants as of November 30, 2001 of $50m.  In December, we see a significant portion of these warrants leaving the portfolio for no gain.  Again, we would like your assessment of this situation.

I would appreciate receiving this information on an urgent basis.

Regards

Declan.

277.    After PriceWaterhouse Coopers signed off on the Funds' NAV in 2002, Keunen, acting with his express authority and in the scope of his employment as Director of Fund Services of The Citco Group and an officer of Citco USA, engaged in an email exchange with the Executive Directors of The Citco Group, which included The Citco Group's CEO, Christopher Smeets.  In discussing Citco's resignation as the Offshore Funds' administrator, Keunen noted, "If we do resign, we need to decide what type of communication is sent to the investors (**We also forego $700K in fees**)."  This email exchange is attached as Exhibit "AA." (Emphasis supplied).

278.    Accordingly, The Citco Group and Citco USA (via their respective director and officer Keunen) admitted they had a direct interest in receiving the inflated administrative fees from the Funds, despite their actual knowledge that their administrative fees were based on patently false and inflated NAVs.  The Citco Group disregarded Citco N.V.'s corporate formalities and used Citco N.V. as its alter ego for the improper purpose of inflating The Citco Group's fees.  Alternatively, Citco N.V. served as The Citco Group and Citco USA's agent

because The Citco Group and Citco USA (via their respective director and officer Keunen) dominated and controlled Citco N.V.'s administration of the Offshore Funds.

279.    At the time of Citco N.V.'s resignation as Administrator for the Funds, the Citco Defendants compounded their breaches by colluding with Lauer and Lancer Management to conceal the acknowledged reason for their resignation–that Citco was scrambling to escape liability for their knowing, willful, reckless and/or grossly negligent breaches of the above-stated duties of care, fiduciary duties, and obligations to the Funds.  The decision for Citco N.V. to resign was made by the Executive Directors of The Citco Group.  Christopher Smeets, the President and CEO of The Citco Group, emailed the decision of The Citco Group's Executive Directors to Keunen on July 4, 2002, which stated:

> From:      Smeets, Christopher G.
> Sent:      Thursday, July 04, 2002, 4:56 AM
> To:        Keunen, William  MIA; zz*Citco All Executive
>            Directors
> Subject:   Re:  Lancer
>
> William:
>
> We Robert, Ermanno, Hans & I, have discussed and we feel we do
> not need to wait for Paul Schrieber's opinion.  We should resign as
> we discussed by phone.  Call either Ermanno or myself for detailed
> reasoning, but essentially it is what you and I discussed.  We
> cannot hide behind PWC, and when [sic] do not wish to be
> associated with the fund when it goes own [sic], plus we do our
> duty in a way by giving the investors a signal albeit maybe to [sic]
> late.  We resign because they do nor [sic] comply with our pricing
> policy.
>
> CGS

280.    Soon thereafter, Keunen, acting within his express authority and in the scope of his employment as Director of Fund Services of The Citco Group and officer of Citco USA, notified Lancer Management of "***our decision to resign*** as Administrator of Lancer Offshore." He communicated the fact that he had resigned on behalf of the Citco Defendants to all of The

Citco Group's Executive Directors.  The email exchange is attached as Exhibit "BB."  (Emphasis

supplied).   Notably, Keunen was not employed by Citco N.V. at this time.   Ermanno

Unternaehrer, a director on The Citco Group's Executive Committee, responded that the draft

Transition Agreement was "a good start," and also confirmed his knowledge that "this is the fund

where there were suspicions of stock manipulation."   This email is attached as Exhibit "CC."

Again, The Citco Group disregarded Citco N.V.'s corporate formalities and exercised pervasive

control over Citco N.V., which served as its alter ego and/or agent.

281.    Contrary to Mr. Smeets' suggested "signal" to investors, the Transition

Agreement between Citco N.V., Offshore, and Lancer Management (attached as Exhibit "DD"),

which was reviewed and commented upon by the Executive Directors of The Citco Group,

provides that each party agrees "not to make any public statements regarding the other party or

any disparaging statement . . . regarding the other party."   In addition, the Transition Agreement

provided specific language for use in responding to inquires regarding Citco's termination as

"Administrator."   The required statement is as follows:

> Citco and the Company have mutually and amicably agreed, on the
> termination of the Administrative Agreement between Citco and
> the Company and, together with the investment manager and its
> principal, have entered into a Transition Agreement to facilitate a
> smooth transition to a new administrator.

282.    In signing the Transition Agreement, Keunen, Quilligan, and Conroy agreed to be

bound by the "inquiries statement" and the "non-disparagement" provisions of the Transition

Agreement.  Significantly, Keunen, who is a director of The Citco Group and an officer of Citco

USA, was a party to the Transition Agreement, demonstrating The Citco Group and Citco USA's

pervasive control over Citco N.V. and The Citco Group and Citco USA's acknowledgment and

representation to the Funds that Citco N.V. was acting on their behalf as their agent.  Moreover,

this shows that The Citco Group disregarded Citco N.V.'s corporate form.  When the resignation

of Citco N.V. was disclosed to the Offshore investors in a letter signed by Quilligan and Conroy, the letter conformed to the statement above and made no mention of inflated NAVs, inflated management and administrative fees, inadequate support for valuations, the small, seemingly purposeless end-of-period trades to inflate values of the Funds' NAVs, or any of the other information relating to the problematic valuations of the Funds of which the Defendants were aware.

283.    All of the above emails demonstrate The Citco Group and Citco USA (via their officers and directors Keunen and Stocks), and Citco N.V. (via their directors Conroy and Quilligan) and the Director Defendants' direct and vicarious duties of care and fiduciary duties to the Offshore Funds because each of the Defendants participated in the administration of the Offshore Funds and therefore assumed these obligations and duties of care to the Offshore Funds.

284.    The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties, and obligations to the Offshore Funds by knowingly approving and/or acquiescing in Lauer's conflicted and baseless valuations for their own pecuniary gain, by disseminating the patently false inflated NAVs to investors and the Funds, by failing to exercise even a minimum of due diligence, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately about the value of the Offshore Funds' NAV.  Instead, they were more concerned about avoiding their own exposure and responsibility for the Offshore Funds' problems.

## VIII.  <u>THE CITCO DEFENDANTS' AND THE DIRECTOR DEFENDANTS' ACTIONS HAVE DAMAGED THE OFFSHORE FUNDS</u>

285.    As the direct and proximate result of the Citco Defendants' and the Director Defendants' ERISA violations, professional malpractice, breaches of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing, and gross negligence, the Offshore Funds have been damaged in a number of different ways.  These damages were caused directly to the Offshore Funds by their former fund administrator and directors as a result of ERISA violations, professional malpractice, breaches of fiduciary duty, breach of contract, and gross negligence, separate and apart from any damages the Citco Defendants and the Director Defendants may have caused to the investors or creditors of the Offshore Funds.  The Defendants signed off on grossly inflated valuations and collected their administration and directors' fees. The Defendants collected their fees that were based on the inflated valuations, enhancing their profits while recklessly, knowingly, and/or willfully ignoring the absurd valuations.  Competent monthly portfolio valuations by the Defendants would have preserved hundreds of millions of dollars of value in the Offshore Funds:  extraordinarily inflated management, incentive, and administration fees would not have been paid; investments in illiquid, restricted stock would have stopped; payment of inflated redemption amounts based on the inflated NAVs would have been prevented; and the Offshore Funds would not have been able to remain in operation.

286.    <u>First</u>, the Offshore Funds were depleted by paying extraordinary amounts in management, incentive, administration, and directors' fees to Lancer Management, to Lauer, and to the Citco Defendants.  These payments were calculated using the inflated and erroneous NAVs that the Citco Defendants and the Director Defendants willfully, knowingly, consciously, recklessly, and/or with gross negligence concocted.

287.    Second, the Offshore Funds were depleted by having their capital continuously invested in various worthless portfolio companies long after the Citco Defendants and the Director Defendants knew that the value of such companies was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.  For example, in the case of SMX, discussed above, Lauer caused Offshore to invest an additional $1,000,000 into SMX in 2002.  Proper performance of their legal, professional and contractual duties by the Citco Defendants and the Director Defendants would have exposed the financial condition of SMX and the outlandish valuation of SMX and would have prevented the Fund's assets from being further dissipated in this manner.  A similar depletion of the Offshore Funds occurred with each investment in the other Target Companies.  Consequently, the Citco Defendants and the Director Defendants failed miserably in their risk monitoring functions.

288.    Third, the Offshore Funds were depleted by redemptions requested by investors that were calculated by the Citco Defendants and the Director Defendants based upon the inflated and erroneous NAVs.  Yet the values ascribed to the redeemed shares were based on the inflated and erroneous NAVs.  But for the willful, knowing, conscious, reckless, and/or grossly negligent acts of the Citco Defendants and the Director Defendants, these amounts would have been substantially lower and, correspondingly, the depletions of the Offshore Funds' value through investor redemptions would have been much less.

289.    Fourth, the Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

290.    The Receiver requests that the Court prevent any officer, director, service provider, partner or shareholder who participated in the Citco Defendants' and the Director

Defendants' conduct that harmed the Offshore Funds from receiving any of the recoveries obtained by the Receiver.

## IX.  CAUSES OF ACTION

### COUNT I

### BREACH OF ERISA FIDUCIARY DUTY

### (The Director Defendants)

291.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 above as if fully stated herein.

292.    The investors in Offshore include "benefit plan investors" as defined under 29 C.F.R. § 2510.3-101(f),[6] which included benefit and retirement plans and certain accounts whether or not subject to ERISA, including individual retirement accounts and foreign benefit plans.

293.    The benefit plan investors in Offshore included plans that are subject to ERISA, including, but not limited to, the following: Bombardier Corp. Retirement Plan (U.S.); Hunnicutt & Co. Inc. Defined Benefit Plan; Dominion Resources Inc. Retirement Plan; Weyerhaeuser Company Master Retirement Trust; and Wyatt Incorporated Employees Profit Sharing Plan.

---

[6] ERISA fiduciary duties apply to an individual to the extent that he or she takes certain actions with respect to ERISA plan assets.  Although ERISA does not define "plan assets," the Department of Labor regulations provides a definition of plan assets in 29 C.F.R. § 2510.3-101.  Pursuant to 29 C.F.R. § 2510.3-101(a)(2), plan assets include:[I]n the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 [the plan's] assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that—(i) The entity is an operating company, or (ii) Equity participation in the entity by benefit plan investors is **not significant**. (Emphasis supplied).  Pursuant to 29 C.F.R. § 2510.3-101(f), the "[e]quity participation in an entity by benefit plan investors is 'significant' on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors."

294.    The equity interests of such benefit plan investors were for all years in excess of 30%.  Accordingly, because the equity interests of benefit plan investors in Offshore exceeded the 25% "significant" threshold under 29 C.F.R. § 2510.3-101(f), and because the benefit plan investors included ERISA employee benefit plans, the assets of such ERISA plans include an undivided interest in each of Offshore's underlying assets pursuant to ERISA's "plan asset" definition under 29 C.F.R. § 2510.3-101(a)(2).  Therefore, the assets of Offshore constitute "plan assets" under ERISA.

295.    Any person who exercises authority or control with respect to the management or disposition of the assets of Offshore, and any person who provides investment advice with respect to such assets for a fee (direct or indirect) or has authority or responsibility to do so, is a fiduciary under ERISA pursuant to 29 U.S.C. § 1002(21) (ERISA § 3(21)), and 29 C.F.R. § 2510.3-101(a)(2).

296.    As the court-appointed receiver for Offshore, the Receiver has authority or control with respect to the management or disposition of Offshore's assets and, to that extent, is an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A) (ERISA § 3(21)(A)).

297.    As a fiduciary with respect to Offshore's ERISA plan assets, the Receiver is authorized under 29 U.S.C. § 1132(a)(2) (ERISA § 502(a)(2)) to bring a civil action for appropriate relief under 29 U.S.C. § 1109 (ERISA § 409), which requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 1109 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

298.    As a fiduciary with respect to Offshore's ERISA plan assets, the Receiver is authorized under 29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)) to bring a civil action to enjoin

any act or practice that violates any provision of Title I of ERISA, or to obtain other appropriate equitable relief to redress such violations, or to enforce any provision of Title I of ERISA.  The Offshore PPM expressly refers to the ERISA "plan asset" rule under 29 C.F.R. § 2510.3-101, and to ERISA's fiduciary and prohibited transaction rules under 29 U.S.C. §§ 1104-1106 (ERISA §§ 404-406).  The PPM includes a statement that ERISA's fiduciary and prohibited transaction rules may apply "[i]f, by virtue of a Plan's purchase of a Share of the Fund, the assets of the Fund are deemed to be 'plan assets' under ERISA."

299.   When the equity interests of benefit plan investors in Offshore exceeded the 25% "significant" threshold under 29 C.F.R. § 2510.3-101(f), the assets of Offshore became subject to ERISA, regardless of any statement or acknowledgement by Offshore or any other person or investor, or any provision in any document or agreement, that it was the intention to limit such benefit plan investors' equity interests to less than 25%.

300.   In accordance with section 50 of the Articles of Association, the first members of Offshore's Board of Directors, Stocks–Verhooren, and ICS–were appointed by Citco BVI, the sole subscriber to the Memorandum of Association.  At the time of their appointment, Stocks and Verhooren were employees of The Citco Group.  Stocks was the Director of International Fund Services Division of the Citco Group, and Verhooren was the Operations Manager of International Fund Services Division of The Citco Group.  ICS was the alter ego and/or agent of The Citco Group.  Thereafter, vacancies on Offshore's Board of Directors were filled by action of the remaining directors in accordance with section 55 of the Articles of Association.  Conroy replaced Verhooren in May 1998, and Quilligan replaced Stocks in  2001.  At the time of their appointment to Offshore's Board of Directors, Quilligan and Conroy were employees of Citco N.V.  Conroy was the Managing Director of Citco N.V. from 1998 until he transferred to Citco

Dublin in 2001, and Quilligan became the Managing Director and General Manager of Citco N.V. in 2001.  After their resignation on February 15, 2002, from Offshore's Board of Directors, Quilligan and Conroy remained employees of Citco N.V. and Citco Dublin, respectively.

301.    The Director Defendants, in their capacity as directors, exercised authority or control over Offshore.  Accordingly, as directors of the fund, the Director Defendants exercised authority or control with respect to the management or disposition of Offshore's ERISA plan assets.  The Director Defendants were ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(i) (ERISA § 3(21)(A)(i)).

302.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to appoint, monitor, and, if necessary, replace Lancer Management, which was also an ERISA fiduciary in its capacity as Offshore's investment manager, in accordance with the Investment Management Agreement, attached as Exhibit "I."  Section 2 of the Investment Management Agreement provides that Lancer Management is authorized to invest Offshore's assets **"subject to the policies and control of the Board of Directors."** (Emphasis supplied).

303.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their authority to "apply any part of the assets of [Offshore] in the acquisition of any Investments as they shall in their absolute discretion determine" in accordance with section 11 of the Articles of Association of Offshore.

304.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their authority to "suspend redemption rights for all Shareholders when, in the opinion of the Board of Directors, disposal of

part or all of the fund's assets, or determination of Net Asset Value . . . would not be reasonable or practicable or would be prejudicial to the Shareholders," and "to terminate the Fund at any time and for any reason," in accordance with the Offshore PPM.

305.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to meet at least annually to review and assess the investment policy and investment performance of Offshore.

306.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to determine the NAV and the NAV/Share as of the close of business on each valuation day and redemption day in accordance with the procedures described in section 10 of the Articles of Association, which Citco N.V. was contractually obligated to compute on a monthly basis under the Citco Agreements.

307.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to manage the business and affairs of the Offshore fund as provided in section 58 of the Articles of Association.

308.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, the power to "appoint any person or persons as manager of the Company to exercise all or any of the duties, powers and discretions exercisable by the Directors upon such terms and conditions and for such period and with such restrictions as the Directors think fit . . ." as provided in section 12 of the Articles of Association.

309.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to supervise Citco N.V. in its role as administrator of the fund as provided in section 1.1 of the amended and restated Citco Agreement dated April 1, 2000.  Further, the Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included their responsibility to pay or to monitor payment to Offshore's third party service providers (such as Citco) and its investment manager, Lauer.

310.    ERISA provides that "a person is a fiduciary with respect to a plan to the extent . . . (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so . . . ."  29 U.S.C. 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)).

311.    Pursuant to 29 C.F.R. §§ 2510.3-21(c)(1)(i), a person shall be deemed to render investment advice to a plan if:

(i)    Such person **renders advice to the plan as to the value of securities** or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property; and

(ii)    Such person either directly or indirectly (e.g., through or together with any affiliate)—

(A)    Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

(B)    Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement,

arrangement or understanding, written or otherwise, between such person

and the plan or a fiduciary with respect to the plan, that such services will

serve as a primary basis for investment decisions with respect to plan

assets, and that such person will render individualized investment advice

to the plan based on the particular needs of the plan regarding such matters

as, among other things, investment policies or strategy, overall portfolio

composition, or diversification of plan investments.

(Emphasis added.)

312.   Section 10(3)(h) of the Articles of Association confers discretion and responsibility on the Director Defendants to determine the proper valuation of the fund, including considering whether prices generated in a securities market reflected the investments' true value and whether some other valuation method should be used that better reflects the investments' fair value.  The Director Defendants also had authority and control with respect to Offshore's purchasing and selling of securities.  Accordingly, the Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, rendering advice to benefit plan investors as to the value of Offshore's ERISA plan assets.

313.   Offshore paid fees for the Director Defendants' services on Offshore's board to Citco, not to the Director Defendants individually.

314.   Thus, by rendering **"advice to the [benefit plan investors] as to the value of securities**," the Director Defendants directly or indirectly rendered investment advice for a fee or other compensation with respect to Offshore's ERISA plan assets because: (i) they were responsible to determine the fund's NAV; (ii) they regularly approved the fund's monthly NAV,

which was calculated by Citco N.V. and reviewed and approved by Keunen, acting in his express authority and within the scope of his employment as director of The Citco Group and an officer of Citco USA, in accordance with policies and procedures set forth in section 10 of the Articles of Association.   The Director Defendants were ERISA fiduciaries, pursuant to 29 U.S.C. 1002(21)(A)(ii)  (ERISA  § 3(21)(A)(ii)),  and  29  C.F.R.  §§ 2510.3-21(c)(1)(i)  and  2510.3-101(a)(2).

315.   The Director Defendants also rendered investment advice for a fee or other compensation with respect to Offshore's ERISA plan assets through their authority and contractual responsibility to independently calculate Offshore's NAV/share pursuant to the Citco Agreement with Offshore, which provides in part that Citco N.V. "shall be responsible for . . . computing the monthly [NAV]" for Offshore and "*independently* pricing the fund." (Emphasis supplied).  By virtue of The Citco Group and Citco USA's vicarious liability, these two entities were also charged with these duties.  The Director Defendants had the responsibility under the Citco Agreement, the Articles of Association, and the PPM to provide values for any securities in Offshore's portfolio for which the open market did not provide an accurate valuation.  The Director Defendants were ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and § 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2).

316.   As ERISA fiduciaries, the Director Defendants were obligated under 29 U.S.C. § 1104(a)(1) (ERISA § 404(a)(1)) to discharge their duties with respect to Offshore's ERISA plan assets: (i) solely in the interests of the beneficiaries of the ERISA plans; (ii) for the exclusive purpose of providing benefits to the beneficiaries of the ERISA plans and defraying reasonable plan administration expenses; (iii) with the care, skill, prudence and diligence under the prevailing circumstances that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims; (iv) by diversifying the investments of the Offshore ERISA plan assets so as to minimize the risk of large losses, unless under the circumstances it was clearly prudent not to do so.

317.   The Director Defendants were an integral part of the inflated valuation scheme.  If the Director Defendants did not agree with and publish the inflated NAVs and allow them to be applied to the Fund's portfolio, the scheme could not have been successful.

318.   As ERISA fiduciaries, the Director Defendants were prohibited under 29 U.S.C. § 1106(b) (ERISA § 406(b)) from self-dealing with respect to Offshore's ERISA plan assets.

319.   Additionally, the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties as set forth in paragraphs 301-309 and failed to avoid conflicts of interest and self-dealing.

320.   The Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to review, at reasonable intervals, the performance of Lancer Management as investment manager, in such manner as may be reasonably expected to ensure that its performance was in compliance with ERISA, in accordance with 29 C.F.R. § 2509.75-8, Q&A 17.

321.   The Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to perform due diligence and failing to investigate or respond to the "red flags" described herein that would have revealed Lancer Management was not managing such plan assets in accordance with the Investment Management Agreement, Offshore's PPM, and ERISA's strict fiduciary standards.

322.     Citco and the Director Defendants' interests were aligned with Lauer and were adverse to the interests of the Funds because Lauer's and the Citco Defendants' fees were each tied to the NAVs that were grossly inflated.  Moreover, the Citco Defendants and the Director Defendants were charged with independently valuing the NAVs and failed to do so to enhance their own financial interests.  Rather than acting in the best interest of providing benefits to ERISA plan participants, the Director Defendants and the Citco Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties respecting the management or disposition of Offshore's assets by participating in and/or permitting the inflation of the NAVs to pay themselves and Lauer inflated fees that corresponded to the inflated NAVs and by failing to monitor and supervise the fees paid out of Offshore's assets.

323.     The Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their ERISA fiduciary duty to determine independently the NAVs for Offshore, by failing to respond appropriately as to the portfolio values claimed by Lauer–which the Director Defendants knew were absurd–and by otherwise failing to perform due diligence and failing to investigate or respond to the "red flags" described herein that would have revealed the over-valuation of Offshore's NAVs.

324.     The Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to discover and reveal Lauer's conduct regarding his valuation of certain portfolio companies, such as the Target Companies within Offshore.

325.     Alternatively, the Director Defendants knew of the breaches of fiduciary duties by Lauer, as evidenced by communications to and from the Director Defendants cited herein relating to valuation issues, and failed to make reasonable efforts under the circumstances to

remedy such breaches, to the detriment of Offshore's ERISA plan assets.  Further, the Director Defendants knowingly, willfully, recklessly and/or with gross negligence breached their fiduciary duties by failing to comply with their duties outlined in paragraphs 301-309, above.

326.   The Director Defendants further failed to employ and perform independent valuations as required under the Citco Agreements and GAAP, and failed to confirm the independence and accuracy of the valuations provided to the Citco Defendants by Lauer and by Lancer Management.

327.   The Director Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties of care and prudence with respect to Offshore's ERISA plan assets by ignoring the independent pricing information provided by several employees of Citco N.V. and instead deferring to the judgment of Keunen, the Director of Fund Services for the Citco Group and an officer of Citco USA, with respect to the decisions to publish the January 2002 NAV based on the portfolio values provided by Lauer, which director Quilligan described as "hugely aggressive in valuing thinly traded stocks" because of the unreasonably high values for investments with unrealized gain.

328.   Alternatively, the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by actively participating in the Lauer's inflated valuation scheme.  If the Director Defendants had not approve the inflated NAVs and allowed them to be applied to the Fund's portfolio, the scheme could not have been successful. The Director Defendants' active participation fostered the fiduciary breaches of Lauer and Lancer Management.

329.   The Director Defendants' breaches alleged above resulted in grossly exaggerated valuations for Offshore and enabled Lauer to artificially prolong the life of Offshore, both of

which significantly increased the fees paid to Citco N.V. and by extension to the other Citco Defendants in breach of their fiduciary obligations under ERISA with respect to Offshore's ERISA plan assets.

330.    Accordingly, by acting in a manner that resulted in excessive fees being paid by Offshore to Citco N.V. for their services, the Director Defendants breached their ERISA fiduciary duties by actively participating in Lauer's inflated valuation scheme, by knowingly, willfully, recklessly and/or with gross negligence disseminating the false inflated valuations to investors and the Funds, by failing to act, with respect to Offshore's ERISA plan assets, solely in the interests of the beneficiaries of the plans and for the exclusive purpose of providing benefits to the beneficiaries of such plans, and by dealing with such assets in their own interests, in violation of 29 U.S.C. §§ 1104(a)(1) and 1106(b) (ERISA §§ 404(a)(1) and 406(b)).

331.    The Director Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to discover and reveal Lauer's conduct regarding his valuation of certain portfolio companies, such as the Target Companies within Offshore, and by failing to disclose the inflated valuations to the investors, appropriate authorities, and/or the Independent Directors.  The Director Defendants further failed to employ appropriate valuation methodologies and to independently price the fund as required under the Citco Agreements and GAAP, failed to confirm the independence and accuracy of the valuations provided to the Citco Defendants by Lauer and by Lancer Management, and approved and/or acquiesced in Lauer's inflated valuations, despite actual knowledge of the valuations' falsity.

332.    The Director Defendants' fiduciary breaches alleged above resulted in grossly exaggerated valuations for Offshore and enabled Lauer to artificially prolong the life of

Offshore, both of which significantly increased the fees paid to the Citco Defendants at the expense of Offshore's ERISA plan assets.  Additionally, by assuming the responsibilities as directors of the Funds, the Director Defendants approved and/or acquiesced in Lauer's acts and misconduct wrought upon the Funds.

333.    Accordingly, by acting in a manner that resulted in excessive fees from Offshore, the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their ERISA fiduciary duties by failing to act, with respect to Offshore's ERISA plan assets, solely in the interests of the beneficiaries of the affected ERISA plans and for the exclusive purpose of providing benefits to the beneficiaries of such plans, and by dealing with such assets in their own interests, in violation of 29 U.S.C. §§ 1104(a)(1) and 1106(b) (ERISA §§ 404(a)(1) and 406(b)).

334.    The Receiver is entitled to relief from the Director Defendants in the form of: (i) a monetary payment to Offshore to reimburse it for the losses incurred by Offshore and profits received by the Citco Defendants with respect to the ERISA plan assets resulting from the breaches of fiduciary duties alleged above, as required by 29 U.S.C. § 1109(a) (ERISA § 409(a)); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) (ERISA §§ 409(a) and 502(a)(2) and (3)); and (iii) reasonable attorneys' fees and expenses as provided by 29 U.S.C. § 1132(g) (ERISA § 502(g)), and other applicable law.

WHEREFORE, the Receiver prays that a judgment be entered against the Director Defendants for: (a) damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving

any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT II

## BREACH OF ERISA FIDUCIARY DUTY

### (The Citco Defendants)

335.    Receiver hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 290 above as if fully stated herein.

336.    ERISA fiduciary duties apply to an individual to the extent that he or she takes certain actions with respect to ERISA plan assets.  The applicable Department of Labor regulations provides a definition of plan assets in 29 C.F.R. § 2510.3-101.[7]

337.    The investors in Offshore include certain "benefit plan investors," as defined under 29 C.F.R. § 2510.3-101(f), which, at the time, included most benefit and retirement plans and certain accounts whether or not subject to ERISA, including individual retirement accounts and foreign benefit plans.

---

[7] Pursuant to 29 C.F.R. § 2510.3-101(a)(2), plan assets include: [I]n the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 [the plan's] assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that—

> (i) The entity is an operating company, or
> (ii) Equity participation in the entity by benefit plan investors is **not significant**.

(Emphasis supplied). Further, pursuant to 29 C.F.R. § 2510.3-101(f), the "[e]quity participation in an entity by benefit plan investors is 'significant' on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors."

338.    The benefit plan investors in Offshore included plans that are subject to ERISA, including, but not limited to, the following: Bombardier Corp. Retirement Plan (U.S.); Hunnicutt & Co. Inc. Defined Benefit Plan; Dominion Resources Inc. Retirement Plan; Weyerhaeuser Company Master Retirement Trust; and Wyatt Incorporated Employees Profit Sharing Plan.

339.    The equity interests of such benefit plan investors were for all years in excess of 30%.  Accordingly, because the equity interests of benefit plan investors in Offshore exceeded the 25% "significant" threshold under 29 C.F.R. § 2510.3-101(f), and because the benefit plan investors included ERISA employee benefit plans, the assets of such ERISA plans include an undivided interest in each of Offshore's underlying assets pursuant to ERISA's "plan asset" definition under 29 C.F.R. § 2510.3-101(a)(2).  Therefore, the assets of Offshore constitute "plan assets" under ERISA.

340.    Any person who exercises authority or control with respect to the management or disposition of the assets of Offshore, and any person who provides investment advice with respect to such assets for a fee (direct or indirect) or has authority or responsibility to do so, is a fiduciary under ERISA pursuant to 29 U.S.C. § 1002(21) (ERISA § 3(21)) and 29 C.F.R. § 2510.3-101(a)(2).

341.    As the court-appointed receiver for Offshore, the Receiver has authority or control with respect to the management or disposition of Offshore's assets and, to that extent, is an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A) (ERISA § 3(21)(A)).

342.    As a fiduciary with respect to Offshore's ERISA plan assets, the Receiver is authorized under 29 U.S.C. § 1132(a)(2) (ERISA § 502(a)(2)) to bring a civil action for appropriate relief under 29 U.S.C. § 1109 (ERISA § 409), which requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to

such plan any losses to the plan . . . ."  Section 1109 also authorizes "such other equitable or remedial relief as the court may deem appropriate  . . . ."

343.    As a fiduciary with respect to Offshore's ERISA plan assets, the Receiver is further authorized under 29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)) to bring a civil action to enjoin any act or practice that violates any provision of Title I of ERISA, or to obtain other appropriate equitable relief to redress such violations, or to enforce any provision of Title I of ERISA. The Offshore PPM expressly refers to the ERISA "plan asset" rule under 29 C.F.R. § 2510.3-101 and ERISA's fiduciary and prohibited transaction rules under 29 U.S.C. §§ 1104-1106 (ERISA §§ 404-406).  The PPM includes a statement that ERISA's fiduciary and prohibited transaction rules may apply "[i]f, by virtue of a Plan's purchase of a Share of the Fund, the assets of the Fund are deemed to be 'plan assets' under ERISA."

344.    When the equity interests of benefit plan investors in Offshore exceeded the 25% "significant" threshold under 29 C.F.R. § 2510.3-101(f), the assets of Offshore became subject to ERISA, regardless of any statement or acknowledgement by Offshore or any other person or investor, or any provision in any document or agreement, that it was the intention to limit such benefit plan investors' equity interests to less than 25%.

345.    In accordance with section 50 of the Articles of Association, the first members of Offshore's Board of Directors–Stocks, Verhooren, and ICS–were appointed by Citco BVI, the sole subscriber to the Memorandum of Association.  At the time of their appointment, Stocks and Verhooren were employees of The Citco Group.  Stocks was the Director of International Fund Services Division of the Citco Group, and Verhooren was the Operations Manager of International Fund Services Division of The Citco Group.  ICS was the alter ego and/or agent of The Citco Group.  Thereafter, vacancies on Offshore's Board of Directors were filled by action

of the remaining directors in accordance with section 55 of the Articles of Association.  Conroy replaced Verhooren in May 1998, and Quilligan replaced Stocks in  2001.  At the time of their appointment to Offshore's Board of Directors, Quilligan and Conroy were employees of Citco N.V.  Conroy was the Managing Director of Citco N.V. from 1998 until he transferred to Citco Dublin in 2001, and Quilligan became the Managing Director and General Manager of Citco N.V. in 2001.  After their resignation on February 15, 2002, from Offshore's Board of Directors, Quilligan and Conroy remained employees of Citco N.V. and Citco Dublin, respectively.

346.   The Director Defendants, in their capacity as directors, exercised authority or control over Offshore.  Accordingly, as directors of the fund, the Director Defendants exercised authority or control with respect to the management or disposition of Offshore's ERISA plan assets.  The Director Defendants were ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(i) (ERISA § 3(21)(A)(i)).

347.   The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to appoint, monitor, and, if necessary, replace Lancer Management, which was also an ERISA fiduciary in its capacity as Offshore's investment manager, in accordance with the Investment Management Agreement, attached as Exhibit "I."   Section 2 of the Investment Management Agreement provides that Lancer Management is authorized to invest Offshore's assets **"subject to the policies and control of the Board of Directors."**  (Emphasis supplied.)

348.   The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their authority to "apply any part of the assets of [Offshore] in the acquisition of any Investments as they shall in their

absolute discretion determine" in accordance with section 11 of the Articles of Association of Offshore.

349.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their authority to "suspend redemption rights for all Shareholders when, in the opinion of the Board of Directors, disposal of part or all of the fund's assets, or determination of Net Asset Value . . . would not be reasonable or practicable or would be prejudicial to the Shareholders," and "to terminate the Fund at any time and for any reason," in accordance with the Offshore PPM.

350.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to meet at least annually to review and assess the investment policy and investment performance of Offshore.

351.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to determine the NAV and the NAV/Share as of the close of business on each valuation day and redemption day in accordance with the procedures described in section 10 of the Articles of Association, which Citco N.V. was contractually obligated to compute on a monthly basis under the Citco Agreements.

352.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to manage the business and affairs of the Offshore fund as provided in section 58 of the Articles of Association.

353.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, the power to "appoint any person or persons as manager of the Company to exercise all or any of the duties, powers and discretions exercisable by the Directors upon such terms and conditions and for such period and with such restrictions as the Directors think fit . . ." as provided in section 12 of the Articles of Association.

354.    The Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was not limited to, their responsibility to supervise Citco N.V. in its role as administrator of the fund as provided in section 1.1 of the amended and restated Citco Agreement dated April 1, 2000.  Further, the Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included their responsibility to pay or to monitor payment to Offshore's third party service providers (such as Citco) and its investment manager, Lauer.

355.    ERISA provides that "a person is a fiduciary with respect to a plan to the extent . . . (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so . . ." 29 U.S.C. 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)).

356.    Pursuant to 29 C.F.R. §§ 2510.3-21(c)(1)(i), a person shall be deemed to render investment advice to a plan only if:

> (i)    Such person renders advice to the plan **as to the value of securities** or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property; and

(ii)     Such person either directly or indirectly (e.g., through or together with any affiliate)—

(A)     Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

(B)     Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

(Emphasis added.)

357.    Section 10(3)(h) of the Articles of Association confers discretion and responsibility on the Director Defendants to determine the proper valuation of the fund, including considering whether prices generated in a securities market reflected the investments' true value and whether some other valuation method should be used that better reflects the investments' fair value.  The Director Defendants also had authority and control with respect to Offshore's purchasing and selling of securities.  Accordingly, the Director Defendants' authority or control with respect to the management or disposition of Offshore's assets included, but was

not limited to, rendering advice to benefit plan investors as to the value of Offshore's ERISA plan assets.

358.    Offshore paid fees for the Director Defendants' services on Offshore's board to Citco, not to the Director Defendants individually.

359.    Thus, by rendering **"advice to the [benefit plan investors] as to the value of securities**," the Director Defendants, who served as employees of The Citco Group and Citco N.V. and as the alter ego and/or agent of The Citco Group, directly or indirectly rendered investment advice for a fee or other compensation with respect to Offshore's ERISA plan assets because: (i) they were responsible to determine the fund's NAV; (ii) they regularly approved the fund's monthly NAV, which was calculated by Citco N.V. and reviewed and approved by Keunen, acting in his express authority and within the scope of his employment as director of The Citco Group and an officer of Citco USA, in accordance with policies and procedures set forth in section 10 of the Articles of Association. The Director Defendants were ERISA fiduciaries pursuant to 29 U.S.C. 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2).

360.    The Director Defendants also rendered investment advice for a fee or other compensation with respect to Offshore's ERISA plan assets through their authority and contractual responsibility to independently calculate Offshore's NAV/share pursuant to the Citco Agreement with Offshore, which provides in part that Citco N.V. "shall be responsible for . . . computing the monthly [NAV]" for Offshore and "*independently* pricing the fund." (Emphasis supplied).  By virtue of The Citco Group and Citco N.V.'s vicarious liability, these two entities were also charged with these duties.  The Director Defendants had the responsibility under the Citco Agreement, the Articles of Association, and the PPM to provide values for any securities

in Offshore's portfolio for which the open market did not provide an accurate valuation.  The Director Defendants were ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and § 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2).

361.    As ERISA fiduciaries, the Director Defendants were obligated under 29 U.S.C. § 1104(a)(1) (ERISA § 404(a)(1)) to discharge their duties with respect to Offshore's ERISA plan assets: (i) solely in the interests of the beneficiaries of the ERISA plans; (ii) for the exclusive purpose of providing benefits to the beneficiaries of the ERISA plans and defraying reasonable plan administration expenses; (iii) with the care, skill, prudence and diligence under the prevailing circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (iv) by diversifying the investments of the Offshore ERISA plan assets so as to minimize the risk of large losses, unless under the circumstances it was clearly prudent not to do so.

362.    The Director Defendants were an integral part of the inflated valuation scheme.  If the Director Defendants did not agree with and publish the inflated NAVs and allow them to be applied to the Fund's portfolio, the scheme could not have been successful.

363.    As ERISA fiduciaries, the Director Defendants were prohibited under 29 U.S.C. § 1106(b) (ERISA § 406(b)) from self-dealing with respect to Offshore's ERISA plan assets.

364.    Additionally, the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties as set forth in paragraphs 346-354 and failed to avoid conflicts of interest and self-dealing.

365.    The Director Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to review, at reasonable intervals, the performance of Lancer Management as investment manager, in such

manner as may be reasonably expected to ensure that its performance was in compliance with ERISA, in accordance with 29 C.F.R. § 2509.75-8, Q&A 17.

366.   The Director Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to perform due diligence and failing to investigate or respond to the "red flags" described herein that would have revealed Lancer Management was not managing such plan assets in accordance with the Investment Management Agreement, Offshore's PPM, and ERISA's strict fiduciary standards.

367.   Citco and the Director Defendants' interests were aligned with Lauer and were adverse to the interests of the Funds because Lauer's and the Citco Defendants' fees were each tied to the NAVs that were grossly inflated.  Moreover, the Citco Defendants and the Director Defendants were charged with independently valuing the NAVs and failed to do so to enhance their own financial interests.  Rather than acting in the best interest of providing benefits to ERISA plan participants, the Director Defendants and the Citco Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties respecting the management or disposition of Offshore's assets by participating in and/or permitting the inflation of the NAVs to pay themselves and Lauer inflated fees that corresponded to the inflated NAVs and by failing to monitor and supervise the fees paid out of Offshore's assets.

368.   The Director Defendants knowingly, recklessly, and/or with gross negligence breached their ERISA fiduciary duty to determine independently the NAVs for Offshore, by failing to respond appropriately as to the portfolio values claimed by Lauer – which the Director Defendants knew were absurd – and by otherwise failing to perform due diligence and failing to

investigate or respond to the "red flags" described herein that would have revealed the over-valuation of Offshore's NAVs.

369.    The Director Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to discover and reveal Lauer's conduct regarding his valuation of certain portfolio companies, such as the Target Companies within Offshore.

370.    Alternatively, the Director Defendants knew of the breaches of fiduciary duties by Lauer, as evidenced by communications to and from the Director Defendants cited herein relating to valuation issues, and failed to make reasonable efforts under the circumstances to remedy such breaches, to the detriment of Offshore's ERISA plan assets.  Further, the Director Defendants knowingly, willfully, recklessly and/or with gross negligence breached their fiduciary duties outlined in paragraphs 346-354, above.

371.    The Director Defendants further failed to employ appropriate valuation methodologies and to independently price the fund as required under the Citco Agreements and GAAP, and failed to confirm the independence and accuracy of the valuations provided to the Citco Defendants by Lauer and by Lancer Management.

372.    The Director Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties of care and prudence with respect to Offshore's ERISA plan assets by ignoring the independent pricing information provided by several employees of Citco N.V. and instead deferring to the judgment of Keunen, the Director of Fund Services for the Citco Group and an officer of Citco USA, with respect to the decisions to publish the January 2002 NAV based on the portfolio values provided by Lauer, which director Quilligan described

as "hugely aggressive in valuing thinly traded stocks" because of the unreasonably high values for investments with unrealized gain.

373.    Alternatively, the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by actively participating in the Lauer's inflated valuation scheme.  If the Director Defendants had not approve the inflated NAVs and allowed them to be applied to the Fund's portfolio, the scheme could not have been successful. The Director Defendants' active participation fostered the fiduciary breaches of Lauer and Lancer Management.

374.    The Director Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to discover and reveal Lauer's conduct regarding his valuation of certain portfolio companies, such as the Target Companies within Offshore, and by failing to disclose the inflated valuations to the investors, appropriate authorities, and/or the Independent Directors.  The Director Defendants further failed to employ appropriate valuation methodologies and to independently price the fund as required under the Citco Agreements and GAAP, failed to confirm the independence and accuracy of the valuations provided to the Citco Defendants by Lauer and by Lancer Management, and approved and/or acquiesced in Lauer's inflated valuations, despite actual knowledge of the valuations' falsity.

375.    The Director Defendants' fiduciary breaches alleged above resulted in grossly exaggerated valuations for Offshore and enabled Lauer to artificially prolong the life of Offshore, both of which significantly increased the fees paid to the Citco Defendants at the expense of Offshore's ERISA plan assets.  Additionally, by assuming the responsibilities as

directors of the Funds, the Director Defendants approved and/or acquiesced Lauer's acts and misconduct wrought upon the Funds.

376.     Accordingly, by acting in a manner that resulted in excessive fees being paid by Offshore to Citco N.V. for their services, the Director Defendants breached their ERISA fiduciary duties by actively participating in Lauer's inflated valuation scheme, by knowingly, willfully, recklessly and/or with gross negligence disseminating the false inflated valuations to investors and the Funds, by failing to act, with respect to Offshore's ERISA plan assets, solely in the interests of the beneficiaries of the plans and for the exclusive purpose of providing benefits to the beneficiaries of such plans, and by dealing with such assets in their own interests, in violation of 29 U.S.C. §§ 1104(a)(1) and 1106(b) (ERISA §§ 404(a)(1) and 406(b)).

377.     Citco, in accordance with the Citco Agreements, provided directors to Offshore, *i.e.*, the Director Defendants.  The Director Defendants were either employees of The Citco Group and Citco N.V., or, in the case of ICS, the alter ego and/or agent of The Citco Group. Citco was contractually obligated to provide directors and received an annual fee for providing the Offshore Funds with the services of the Director Defendants.  As the employer of Conroy and Quilligan, Citco N.V. is liable for the conduct of its employees under the doctrine of respondeat superior because, as set forth in this Complaint, Conroy and Quilligan were acting under the express authority and within the scope of their employment as employees of Citco N.V. at all times when serving on Offshore's board.  Additionally, as the employer of Stocks and Verhooren and because ICS served as The Citco Group's alter ego and/or agent, The Citco Group is liable for the conduct of its employees and agents under the doctrine of respondeat superior because, as set forth in this Complaint, Verhooren and Stocks were acting under the

express authority and within the scope of their employment as employees of The Citco Group at all times when serving on Offshore's board.

378.    Citco N.V., The Citco Group, and Citco USA selected and exercised authority or control with respect to the management or disposition of Offshore's ERISA plan assets through the Citco Defendants' selection of and authority and control over the Director Defendants, including without limitation through their authority and control over the Director Defendants as employees and their authority to select which employees and which Citco subsidiary/affiliate would be provided to serve or continue to serve as Offshore's directors.  Therefore, the Citco Defendants were ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(i) (ERISA § 3(21)(A)(i)).

379.    In addition to serving as a director of Offshore responsible for supervising the fund Administrator Citco N.V., Quilligan was also the General Manager and Managing Director of Citco N.V.  Therefore, as a fiduciary with respect to the fund's ERISA plan assets, Director Defendants Quilligan, Conroy, and Stocks were contractually obligated to supervise their own employers and the administrative services their employers provided to Offshore.  As employees of the Citco Defendants, all of the Director Defendants received their compensation from one of the Citco Defendants.  In accordance with the Citco Agreements, Citco N.V., and indirectly the other Citco Defendants, received a fee from Offshore for the Director Defendants' services. Through this circular arrangement the Citco Defendants had, and exercised, the ultimate authority or control with respect to the management or disposition of Offshore's ERISA plan assets through their authority or control over the Director Defendants.  Therefore, the Citco Defendants were also ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(i) (ERISA § 3(21)(A)(i)).

380.    By rendering **"advice to the [benefit plan investors] as to the value of securities,"** Citco N.V. rendered investment advice for a fee or other compensation with respect to Offshore's ERISA plan assets through its authority and contractual responsibility to independently calculate the fund's value pursuant to section 1.1(g) and (h) of amended and restated the Citco Agreement with Offshore dated April 1, 2000, which provides in part that Citco N.V. "shall be responsible for . . . computing the monthly [NAV]" for Offshore and "*independently* pricing the fund." (Emphasis supplied.)  Citco N.V. was an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and § 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2).

381.    The Citco Group and Citco USA also rendered investment advice for a fee or other compensation with respect to Offshore's ERISA plan assets through their review of the NAV and approval of its publication as is demonstrated by the numerous emails, cited in paragraphs 254-283 above, between Keunen, the Director of Fund Services for The Citco Group and an officer of Citco USA, and Quilligan and Conroy, and other Citco N.V. employees regarding the monthly NAV and Keunen's specific direction to Quilligan on February 7, 2002, to "send out the NAV for Jan[uary 2002] . . . and the letter, subject to my comments and any others you may have . . ." (attached hereto as Exhibit "T").  The Citco Group and Citco USA were ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(ii) (ERISA § 3(21)(A)(ii)), and § 29 C.F.R. §§ 2510.3-21(c)(1)(i) and 2510.3-101(a)(2).

382.    As ERISA fiduciaries, the Citco Defendants were obligated under 29 U.S.C. § 1104(a)(1) (ERISA § 404(a)(1)) to discharge their duties with respect to Offshore's ERISA plan assets: (i) solely in the interests of the beneficiaries of the ERISA plans; (ii) for the exclusive purpose of providing benefits to the beneficiaries of the ERISA plans and defraying

reasonable plan administration expenses; (iii) with the care, skill, prudence and diligence under

the prevailing circumstances that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims; and

(iv) by diversifying the investments of the Offshore ERISA plan assets so as to minimize the risk

of large losses, unless under the circumstances it was clearly prudent not to do so.

383.    The Citco Defendants were an integral part of the inflated valuation scheme.  If

the Citco Defendants did not agree with and publish the inflated NAVs and allow them to be

applied to the Fund's portfolio, the scheme could not have been successful.

384.    As ERISA fiduciaries, the Citco Defendants were prohibited under 29 U.S.C.

§ 1106(b) (ERISA § 406(b)) from self-dealing with respect to Offshore's ERISA plan assets.

385.    Citco N.V. knowingly, recklessly, and/or with gross negligence breached its

fiduciary duties with respect to Offshore's ERISA plan assets by failing in its duty to calculate

Offshore's NAV independently, by failing to inquire as to the portfolio values claimed by Lauer,

and by otherwise failing to perform due diligence and failing to investigate or respond to the "red

flags" described herein that would have revealed the over-valuation of Offshore's NAVs.

386.    The Citco Group and Citco USA knowingly, recklessly, and/or with gross

negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by

approving and directing Citco N.V. to release Offshore's NAV without independently

investigating the portfolio values or respond to the "red flags" described herein that would have

revealed the over-valuation of Offshore's NAVs.

387.    Citco N.V. knowingly, recklessly, and/or with gross negligence breached its

fiduciary duties with respect to Offshore's ERISA plan assets by directing the Citco employee

directors to act in the interests of the Citco Defendants rather than the Offshore Fund and by

failing to insist that Director Defendants Quilligan and Conroy, as its employees, fulfill their ERISA fiduciary duties as directors of Offshore.

388.    The Citco Group and Citco USA knowingly, recklessly, and/or with gross negligence breached their duties with respect to Offshore's ERISA plan assets by selecting Citco employees as directors and directing them to act in the interest of the Citco Defendants rather than the Offshore Fund.

389.    The Citco Group and Citco USA knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by directing the Citco employee directors to act in the interests of the Citco Defendants rather than the Offshore Fund and by failing to insist that Citco N.V. and Director Defendants, who were Citco employees and a Citco subsidiary, fulfill their ERISA fiduciary duties as directors of Offshore.

390.    The Citco Group knowingly, recklessly, and/or with gross negligence breached its fiduciary duties with respect to Offshore's ERISA plan assets by failing to insist that Director Defendant Stocks and Verhooren, who were The Citco Group's employees, and ICS, which was The Citco Group's alter ego and/or agent, fulfill their ERISA fiduciary duties as directors of Offshore.

391.    Citco N.V. knowingly, recklessly, and/or with gross negligence breached its fiduciary duties with respect to Offshore's ERISA plan assets by failing to monitor, remove, and provide replacement employees to serve as directors of Offshore.

392.    The Citco Group and Citco USA knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by

failing to monitor the Director Defendants and demand that Citco N.V. remove and provide replacement employees to serve as directors of Offshore.

393.    The Citco Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by failing to discover and reveal Lauer's conduct regarding his valuation of certain portfolio companies, such as the Target Companies within Offshore.   The Citco Defendants further failed to employ appropriate valuation methodologies and to independently price the fund as required under the Citco Agreements and GAAP, and failed to confirm the independence and accuracy of the valuations provided to the Citco Defendants by Lauer and by Lancer Management.

394.    Citco N.V. knowingly, recklessly, and/or with gross negligence breached its fiduciary duties with respect to Offshore's ERISA plan assets when it strongly suspected that Lauer's valuation of the portfolio was fraudulent by continuing to publish the NAV rather than notifying the Director Defendants that they would not publish the fund's NAV until the Director Defendants resolved the valuation issues.

395.    Alternatively, the Citco Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by actively participating in the Lauer's inflated valuation scheme.  If Citco N.V., at the direction of Keunen, had not approved the inflated NAVs and allowed them to be applied to the Fund's portfolio, the scheme could not have been successful.  The Citco Defendants' active participation fostered the fiduciary breaches of Lauer and Lancer Management.

396.    The other Citco Defendants knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by directing that

Citco N.V. publish the NAV when they strongly suspected that Lauer's valuation of the portfolio was fraudulent.

397.    Citco further failed to employ appropriate valuation methodologies and to independently price the fund as required under the Citco Agreements, the Articles of Association, and GAAP, and failed to confirm the independence and accuracy of the valuations provided to the Citco Defendants by Lauer and by Lancer Management.

398.    The Citco Defendants' fiduciary breaches alleged above resulted in grossly exaggerated valuations for Offshore and enabled Lauer to artificially prolong the life of Offshore, both of which significantly increased the fees paid to Citco N.V., and ultimately the other Citco Defendants, at the expense of Offshore's ERISA plan assets.

399.    In response to Ger-Jan Meyer's valuation memo outlining the dire state of the Funds' true condition, Keunen, acting within his express authority and in the scope of his employment for The Citco Group and Citco USA, responded by forwarding the memo to all Citco Executive Directors on May 22, 2002,  addressing his comments to Christopher Smeets, the CEO of The Citco Group:

> From:        Keunen, William  MIA
> Sent:        Wednesday, May 22, 2002, 7:48 PM
> To:          zz*Citco All Executive Directors
> Cc:          Quilligan, Declan  CUR; Verhooren, John  GEN;
>              Conroy, Kieran  DUB; Peller, Jay  NYC
> Subject:     Lancer
>
> Chris, as I mentioned to you yesterday, here is the story about Lancer, a fund that has been administered out of Curacao since its inception in 1995.
>
> Recently the management team in Curacao have become concerned about the pricing policy of the Fund, in particular with respect to its less liquid positions which at their current reported value make up two thirds of the value of the portfolio.  We began by discussing our concerns with the Investment Manager and then asked for back-up in the form of reports about the relevant

companies. To date two of seven reports have been received and they do not make for pleasant reading. Then we had our internal audit group perform a detailed analysis of the positions. Their report is enclosed. The upshot is that there are a handful of positions which we feel the IM has at the least grossly over-valued and at worst manipulated the month end valuations by executing large buys close to month end that force the price up. The whole situation was discussed during my visit to Curacao.

Other issues to be taken into consideration:

- The pricing policy of the Fund as stated in the Prospectus is clear – value positions at latest closing price – the Fund follows this policy and a strict interpretation of such indicates that it is not breaking its rules.

- **Our personal directors** (Kieran and Declan) resigned earlier this year.

- The Fund's auditors, PwC Curacao have signed each year's audit report up to 2000, but have still not signed off 2001. Their deadline is Irish Stock Exchange imposed – June 30. They recently collected the company reports we requested from the IM. If PwC decide not to sign, our mission is clear – resign immediately. Declan is in touch with them, but they don't seem to be in any hurry and the May 31 NAV cycle looms.

- If PwC do sign, we should still consider our exit strategy, but by doing is likely to create shock-waves that could cause significant distress, and our association will not be pretty.

We will keep you posted – comments welcome.

Rgds, William

(Emphasis supplied).

400.   Keunen, acting within his express authority and in the scope of his employment as a director of The Citco Group and as an officer of Citco USA, even admits that Citco's "personal directors" performed for and at the direction of The Citco Group, Citco USA, and Citco N.V. when they served on the Funds' boards. Keunen's observation that Citco and the Director Defendants' association with Lancer and Lauer "will not be pretty" is prophetic and

further demonstrates Defendants' scheme to accept inflated fees based on the Funds' inflated valuations.

401.    This chain of self-dealing on the part of the Citco Defendants is clearly expressed in the email correspondence leading up to the decision by the executive directors of The Citco Group to direct Citco N.V. to resign as Administrator.  In a July 2, 2002, email from Keunen to the executive directors of The Citco Group, which discusses the proposed resignation as "Administrator of the fund" and whether The Citco Group had a duty "to take concerns about their trading patterns any [sic] investors," Keunen notes that the resignation would mean that "We also forego $700k in fees . . .  ."  Accordingly, by acting in a manner that resulted in excessive fees from Offshore, the Citco Defendants breached their ERISA fiduciary duties by failing to act, with respect to Offshore's ERISA plan assets, solely in the interests of the beneficiaries of the affected ERISA plans and for the exclusive purpose of providing benefits to the beneficiaries of such plans, and by dealing with such assets in their own interests, in violation of 29 U.S.C. §§ 1104(a)(1) and 1106(b) (ERISA §§ 404(a)(1) and 406(b)).

402.    The Receiver is entitled to relief from the Citco Defendants in the form of:  (i) a monetary payment to Offshore to reimburse it for the losses incurred by Offshore's ERISA plan assets and profits received by the Citco Defendants with respect to the ERISA plan assets resulting from the breaches of fiduciary duties alleged above, as required by 29 U.S.C. § 1109(a) (ERISA § 409(a)); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) (ERISA §§ 409(a) and 502(a)(2) and (3)); and (iii) reasonable attorneys' fees and expenses as provided by 29 U.S.C. § 1132(g) (ERISA § 502(g)), and other applicable law.

WHEREFORE, the Receiver prays that a judgment be entered against the Citco Defendants for: (a) damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

### COUNT III

### LIABILITY UNDER ERISA FOR BREACH BY CO-FIDUCIARIES

**(The Director Defendants)**

403.   The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 and paragraphs 292 through 402 above as if fully stated herein.

404.   As ERISA fiduciaries, the Director Defendants are subject to co-fiduciary liability under 29 U.S.C. § 1105(a) (ERISA § 405(a)) if: (i) they participated knowingly in, or knowingly undertook to conceal, an act or omission of another fiduciary–here, each other's, the Citco Defendants, Lauer, and Lancer Management; (ii) they enabled, through failure to comply with their own fiduciary obligations, another fiduciary to commit a breach; or (iii) they had knowledge of another's breach, unless they made reasonable efforts under the circumstances to remedy the breach.

405.   As alleged above, the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by actively participating in Lauer's scheme to inflate the NAVs; by disseminating the false; and inflated NAVs to investors and the Funds; by actively breaching their duties and obligations set forth in paragraphs 301-309; failing to monitor and replace Lancer Management as Offshore's investment manager; failing to review and assess Offshore's investment policies

and performance and otherwise failing to perform due diligence and failing to respond to the "red flags" that would have revealed that Lancer Management's mismanagement of the plan assets; by failing adequately to supervise the calculation of NAVs for Offshore; by failing to respond to the "red flags" that would have revealed the over-valuation of Offshore's NAVs; and by failing to perform their valuation functions for Offshore's assets in accordance with GAAP and to employ independent valuations by disinterested parties as required under the Citco Agreements.

406.    Because Lauer, and Lancer Management exercised authority and control over the management and disposition of the assets of Offshore, and because Lauer provided investment advice to Offshore for a fee, they were fiduciaries with respect to Offshore's ERISA plan assets pursuant to 29 U.S.C. § 1002(21)(A)(i); (ERISA § 3(21)(A)(i)).

407.    Both Lauer and Lancer Management knowingly, willfully, recklessly, and/or with gross negligence breached their respective fiduciary duties under 29 U.S.C. § 1104 (ERISA § 404), with respect to Offshore's ERISA plan assets by investing such assets in risky start-up companies inappropriate for ERISA plans, by failing to adequately diversify Offshore's investments, and by inflating the values assigned to Offshore's portfolio, particularly the Target Companies, which resulted in excessive fees for Lauer, Lancer Management, and the Citco Defendants, and which prolonged the life of Offshore, at the expense of Offshore's ERISA plan assets.

408.    Further, the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their respective fiduciary duties under 29 U.S.C. § 1104 (ERISA § 404), with respect to Offshore's ERISA plan assets by actively participating in, acquiescing, and/or ignoring each other's breaches and the breaches of the Citco Defendants.

409.    The Director Defendants are liable for the breach of duty by their co-fiduciaries, which include each individual Director Defendant, the Citco Defendants, Lauer, and Lancer Management, because through the Director Defendants' failure to comply with their own fiduciary obligations, as alleged above, the Director Defendants enabled each other, the Citco Defendants, Lauer, and Lancer Management to breach their respective fiduciary duties with respect to Offshore's ERISA plans assets.  The Director Defendants were an integral part of the inflated valuation scheme.  If the Director Defendants did not agree with and publish the inflated NAVs and allow them to be applied to the Fund's portfolio, the scheme could not have been successful.  The Director Defendants' active participation fostered the fiduciary breaches of each other, the Citco Defendants, Lauer, and Lancer Management.

410.    The Director Defendants' failure to detect the over-inflated valuations of the Target Companies and over-accumulation of equity positions in the Target Companies;  failure to acknowledge, disapprove of, and/or detect Stenton Leigh's conflicts of interest as a security valuation expert; and failure to act as to Lauer's conflict of interest in setting inflated values to increase his own fees enabled Lauer to prolong the life of Offshore and continue depleting Offshore's asset, to the detriment of Offshore's ERISA plan assets.

411.    Alternatively, the Director Defendants knew of each other's, the Citco Defendants', Lauer's, and Lancer Management's breaches of fiduciary duty, as evidenced by communications to, from, and among the Citco Defendants cited herein relating to valuation issues, and failed to take reasonable efforts under the circumstances to remedy such breaches to the detriment of Offshore's ERISA plan assets and to benefit themselves, their employers, and related entities.

412.    Following their respective resignations, the Director Defendants continued to be liable for Offshore's losses resulting from the continued breaches by their co-fiduciaries Lauer and Lancer Management to the extent that the Director Defendants' improper actions or their failure to act prior to resignation, as alleged above, enabled such breaches by Lauer or Lancer Management.

413.    The Receiver is entitled to relief from the Director Defendants in the form of:  (i) a monetary payment to Offshore to reimburse it for the losses incurred or profits received with respect to the plan assets resulting from the breaches of fiduciary duties alleged above, including profits received by Lauer and Lancer Management, as required by 29 U.S.C. § 1109(a) (ERISA § 409(a)); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) (ERISA §§ 409(a) and 502(a)(2) and (3)); and (iii) reasonable attorneys' fees and expenses as provided by 29 U.S.C. § 1132(g) (ERISA § 502(g)), and other applicable law.

WHEREFORE, the Receiver prays that a judgment be entered against the Director Defendants for: (a) damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT IV

## LIABILITY UNDER ERISA FOR BREACH BY CO-FIDUCIARIES

### (The Citco Defendants)

414.    The Receiver hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 290 and paragraphs 292 through 402 above as if fully stated herein.

415.    As ERISA fiduciaries, the Citco Defendants are subject to co-fiduciary liability under 29 U.S.C. § 1105(a) (ERISA § 405(a)) if: (i) they knowingly participated in, or knowingly undertook to conceal, an act or omission of another fiduciary–here, each individual Citco Defendant, the Director Defendants, Lauer, and Lancer Management; (ii) they enabled, through failure to comply with their own fiduciary obligations, another fiduciary to commit a breach; or (iii) they had knowledge of another's breach, unless they made reasonable efforts under the circumstances to remedy the breach.

416.    As alleged above, Citco N.V., and The Citco Group and Citco USA, which exercised control over the Director Defendants and Citco N.V. through the express authority of Keunen, who at all times acted in the scope of his employment as the Director of Fund Services for The Citco Group and an officer of Citco USA, knowingly, recklessly, and/or with gross negligence breached their fiduciary duties with respect to Offshore's ERISA plan assets by actively breaching the duties and obligations as set forth in paragraphs 301-309; failing to employ appropriate valuation methodologies and to independently price the fund in accordance with the Articles of Association, the Citco Agreements, and GAAP; failing to have independent valuations performed by disinterested parties; failing to challenge the inflated portfolio values provided by Lauer, failing to act as to Lauer's, each individual Citco Defendant's, and the Director Defendants' conflicts of interest in setting inflated values to increase Lauer and Citco's own fees; by otherwise failing to perform due diligence and failing to investigate certain "red flags" that would have revealed the improper conduct in which Lauer engaged; by failing to insist that the other individual Citco Defendants and the Director Defendants, as their employees, fulfill their ERISA fiduciary duties as directors of Offshore; by failing to monitor, remove, and

provide replacement employees to serve as directors of Offshore on determining that Quilligan and Conroy were not qualified to discharge their ERISA fiduciary responsibilities.

417.    Because Lauer and Lancer Management exercised authority and control over the management and disposition of the assets of Offshore, and because Lauer provided investment advice to Offshore for a fee, as provided in section 3 of the Investment Management Agreement, they were fiduciaries with respect to Offshore's ERISA plan assets pursuant to 29 U.S.C. § 1002(21)(A)(i); (ERISA § 3(21)(A)(i)).

418.    Both Lauer and Lancer Management knowingly, recklessly, and/or with gross negligence breached their respective fiduciary duties under 29 U.S.C. § 1104 (ERISA § 404), with respect to Offshore's ERISA plan assets by investing such assets in risky start-up companies inappropriate for ERISA plans, by failing to adequately diversify Offshore's investments, and by inflating the values assigned to Offshore's portfolio, particularly the Target Companies, which induced investors, including the ERISA plans, to invest and continue investing in the fund, which resulted in excessive fees for Lauer, Lancer Management, and the Citco Defendants, and which prolonged the life of Offshore, at the expense of Offshore's ERISA plan assets.

419.    The Citco Defendants are liable for the breach of duty by their co-fiduciaries, each individual Citco Defendant, the Director Defendants, Lauer, and Lancer Management, because they knowingly participated in and knowingly undertook to foster and conceal the breaches of fiduciary duties by Lauer and Lancer Management when, as an example, Keunen, acting as Director of Fund Services for The Citco Group and as an officer of Citco USA, directed Citco N.V. and its employees, the Director Defendants, to send out the obviously inflated NAV for January 2002 rather than demanding that Lauer provide an accurate valuation of the portfolio

assets. Thus, through their own breach of fiduciary duties, the Citco Defendants concealed Lauer's breaches and prolonged the life of Offshore, at the expense of Offshore's ERISA plan assets.

420. The Citco Defendants are liable for the breach of duty by their co-fiduciaries, each individual Citco Defendant, the Director Defendants, Lauer, and Lancer Management, because, through the Citco Defendants' failure to comply with their own fiduciary obligations, the Citco Defendants enabled the Director Defendants, Lauer, and Lancer Management to breach their respective fiduciary duties with respect to Offshore's ERISA plan assets. The Citco Defendants were an integral part of the inflated valuation scheme. If the Citco Defendants did not agree with and publish the inflated NAVs and allow them to be applied to the Fund's portfolio, the scheme could not have been successful. The Citco Defendant's active participation fostered the fiduciary breaches of each individual Citco Defendant, Lancer Management, the Director Defendants, and Lauer.

421. The Citco Defendants' failure to detect the over-inflated valuations of the Target Companies and excess accumulations of equity positions in the Target Companies and to detect, acknowledge and/or disapprove of Stenton Leigh's conflicts of interest as a security valuation expert enabled Lauer to prolong the life of Offshore and continue depleting Offshore's assets to the detriment of Offshore's ERISA plan assets.

422. Alternatively, the Citco Defendants knew of the breaches of fiduciary duties by each other, the Director Defendants, Lauer, and Lancer Management, as evidenced by communications to, from, and among the Citco Defendants cited herein relating to valuation issues, and failed to make reasonable efforts under the circumstances to remedy such breaches to

the detriment of Offshore's ERISA plan assets and to benefit themselves, their employees, and related entities.

423.    At the time of Citco N.V.'s resignation as Administrator for the Offshore fund, the Citco Defendants compounded their fiduciary breaches by colluding with Lauer and Lancer Management to conceal the acknowledged reason for their resignation.  The decision for Citco N.V. to resign was made by the Executive Directors of The Citco Group.  Christopher Smeets, the President and CEO of The Citco Group, emailed the decision of the executive directors to Keunen on July 4, 2002, which was as follows:

> From:       Smeets, Christopher G.
> Sent:        Thursday, July 04, 2002, 4:56 AM
> To:          Keunen, William  MIA; zz*Citco All Executive
>              Directors
> Subject:    Re:  Lancer
>
> William:
>
> We Robert, Ermanno, Hans & I, have discussed and we feel we do not need to wait for Paul Schrieber's opinion.  We should resign as we discussed by phone.  Call either Ermanno or myself for detailed reasoning, but essentially it is what you and I discussed.  We cannot hide behind PWC, and when [sic] do not wish to be associated with the fund when it goes own [sic], plus we do our duty in a way by giving the investors a signal albeit maybe to [sic] late.  We resign because they do nor [sic] comply with our pricing policy.
>
> CGS

Contrary to Mr. Smeets' suggested "signal" to investors, the Transition Agreement between Citco N.V., Offshore, and Lancer Management, which was reviewed and commented upon by the Executive Directors of The Citco Group, provides that each party agrees "not to make any public statements regarding the other party or any disparaging statement . . . regarding the other party."  In addition, the Transition Agreement provided specific language for use in responding

to inquires regarding Citco's termination as "Administrator."  The required statement is as follows:

> Citco and the Company have mutually and amicably agreed, on the termination of the Administrative Agreement between Citco and the Company and, together with the investment manager and its principal, have entered into a Transition Agreement to facilitate a smooth transition to a new administrator.

In signing the Transition Agreement, which provided additional indemnification protections for Citco N.V. not previously included in the Citco Agreements, Keunen, Quilligan, and Conroy agreed to be personally bound by the "inquiries statement" and the "non-disparagement" provisions of the Transition Agreement.  When the resignation of Citco N.V. was disclosed to the Offshore investors in the fund in a letter signed by Quilligan and Conroy, the letter conformed to the statement above and made no mention of any disagreement regarding pricing policies.  Therefore, not only did the Citco Defendants fail to "signal" investors in the Offshore fund with respect to the serious overvaluation by each other, the Director Defendants, Lauer, and Lancer Management, they failed to take any reasonable efforts to remedy these breaches. Accordingly, the Citco Defendants should not be permitted to escape liability for Offshore's losses resulting from the continued breaches by their co-fiduciaries, Lauer and Lancer Management, to the extent that the Citco Defendants' improper actions or their failure to act prior to resignation, as alleged above, enabled such ongoing breaches by Lauer or Lancer Management to continue.

424.    The Receiver is entitled to relief from the Citco Defendants in the form of:  (i) a monetary payment to Offshore to reimburse it for the losses incurred or profits received with respect to the ERISA plan assets resulting from the breaches of fiduciary duties alleged above, including profits received by Lauer and Lancer Management, as required by 29 U.S.C. § 1109(a) (ERISA § 409(a)); (ii) injunctive and other appropriate equitable relief to remedy the breaches

alleged above, as provided by 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) (ERISA §§ 409(a) and 502(a)(2) and (3)); and (iii) reasonable attorneys' fees and expenses as provided by 29 U.S.C. § 1132(g) (ERISA § 502(g)) and other applicable law.

## COUNT V

## BREACH OF CONTRACT

### (The Citco Defendants)

425.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 above as if fully stated herein.

426.    The Citco Agreements between the Offshore Funds and the Citco Defendants constitute valid and enforceable contracts between the Offshore Funds and the Citco Defendants.

427.    The terms of the Citco Agreements required the Citco Defendants to perform certain services in accordance with the terms and provisions therewith.  The Citco Agreements also provided the appointment of Citco employees as "independent directors" of the Offshore Funds with their own duties and responsibilities as articulated in the Citco Agreements.

428.    The Citco Defendants knowingly, willfully, recklessly, and/or with gross negligence breached the Citco Agreements by failing to perform the services articulated therein. These breaches include, but are not limited to: failing to independently price the Offshore Funds; failing to independently verify the valuations stated by Lauer and Stenton Leigh, who were both conflicted, failing to appoint independent directors to the Funds' boards, and failing to compute the Funds' monthly NAV in accordance with GAAP.

429.    The Citco Defendants' failure to perform these obligations constitutes serious error.

430.    But for the Citco Defendants' gross negligence, willful misconduct and/or reckless disregard for their contractual duties, Lauer could not have continued to perpetrate harm upon the Offshore Funds.

431.    The Citco Defendants' breaches of their respective contractual duties and their willful, reckless or grossly negligent conduct directly and/or proximately caused damages to the Offshore Funds.  These damages include, but are not limited to, the following:

    a.    The Offshore Funds were depleted by paying tens of millions of dollars in management, incentive, and administrative fees to Lancer Management, Lauer, and the Citco Defendants, and in some cases, finder's fees to agents–all based on inaccurate NAVs that the Citco Defendants provided.

    b.    The Offshore Funds were depleted by making continuing "investments" in various portfolio companies in 2001 and beyond, well after the Citco Defendants should have known that the value of these companies was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.

    c.    The Offshore Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated by the Citco Defendants based on the inflated and erroneous NAVs.

    d.    The Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

WHEREFORE, the Receiver prays that a judgment be entered against the Citco Defendants for: (a) actual, consequential, special, and incidental damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT VI

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

### (The Citco Defendants)

432.    The Receiver herby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 above as if fully stated herein.

433.    The Citco Agreements required Citco to "independently price" the Funds' investment portfolio and to "compute the monthly NAV" in accordance with GAAP.

434.    Accordingly, the Citco Defendants had the obligation to use its discretion in good faith to independently verify and confirm the value of Funds' portfolio and to compute the Funds' monthly NAV in accordance with GAAP.

435.    Rather than using their discretion to the Funds' benefit, the Citco Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duty of good faith and fair dealing to the Funds by rubberstamping Lauer and Stenton Leigh's conflicted and inflated valuations despite actual knowledge that these valuations were baseless and not supported by reality.  The Citco Defendants further breached their duty of good faith by failing to use their discretion to independently verify the fair value of the NAV or even attempt to compute the Funds' NAV in accordance with GAAP.  Further, the Citco Defendants breached their duty of good faith and fair dealing owed to the Funds by failing to use and observe reasonable limits in exercising their discretion to independently verify the fair value of the Funds' NAV and compute the monthly NAV in accordance with GAAP.

436.    The Citco Defendants knowingly, willfully, recklessly, and/or with gross negligence breached the Citco Agreements by failing to perform the services articulated therein. These breaches include, but are not limited to: failing to independently price the Offshore Funds;

failing to independently verify the valuations stated by Lauer and Stenton Leigh, who were both conflicted; failing to exercise even minimal due diligence; and failing to compute the Funds' monthly NAV in accordance with GAAP.

437.   The Citco Defendants' failure to perform their duty of good faith constitutes serious error.

438.   But for the Citco Defendants' gross negligence, willful misconduct and/or reckless disregard for their duty of good faith, Lauer could not have continued to perpetrate harm upon the Offshore Funds.

439.   The Citco Defendants' breaches of their respective duties of good faith and fair dealing relating to the Citco Agreements, and their willful, reckless and/or grossly negligent conduct directly and/or proximately caused damages to the Offshore Funds.  These damages include, but are not limited to, the following:

    a.    The Offshore Funds were depleted by paying tens of millions of dollars in management, incentive, and administrative fees to Lancer Management, Lauer, and the Citco Defendants, and in some cases, finder's fees to agents–all based on inaccurate NAVs that the Citco Defendants provided.

    b.    The Offshore Funds were depleted by making continuing "investments" in various portfolio companies in 2001 and beyond, well after the Citco Defendants should have known that the value of these companies was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.

    c.    The Offshore Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated by the Citco Defendants based on the inflated and erroneous NAVs.

    d.    The Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

WHEREFORE, the Receiver prays that a judgment be entered against the Citco Defendants for: (a) actual, consequential, special, and incidental damages, plus interest, fees, and

costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT VII

## GROSS NEGLIGENCE

### (The Citco Defendants and Director Defendants)

440.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 above as if fully stated herein.

441.    The Citco Defendants and Director Defendants owed a duty to use reasonable skill and care in performing their fund administration services for the Offshore Funds, which included one or more of the following: the duty to use reasonable skill and care in advising the Offshore Funds on the appropriate course of action; the duty to disclose the inflated and baseless NAVs to the Independent Directors, the appropriate authorities, and the investors; the duty to warn the Funds, particularly the Independent Directors, of the overstated and inflated values of the Funds' NAVs; the duty to exercise due diligence; the duty to warn the Funds and the investors of the inflated valuations; the duty to control Lancer Management and Lauer's valuation procedures and to reject their methodology; the duties to act in accordance with the Articles of Association, the PPM, and the Investment Management Agreement; the duty to speak accurately after knowingly, willfully, recklessly, and/or with gross negligence disseminating the false inflated NAVs, the duty to use reasonable skill and care in providing the Offshore Funds with true and correct information; the duty to use reasonable skill and care in valuing the NAVs in accordance with GAAP; the duty to use reasonable skill and care to independently price the Offshore Funds; the duty to use reasonable skill and care to independently verify the valuations stated by Lauer; the duty to use reasonable skill and care to discover the incorrect valuations and

NAV calculations reported by Lauer; the duty to use reasonable skill and care to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate authorities; the duty to use reasonable skill and care to be aware of, discover, and/or investigate the "red flags" set forth above; and/or the duty to use reasonable skill and care to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

442.    The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duty of care to the Offshore Funds by: approving and/or acquiescing in Lauer's false inflated valuations; failing to replace Lauer and Lancer after discovering the valuation problems; disseminating the false NAVs to the investors and the Funds; actively concealing the false valuations from the investors; actively participating in Lauer's scheme to inflate the NAV; mismanaging the Funds, failing to use reasonable skill and care to value the NAVs in accordance with GAAP; failing to use reasonable skill and care to independently price the Offshore Funds; failing to use reasonable skill and care to independently verify the valuations stated by Lauer; failing to exercise due diligence; failing to use reasonable skill and care to discover the incorrect valuations and NAV calculations reported by Lauer; failing to use reasonable skill and care to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate authorities; failing to use reasonable skill and care to be aware of, discover and/or investigate the "red flags" set forth above; and/or failing to use reasonable skill and care to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

443.    The Citco Defendants and the Director Defendants' above-mentioned breaches constitute serious error.

444.    The Citco Defendants and the Director Defendants committed the above-mentioned breaches even though they knew that their course of conduct would probably, most likely and/or imminently result in injury to the Offshore Funds.

445.    The Citco Defendants and the Director Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage would result from it and/or that their conduct placed the Offshore Funds in clear and present danger that was likely to result in grave injury to the Offshore Funds.

446.    Despite this knowledge, they intentionally, consciously, voluntarily, and willfully performed their course of conduct and failed to perform their requisite duties and/or comply with their duty of care.

447.    The Citco Defendants' and the Director Defendants' conduct was so egregious as to rise to the level of intentional misconduct or gross negligence.

448.    The Director Defendants were at all times employed by and acting for the Citco Defendants and were dominated and controlled by the Citco Defendants when acting and voting as directors of the Funds.

449.    The Citco Defendants and the Director Defendants actively participated in their misconduct.

450.    The officers, directors, or managers of the Citco Defendants and the Director Defendants knowingly participated in, condoned, ratified, or consented to such conduct.

451.    But for the Citco Defendants' and Director Defendants' gross negligence, willful misconduct, and/or reckless disregard for their duties, Lauer could not have continued to perpetrate harm upon the Offshore Funds.

452.    The Citco Defendants and the Director Defendants' conscious, voluntary and willful disregard for their duties of care and/or their grossly negligent breach of their duties of care directly and/or proximately caused damages to the Offshore Funds. These damages include, but are not limited to, the following:

    a.    The Offshore Funds were depleted by paying tens of millions of dollars in management, incentive, and administrative fees to Lancer Management, Lauer, and the Citco Defendants, and in some cases, finder's fees to agents – all based on inaccurate NAVs that the Citco Defendants and Director Defendants provided.

    b.    The Offshore Funds were depleted by making continuing "investments" in various portfolio companies in 2001 and beyond, well after the Citco Defendants and the Director Defendants should have known that the value of these companies was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.

    c.    The Offshore Funds were depleted through satisfaction of redemption requests for shares that were calculated by the Citco Defendants and the Director Defendants based on the inflated and erroneous NAVs.

    d.    The Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

WHEREFORE, the Receiver prays that a judgment be entered against the Citco Defendants and the Director Defendants for: (a) compensatory and punitive damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT VIII

## BREACH OF FIDUCIARY DUTY

### (The Citco Defendants and Director Defendants)

453.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 and  paragraphs 301 through 309 above as if fully stated herein.

454.    As directors of the Offshore Funds, the Director Defendants owed the Offshore Funds fiduciary duties.

455.    As administrators of the Offshore Funds, the Citco Defendants also owed the Funds  fiduciary duties.

456.    As directors of the Offshore Funds, the Director Defendants had responsibility for and voted on issues dealing with the management of the Funds, including having oversight over the investment decisions of Lancer and Lauer.

457.    The Director Defendants were at all times employed by and acting for the Citco Defendants and were dominated and controlled by the Citco Defendants when acting and voting as directors of the Funds.

458.    When the Director Defendants approved and/or acquiesced in Lauer and Lancer's investment strategy–and approved the inflated NAVs despite knowing they were baseless and inflated–they were, therefore, doing so–or failing to act–on behalf and for the benefit of the Citco Defendants.

459.    Thus, the Citco Defendants, through the Director Defendants who they controlled, were dealing with issues relating to the management and investment decisions of the Funds.  And these were issues unrelated to the valuation of the assets of the Funds as well as the other administrative duties in the Citco Agreements.

460.    Moreover, despite being named as administrator and directors of the Funds, the Citco Agreements do not limit the fiduciary duties of the Defendants.  Once Defendants were appointed to fiduciary positions and undertook fiduciary obligations, the Defendants assumed statutory and common law fiduciary obligations.

461.    Since the Citco Defendants, by controlling the directors, being involved in decisions, and having control over the management and investment of the Funds, went beyond the duties and subject matter of the Citco Agreements, the Citco Defendants established a "special relationship" or developed "special circumstances" sufficient to become a fiduciary–i.e., they undertook to counsel and advise the Funds and went above and beyond a ministerial administrative role.

462.    Their acquiescence and/or approval of Lauer's misconduct in inflating the Funds' NAV and Lauer's investments decision constitutes a breach of the Citco Defendants fiduciary duty, especially because investment and management decisions are not contemplated by the Citco Agreements and these decisions were not related to the valuation of the Funds.

463.    Accordingly, the Citco Defendants and the Director Defendants, as directors of the Offshore Funds, owed one or more of the following fiduciary duties to the Offshore Funds that are separate and distinct from Citco's contractual obligations: the duty to ensure that its independent pricing and valuation of the Funds' NAV would be accurate and fair; the duty to ensure that the Offshore Funds' boards was free from conflicts of interest and act in the best interest of the Funds at all times; to perform reasonable due diligence; to counsel, advise, inform, and, protect the Funds from Lauer's misconduct and the resulting deepening insolvency; the duty to value the NAVs in accordance with GAAP; the duty to independently price the Offshore Funds; the duty to independently verify the valuations stated by Lauer; the duty to discover the

incorrect valuations and NAV calculations reported by Lauer; the duty to report Lauer's misconduct and the inflated valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate authorities; the duty to be aware of, discover, disclose, and/or investigate the "red flags" set forth above; and/or the duty to report the "red flags" set forth above to the Independent Directors, investors or appropriate authorities.

464.    The Citco Defendants and the Director Defendants assumed extra services for the Funds separate and distinct from Citco's contractual obligations by suggesting valuation techniques to Lauer and Lancer as a means to validate the inflated NAV despite their actual knowledge that the NAV was baseless and unsupported by reality.  Further, the Citco Defendants and the Director Defendants worked in concert with Lauer, Lancer, and the Funds' auditor in an attempt to avoid liability for their knowing, willful, and reckless, and grossly negligent inflation of the Funds' NAV for their own pecuniary gain.  Finally, the Citco Defendants and the Director Defendants assumed authority and control relating to the management and disposition of the Funds' assets as set forth in the Articles of Association, PPM, and the Investment Management Agreement.

465.    The Citco Defendants and the Director Defendants received a greater economic benefit from administering the Offshore Funds than from other similar and typical hedge fund administrations.

466.    The Citco Defendants exercised extensive control and dominated the decisions of the Director Defendants, and each Defendant directly participated in the administration of the Offshore Funds and the misconduct at issue, as detailed herein.

467.    The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties to the Offshore Funds by:

approving and/or acquiescing in Lauer's investment decisions despite actual knowledge that Lauer's decisions were damaging the Funds; approving Lauer's mismanagement of the Funds despite actual knowledge of the mismanagement and the damages wrought to the Funds; disseminating false inflated NAVs statements; actively concealing the Funds' inflated valuations from the investors; mismanaging the Funds, failing to perform reasonable due diligence; failing to replace Lauer as investment manager; failing to value the NAVs in accordance with GAAP; failing to independently price the Offshore Funds; failing to independently verify the valuations stated by Lauer; failing to discover the incorrect valuations and NAV calculations reported by Lauer; failing to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors or, appropriate authorities; failing to be aware of, discover and/or investigate the "red flags" set forth above; and/or failing to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

468.    While serving on the boards of the Offshore Funds, the Director Defendants were always acting within their express authority and in the scope of their employment as officers and directors of the Citco Defendants.  The Citco Defendants are therefore liable under the theory of respondeat superior for the Director Defendants' breaches of fiduciary duties owed to the Offshore Funds.

469.    The Citco Defendants and the Director Defendants committed the above-mentioned breaches even though they knew that their course of conduct would probably, most likely, and/or imminently result in injury to the Offshore Funds.

470.    The Citco Defendants and the Director Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage would result from it

and/or that their conduct placed the Offshore Funds in clear and present danger that was likely to result in grave injury to the Offshore Funds.

471.    Despite this knowledge, Defendants intentionally, consciously, voluntarily, and willfully breached their fiduciary duties owed to the Offshore Funds.

472.    The Citco Defendants' and the Director Defendants' conduct was so egregious as to rise to the level of intentional misconduct or gross negligence.

473.    The Citco Defendants and the Director Defendants actively participated in their misconduct.

474.    The officers, directors, or managers of the Citco Defendants and the Director Defendants knowingly participated in, condoned, ratified, or consented to such conduct.

475.    But for the Citco Defendants' and Director Defendants' gross negligence, willful misconduct, and/or reckless disregard for their duties, Lauer and Lancer could not have continued to perpetrate harm upon the Offshore Funds.

476.    The breaches of fiduciary duty committed by the Citco Defendants and the Director Defendants proximately caused damages to the Offshore Funds.   These damages include, but are not limited to, the following:

   a.    The Offshore Funds were depleted by paying tens of millions of dollars in management, incentive, and administrative fees to Lancer Management, Lauer, and the Citco Defendants, and in some cases, finder's fees to agents–all based on inaccurate NAVs that the Citco Defendants and Director Defendants provided.

   b.    The Offshore Funds were depleted by making continuing "investments" in various portfolio companies in 2001 and beyond, well after the Citco Defendants and the Director Defendants should have known that the value of these companies was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.

   c.    The Offshore Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated by the Citco Defendants and the Director Defendants based on the inflated and erroneous NAVs.

d.   The Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

WHEREFORE, the Receiver prays that a judgment be entered against the Citco Defendants and the Director Defendants for: (a) compensatory and punitive damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT IX

## AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

### (The Director Defendants)

477.   The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 and paragraphs 453 through 475 above as if fully stated herein.

478.   As directors of the Offshore Funds, the Director Defendants had responsibility for and/or voted on issues dealing with the management of the Funds, including having oversight over the investment decisions of Lancer and Lauer.

479.   The Director Defendants were at all times employed by and acting for the Citco Defendants and were dominated and controlled by the Citco Defendants when acting and voting as directors of the Funds.

480.   When the directors acquiesced in Lauer and Lancer's investment strategy–and approved the inflated NAVs despite knowing they were baseless and inflated–they were, therefore, doing so–or failing to act–on behalf and for the benefit of the Citco Defendants.

481.   Thus, the Citco Defendants, through the Director Defendants who they controlled, were dealing with issues relating to the management and investment decisions of the Funds.  And

these were issues unrelated to the valuation of the assets of the Funds as well as the other administrative duties in the Citco Agreements.

482.    Since the Citco Defendants, by controlling the directors, being involved in decisions, and having control over the management and investment of the Funds, went beyond the duties and subject matter of the Citco Agreements, the Citco Defendants established a "special relationship" or developed "special circumstances" sufficient to become a fiduciary–i.e., they undertook to counsel and advise the Funds and went above and beyond a ministerial administrative role.

483.    Their acquiescence and approval of Lauer's misconduct in inflating the Funds' NAV and Lauer's investments decision constitutes a breach of the Citco Defendants fiduciary duty, especially because investment and management decisions are not contemplated by the Citco Agreements, and these decisions were not related to the valuation of the Funds.

484.    Accordingly, the Citco Defendants, and the Director Defendants, as directors of the Offshore Funds, owed one or more of the following fiduciary duties to the Offshore Funds that are separate and distinct from Citco's contractual obligations: the duty to ensure that its independent pricing and valuation of the Funds' NAV would be accurate and fair; the duty to ensure that the Offshore Funds' boards was free from conflicts of interest and act in the best interest of the Funds at all times; the duty to perform due diligence, to counsel, advise, inform, and protect the Funds from Lauer's misconduct and the resulting deepening insolvency; the duty to value the NAVs in accordance with GAAP; the duty to independently price the Offshore Funds; the duty to independently verify the valuations stated by Lauer; the duty to discover the incorrect valuations and NAV calculations reported by Lauer; the duty to report Lauer's misconduct and the inflated valuations and NAV calculations reported by Lauer to the

Independent Directors, investors, or appropriate authorities; the duty to be aware of, discover, disclose and/or investigate the "red flags" set forth above; and/or the duty to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

485.    The Citco Defendants and the Director Defendants assumed extra services for the Funds separate and distinct from Citco's contractual obligations by suggesting valuation techniques to Lauer and Lancer as a means to validate the inflated NAV despite their actual knowledge that the NAV was baseless and unsupported by reality.  Further, the Citco Defendants and the Director Defendants worked in concert with Lauer, Lancer, and the Funds' auditor in an attempt to avoid liability for their knowing, willful, and reckless, and/or grossly negligent inflation of the Funds' NAV for their own pecuniary gain.

486.    The Citco Defendants and the Director Defendants received a greater economic benefit from administering the Offshore Funds than from other similar and typical hedge fund administrations.

487.    The Citco Defendants exercised extensive control and dominated the decisions of the Director Defendants, and each Defendant directly participated in the administration of the Offshore Funds and the misconduct at issue, as detailed herein.

488.    The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties to the Offshore Funds by: approving Lauer's investment decisions despite actual knowledge that Lauer's decisions were damaging the Funds; approving Lauer's mismanagement of the Funds despite actual knowledge of the mismanagement and the damages wrought to the Funds; failing to perform due diligence; failing to replace Lauer as investment manager; failing to value the NAVs in accordance with GAAP; failing to independently price the Offshore Funds; failing to independently verify the

valuations stated by Lauer; failing to discover the incorrect valuations and NAV calculations reported by Lauer; failing to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate authorities; failing to be aware of, discover and/or investigate the "red flags" set forth above; and/or failing to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

489.    The Director Defendants had actual knowledge of the above-mentioned breaches of fiduciary duty committed by the Citco Defendants, as well as each other's breaches of fiduciary duty.

490.    The Director Defendants provided substantial assistance to the Citco Defendants and to each other in carrying out these breaches, encouraged the Citco Defendants' and each other's wrongdoing, and/or aided and abetted the Citco Defendants and each other in breaching their fiduciary duty or duties to the Offshore Funds by willfully, knowingly, consciously, recklessly, and/or with gross negligence: approving Lauer's investment decisions despite actual knowledge that Lauer's decisions were damaging the Funds; approving Lauer's mismanagement of the Funds despite actual knowledge of the mismanagement and the damages wrought to the Funds; failing to replace Lauer as investment manager; failing to perform due diligence; disseminating false and inflated NAVs despite knowing the Lauer had provided them with bogus valuations for their own pecuniary benefit; endorsing the false and inflated NAVs as independently certified knowing that the Funds would rely on Citco's certification; failing to value the NAVs in accordance with GAAP; failing to independently price the Offshore Funds; failing to independently verify the valuations stated by Lauer; failing to discover the incorrect valuations and NAV calculations reported by Lauer; failing to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate

authorities; failing to be aware of, discover, and/or investigate the "red flags" set forth above; and/or failing to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

491.    Because the Director Defendants aided and abetted the breaches of fiduciary duty by (i) the Citco Defendants and (ii) each other, they are also liable for these breaches of fiduciary duty.

492.    The Director Defendants and the Citco Defendants committed the above-mentioned breaches even though they knew that their course of conduct would probably, most likely, and/or imminently result in injury to the Offshore Funds.

493.    The Director Defendants and the Citco Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage would result from it and/or that their conduct placed the Offshore Funds in clear and present danger that was likely to result in grave injury to the Offshore Funds.

494.    Despite this knowledge, they intentionally, consciously, voluntarily, and willfully performed their course of conduct and failed to perform their requisite duties and/or comply with their duty of care.

495.    The Director Defendants and the Citco Defendants' conduct was so egregious as to rise to the level of intentional misconduct or gross negligence.

496.    The Citco Defendants and the Director Defendants actively participated in their misconduct.

497.    The officers, directors, or managers of the Citco Defendants and the Director Defendants knowingly participated in, condoned, ratified, or consented to such conduct.

498.    But for the Citco Defendants' and Director Defendants' gross negligence, willful misconduct, and/or reckless disregard for their duties, Lauer could not have continued to perpetrate harm upon the Offshore Funds.

499.    The substantial assistance and encouragement provided by the Director Defendants, which enabled the Citco Defendants and each individual Director Defendant to breach their fiduciary duty or duties, proximately caused damages to the Offshore Funds.  These damages include, but are not limited to, the following:

a.    The Offshore Funds were depleted by paying tens of millions of dollars in management, incentive, and administrative fees to Lancer Management, Lauer, and the Citco Defendants, and in some cases, finder's fees to agents–all based on inaccurate NAVs that the Citco Defendants and Director Defendants provided.

b.    The Offshore Funds were depleted by making continuing "investments" in various portfolio companies in 2001 and beyond, well after the Citco Defendants and the Director Defendants should have known that the value of these companies was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.

c.    The Offshore Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated by the Citco Defendants and the Director Defendants based on the inflated and erroneous NAVs.

d.    The Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

WHEREFORE, the Receiver prays that a judgment be entered against the Director Defendants for: (a) compensatory and punitive damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT X

## AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

### (The Citco Defendants)

500.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 and paragraphs 453 through 475 above as if fully stated herein.

501.    The Director Defendants owed the Offshore Funds express fiduciary duties because they served on the boards of the Offshore Funds.  Further, the Citco Defendants each individually owed the Funds fiduciary duties.  However, the Citco Defendants and the Director Defendants' interests were irreconcilably adverse to those of the Offshore Funds because the Director Defendants were employed and controlled by The Citco Group and Citco N.V. while they served on the Funds' boards.  Furthermore, the applicable fee structure between the Funds and Citco created an incentive for the Director Defendants and the Citco Defendants to artificially inflate the NAVs for their own personal gain, and for their employers' personal gain to the detriment of the Offshore Funds.

502.    Accordingly, each Citco Defendant and the Director Defendants, as directors of the Offshore Funds, owed one or more of the following fiduciary duties to the Offshore Funds: the duty to ensure that its independent pricing and valuation of the Funds' NAV would be accurate and fair; the duty to ensure that the Offshore Funds' boards was free from conflicts of interest and act in the best interest of the Funds at all times; to counsel, advise, inform, and protect the Funds from Lauer's misconduct and the resulting deepening insolvency; the duty to value the NAVs in accordance with GAAP; the duty to independently price the Offshore Funds; the duty to independently verify the valuations stated by Lauer; the duty to perform due diligence, the duty to discover the incorrect valuations and NAV calculations reported by Lauer;

the duty to report Lauer's misconduct and the inflated valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate authorities; the duty to be aware of, discover, disclose, and/or investigate the "red flags" set forth above; and/or the duty to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

503.    The Director Defendants and the Citco Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their fiduciary duties to the Offshore Funds by: approving Lauer's investment decisions; approving Lauer's mismanagement of the Funds; failing to replace Lauer as investment manager; failing to value the NAVs in accordance with GAAP; failing to independently price the Offshore Funds; failing to independently verify the valuations stated by Lauer; failing to discover the incorrect valuations and NAV calculations reported by Lauer; failing to perform due diligence; failing to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate authorities; failing to be aware of, discover, and/or investigate the "red flags" set forth above; and/or failing to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

504.    The Citco Defendants had knowledge of the above-mentioned breaches of fiduciary duty committed by the Director Defendants and by each other.

505.    The Citco Defendants had a high conscious intent to aid and abet each other's and the Director Defendants' breaches of fiduciary duty.  Specifically, the Citco Defendants actively provided substantial assistance to the Director Defendants and each other in carrying out these breaches, encouraged each other's and the Director Defendants' wrongdoing, and/or aided and abetted each other and the Director Defendants in breaching their fiduciary duty or duties to the Offshore Funds by willfully, knowingly, consciously, recklessly, and/or with gross negligence:

approving Lauer's investment decisions despite actual knowledge that Lauer's decisions were damaging the Funds; approving Lauer's mismanagement of the Funds despite actual knowledge of the mismanagement and the damages wrought to the Funds; failing to replace Lauer as investment manager; disseminating false and inflated NAVs despite knowing the Lauer had provided them with bogus valuations for their own pecuniary benefit; endorsing the false and inflated NAVs as independently certified knowing that the Funds would rely on Citco's certification; failing to value the NAVs in accordance with GAAP; failing to independently price the Offshore Funds; failing to independently verify the valuations stated by Lauer; failing to discover the incorrect valuations and NAV calculations reported by Lauer; failing to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate authorities; failing to perform due diligence; failing to be aware of, discover, and/or investigate the "red flags" set forth above; and/or failing to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

506.    Because the Citco Defendants aided and abetted the breaches of fiduciary duty by (i) the Director Defendants and (ii) each other, they are also liable for the breaches of fiduciary duty.

507.    The Citco Defendants and the Director Defendants committed the above-mentioned breaches even though they knew that their course of conduct would probably, most likely, and/or imminently result in injury to the Offshore Funds.

508.    The Citco Defendants and the Director Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage would result from it and/or that their conduct placed the Offshore Funds in clear and present danger that was likely to result in grave injury to the Offshore Funds.

509.    Despite this knowledge, they intentionally, consciously, voluntarily, and willfully performed their course of conduct and failed to perform their requisite duties and/or comply with their duty of care.

510.    The Citco Defendants' and the Director Defendants' conduct was so egregious as to rise to the level of intentional misconduct or gross negligence.

511.    The Citco Defendants and the Director Defendants actively participated in their misconduct.

512.    The officers, directors, or managers of the Citco Defendants and the Director Defendants knowingly participated in, condoned, ratified, or consented to such conduct.

513.    But for the Citco Defendants' and Director Defendants' gross negligence, willful misconduct, and/or reckless disregard for their duties, Lauer could not have continued to perpetrate harm upon the Offshore Funds.

514.    The substantial assistance and encouragement provided by the Citco Defendants, which enabled the Director Defendants to breach their fiduciary duty or duties, proximately caused damages to the Offshore Funds.  These damages include, but are not limited to, the following:

    a.    The Offshore Funds were depleted by paying tens of millions of dollars in management, incentive, and administrative fees to Lancer Management, Lauer, and the Citco Defendants, and in some cases, finder's fees to agents–all based on inaccurate NAVs that the Citco Defendants and Director Defendants provided.

    b.    The Offshore Funds were depleted by making continuing "investments" in various portfolio companies in 2001 and beyond, well after the Citco Defendants and the Director Defendants should have known that the value of these companies was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.

    c.    The Offshore Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated by the Citco Defendants and the Director Defendants based on the inflated and erroneous NAVs.

    d.    The Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

WHEREFORE, the Receiver prays that a judgment be entered against the Citco Defendants for: (a) compensatory and punitive damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT XI

## AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

### (The Citco Defendants and Director Defendants)

515.    The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 and paragraphs 453 through 475 above as if fully stated herein.

516.    Lauer owed a fiduciary duty to the Offshore Funds.  Specifically, he owed one or more of the following fiduciary duties: the duty to accurately value each security in the portfolio and accurately calculate the NAV; the duty to accurately report the value of each security in the portfolio and the NAV calculations; and/or the duty to properly manage the Offshore Funds.

517.    Lauer knowingly, willfully, recklessly, and/or with gross negligence breached his fiduciary duties to the Offshore Funds by willfully, knowingly, recklessly, and/or with gross negligence: incorrectly valuing the securities in the portfolio and incorrectly calculating the NAV; incorrectly reporting the securities in the portfolio and the NAV calculations; and/or mismanaging the Offshore Funds.

518.    The Citco Defendants and the Director Defendants had knowledge of the above-mentioned breach or breaches of fiduciary duty committed by Lauer.

519.    The Citco Defendants and the Director Defendants had a high conscious intent to aid and abet Lauer's breaches of fiduciary duty.  Specifically, the Citco Defendants and the Director Defendants actively provided substantial assistance to Lauer in carrying out these breaches, encouraged Lauer's wrongdoing and/or aided and abetted Lauer in breaching his fiduciary duty or duties to the Offshore Funds by willfully, knowingly, consciously, recklessly, and/or with gross negligence: approving Lauer's investment decisions despite actual knowledge that Lauer's decisions were damaging the Funds; approving Lauer's mismanagement of the Funds; despite actual knowledge of the mismanagement and the damages wrought to the Funds; failing to replace Lauer as investment manager; disseminating false and inflated NAVs despite knowing the Lauer had provided them with bogus valuations for their own pecuniary benefit; endorsing the false and inflated NAVs as independently certified knowing that the Funds would rely on Citco's certification; failing to value the NAVs in accordance with GAAP; failing to independently price the Offshore Funds; failing to independently verify the valuations stated by Lauer; failing to discover the incorrect valuations and NAV calculations reported by Lauer; failing to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors, or appropriate authorities; failing to be aware of, discover and/or investigate the "red flags" set forth above; and/or failing to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

520.    Because the Citco Defendants and Director Defendants aided and abetted the breaches of fiduciary duty by Lauer, they are also liable for the breaches of fiduciary duty.

521.    The Citco Defendants and the Director Defendants committed the above-mentioned breaches even though they knew that their course of conduct would probably, most likely and/or imminently result in injury to the Offshore Funds.

522.    The Citco Defendants and the Director Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage would result from it and/or that their conduct placed the Offshore Funds in clear and present danger that was likely to result in grave injury to the Offshore Funds.

523.    Despite this knowledge, they intentionally, consciously, voluntarily, and willfully performed their course of conduct and failed to perform their requisite duties and/or comply with their duty of care.

524.    The Citco Defendants' and the Director Defendants' conduct was so egregious as to rise to the level of intentional misconduct or gross negligence.

525.    The Citco Defendants and the Director Defendants actively participated in their misconduct.

526.    The officers, directors, or managers of the Citco Defendants and the Director Defendants knowingly participated in, condoned, ratified, or consented to such conduct.

527.    But for the Citco Defendants' and Director Defendants' gross negligence, willful misconduct, and/or reckless disregard for their duties, Lauer could not have continued to perpetrate harm upon the Offshore Funds.

528.    The substantial assistance and encouragement provided by the Citco Defendants and the Director Defendants, which enabled Lauer to breach his fiduciary duty or duties, proximately caused damages to the Offshore Funds.  These damages include, but are not limited to, the following:

    a.    The Offshore Funds were depleted by paying tens of millions of dollars in management, incentive, and administrative fees to Lancer Management, Lauer, and the Citco Defendants, and in some cases, finder's fees to agents–all based on inaccurate NAVs that the Citco Defendants and Director Defendants provided.

    b.    The Offshore Funds were depleted by making continuing "investments" in various portfolio companies in 2001 and beyond, well after the Citco Defendants

and the Director Defendants should have known that the value of these companies was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.

c.   The Offshore Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated by the Citco Defendants and the Director Defendants based on the inflated and erroneous NAVs.

d.   The Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

WHEREFORE, the Receiver prays that a judgment be entered against the Citco Defendants and the Director Defendants for: (a) compensatory and punitive damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the Receivership Estate; and (c) for such other relief as the Court deems just and proper.

## COUNT XII

## PROFESSIONAL MALPRACTICE

### (The Citco Defendants and Director Defendants)

529.   The Receiver hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 290 above as if fully stated herein.

530.   The Citco Defendants, as administrators for the Offshore Funds, and the Director Defendants, as employees of the Citco Defendants, owed the Offshore Funds a duty to exercise reasonable care in the performance of their duties as administrators, including without limitation the duty to independently value the Funds' portfolio, to compute the Funds' NAV in accordance with GAAP, and to fulfill the duties set forth in the Articles of Association, the PPM, the Investment Management Agreement, the Sound Practices Manual, and Citco's own risk management controls and valuation policies and procedures.

531.    The Citco Defendants and Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their respective duties to the Offshore Funds by failing to perform the requisite professional services in accordance with the standard of reasonable care required of fund administrators and directors.  The Citco Defendants and the Director Defendants knowingly, willfully, recklessly, and/or with gross negligence breached the standard of reasonable care by willfully, knowingly, consciously, recklessly and/or with gross negligence: failing to exercise even a minimal amount of due diligence; failing to compute the Funds' NAV in accordance with GAAP; failing to fulfill their duties under the Articles of Association, the PPM, the Investment Management Agreement, the Sound Practices Manual, and Citco's own risk management controls and valuation policies and procedures; failing to independently price the Offshore Funds; failing to independently verify the valuations stated by Lauer; failing to discover the incorrect valuations and NAV calculations reported by Lauer; failing to report the incorrect valuations and NAV calculations reported by Lauer to the Independent Directors, investors or appropriate authorities; failing to be aware of, discover and/or investigate the "red flags" set forth above; and/or failing to report the "red flags" set forth above to the Independent Directors, investors, or appropriate authorities.

532.    The Citco Defendants and the Director Defendants' breaches of their respective duties of care owed to the Offshore Funds directly and/or proximately caused damages to the Offshore Funds.  These damages include, but are not limited to, the following:

  a.    The Offshore Funds were depleted by paying tens of millions of dollars in management, incentive, and administrative fees to Lancer Management, Lauer, and the Citco Defendants, and in some cases, finder's fees to agents–all based on inaccurate NAVs that the Citco Defendants and Director Defendants provided.

  b.    The Offshore Funds were depleted by making continuing "investments" in various portfolio companies in 2001 and beyond, well after the Citco Defendants and the Director Defendants should have known that the value of these companies

was grossly inflated and that none of them had significant earnings or reasonable prospects for such earnings.

c.   The Offshore Funds were depleted through satisfaction of redemption requests by investors based on share prices that were calculated by the Citco Defendants and the Director Defendants based on the inflated and erroneous NAVs.

d.   The Offshore Funds were able to remain in operation, incur obligations, and dispose of assets long after they were insolvent, thereby increasing the insolvency and the amount of the debt that the Offshore Funds were unable to repay.

WHEREFORE, the Receiver prays that a judgment be entered against the Citco Defendants and the Director Defendants:  (a) for compensatory damages, plus interest, fees, and costs; (b) declaring the Defendants and any other complicit third parties, including Lauer and other insiders, are precluded from receiving any distribution from the estates of the Offshore Funds (the "Receivership Estate"); and for such other relief as the Court deems just and proper.

Dated: July 22, 2008

HUNTON & WILLIAMS LLP
*Counsel for the Receiver*
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
305-810-2500
305-810-2460 (fax)


By____/s/Courtney Caprio_____
Juan C. Enjamio  (FBN 571910)
Barry R. Davidson  (FBN 107678)
Courtney Caprio  (FBN 933961)

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on July 22, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on Dyanne Feinberg, Esq., Gilbride Heller & Brown, One Biscayne Tower, 15th Floor, 2 South Biscayne Boulevard, Miami, Florida 33131 in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By: <u>   /s/ Courtney Caprio                </u>
Courtney Caprio